1  Michael G. Marderosian, No. 077296
   Heather S. Cohen, No. 263093
2  MARDEROSIAN & COHEN
   1260 Fulton Street
3  Fresno, CA 93721
   Telephone: (559) 441-7991
4  Facsimile: (559) 441-8170

5  Virginia Gennaro, No. 138877
   City Attorney
6  CITY OF BAKERSFIELD
   1501 Truxtun Avenue
7  Bakersfield, CA 93301
   Telephone: (661) 326-3721
8  Facsimile: (661) 852-2020

9  Attorneys for: Defendants CITY OF BAKERSFIELD and JOSEPH GALLAND

10

                   UNITED STATES DISTRICT COURT
11
                   EASTERN DISTRICT OF CALIFORNIA
12

13  JESUS FLORES,                          )  Case No.  1:17-CV-01393-JLT
                                           )
14                   Plaintiffs,           )  **MEMORANDUM OF POINTS AND**
                                           )  **AUTHORITIES IN SUPPORT OF**
15          v.                             )  **DEFENDANTS' MOTION FOR**
                                           )  **SUMMARY JUDGMENT, OR IN THE**
16  CITY OF BAKERSFIELD;                   )  **ALTERNATIVE, PARTIAL SUMMARY**
    JOSEPH GALLAND; and                    )  **JUDGMENT**
17  DOES 1 to 10, inclusive,               )
                                           )  **DATE:  November 25, 2019**
18                   Defendants.           )  **TIME:  9:30 a.m.**
                                           )  **JUDGE:  Jennifer L. Thurston**
19                                         )
                                           )
20  ─────────────────────────────────     )

21

22

23

24

25

26

27

28

MARDEROSIAN & COHEN
1260 Fulton Street
Fresno, CA 93721

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.      INCIDENT AND SUBSEQUENT INVESTIGATION.. . . . . . . . . . . . . . . . . . . . . 2

    B.      CRIMINAL CHARGES, PRELIMINARY HEARING,
               AND CRIMINAL TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.      CHILD PROTECTIVE SERVICES ACTION/
               REMOVAL OF CHILD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.      CIVIL LAWSUIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          1.       Plaintiff's Discovery Responses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          2.       Plaintiff's  Deposition Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          3.       Dr. Naven's Deposition Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          4.       Dr. Hyden's Deposition Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          5.       Plaintiff's Expert Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          6.       Defendant's Expert Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATION OF MEET AND CONFER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.      SUMMARY JUDGMENT IS APPROPRIATE WHERE
               THERE ARE NO GENUINE ISSUES OF MATERIAL FACT. . . . . . . . . . . . . 21

    B.      DEFENDANTS ARE ENTITLED TO SUMMARY
               JUDGMENT AS TO PLAINTIFF'S FIRST CLAIM
               FOR RELIEF – THAT HIS CONSTITUTIONAL RIGHTS
               WERE VIOLATED BY DEFENDANT JOSEPH GALLAND. . . . . . . . . . . . . 22

          1.       The Fact That Plaintiff Was Acquitted or Did Not
                Like the Result of the Investigation Is Not Enough
                to State a 42 U.S.C. § 1983 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          2.       The Issue of Probable Cause Has Already Been
                Judicially Determined (Twice).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              a.      Judge McNamara Has Confirmed There Was
                      Probable Cause to Arrest Thereby Barring
                      Plaintiff's Claim for False Arrest/False Imprisonment. . . . . . . . 24

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

i

b.     Probable Cause Was Determined as a Matter of Law at the Preliminary Hearing................................ 26

3.     Detective Galland Did Not Violate the Plaintiff's Rights by Falsifying or Misrepresenting the Evidence Against Him.................................................. 29

a.     There Is No Evidence That Detective Galland Deliberately Reported  Something He Knew to Be Untrue, or Deliberately Mischaracterized a Witness Statement...................................... 29

b.     There Is No Evidence That Detective Galland Continued the Investigation Despite Knowing That Mr. Flores Was Innocent or That Detective Galland Was Deliberately Indifferent to Mr. Flores' Alleged Innocence. ........................ 31

c.     There Is No Evidence That Detective Galland's "Investigative Techniques Were Coercive or Abusive or That Detective Galland Knew or Was Deliberately Indifferent to the Possibility That Those Techniques Would Yield False Information............................. 31

4.     The Defendants Did Not Violate the Plaintiff's Rights by Prolonging His Prosecution and Incarceration Once Clear Proof of His Innocence Came to Light..................... 34

5.     Detective Galland  Did Not Violate the Plaintiff's Rights by Maliciously Causing Him to Be Prosecuted over a More than Two Year Period. .......................... 36

a.     Probable Cause Defeats This Claim Without Further Analysis.................................. 36

b.     Defendant Galland Did Not Act With Malice Toward The Plaintiff. .................................... 36

c.     The District Attorney Made The Independent Decision To Charge and Prosecute Mr. Flores. .............. 37

d.     The Plaintiff Cannot Overcome the Presumption The Prosecutor Exercised Independent Judgment In Filing Criminal Charges. ........................... 37

6.     Detective Galland Did Not Violate the Plaintiff's Rights By Falsely Labeling and Defaming Him as a Child Abuser .......... 39

7.     Defendant Galland Is Entitled To Qualified Immunity. .............. 41

C.     DETECTIVE GALLAND IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO HIS CLAIMS THAT DEFENDANTS INTERFERED WITH HIS FAMILIAL RELATIONSHIP......................................... 43

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.    THE PLAINTIFF'S STATE LAW CLAIM FOR FALSE
ARREST/FALSE IMPRISONMENT FAILS FOR THE
SAME REASONS THE PLAINTIFF'S § 1983 CLAIM
FAILS – THERE WAS PROBABLE CAUSE TO ARREST. . . . . . . . . . . . . . . 46

E.    THE PLAINTIFF'S  CLAIM FOR NEGLIGENCE
FAILS AS A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

G.    THE PLAINTIFF'S CLAIM FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS FAILS
AS A MATTER OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

H.    DOES 1 THROUGH 10 SHOULD BE DISMISSED. . . . . . . . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

MARDEROSIAN & COHEN
1260 Fulton Street
Fresno, CA 93721

1

**TABLE OF AUTHORITIES**

Page(s)

2

**CASES**

3  *Allen v. McCurry*, 449 U.S. 90 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

4  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

5  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

6  *Awabdy v. City of Adelanto*, 368 F.3 1062 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

7  *Ayala v. KC Envtl. Health*, 426 F. Supp 2d 1070 (E.D. CA 2006). . . . . . . . . . . . . . . . . . . . . . . 36

8  *Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

9  *Baker v. McCollan,* 443 U.S. 137 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10  *Board of Regents v. Roth*, 408 U.S. 564 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

11  *Beckway v. DeShong*, 717 F. Supp. 2d 908 (N.D. CA 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

12  *Bey v. City of Glendale*, 2015 U.S. Dist. LEXIS 170864 (C.D. CA Sep. 29, 2015). . . . . . . . . . 40

13  *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

14  *Black v. Montgomery Cty.*, 835 F.3d 358 (3d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

15  *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 36

16  *Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

17  *Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18  *Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

19  *Brown v. Selfridge*, 224 U.S. 189 (1912). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

20  *Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

21  *Celotex Corp., v. Catrett*, 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

22  *Chavez v. County of Kern*, 2014 U.S.Dist.LEXIS 13193 (E.D. CA Feb. 3, 2014). . . . . . . . . . . . 21

23  *Chen v. D'Amico*, 2019 U.S. Dist. LEXIS 88063 (W.D. WA May 24, 2019). . . . . . . . . . . . . . . 42

24  *Chism v. Washington*, 661 F.3d 380 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

25  *City & Cnty of San Francisco v. Sheehan*, 135 S. Ct. 1765 (Mar. 23, 2015). . . . . . . . . . . . . . . 42

26  *City of Simi Valley v. Superior Court*, 111 Cal. App. 4th 1077 (2003). . . . . . . . . . . . . . . . . . . . 47

27  *Cochran v. Cochran*, 65 Cal. App. 4th 488 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

28  *Conrad v. United States*, 447 F.3d 760 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

iv

*Constanich v. Washington*, 2008 U.S. Dist. Lexis 36086 (W.D. WA May 2, 2008).. . . . . . . . . 23

*Cooley v. City of Walnut Creek*,
2018 U.S. Dist. LEXIS 205358 (N.D. CA  Dec. 4, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Cooper v. Dupnik*, 924 F.2d 1520 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 44

*Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069 (N.D. CA 2008). . . . . . . . . . . . . . . . . . . . . 48

*Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Croft v. Westmoreland Cnty. Children & Youth Servs*., 103 F.3d 1123 (3d Cir. 1997).. . . . . . . . 44

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 32, 33

*Daniels v. Quintard*, 2018 U.S. Dist. LEXIS 224530 (C.D. CA Sep. 12, 2018). . . . . . . . . . . . . 38

*Davidson v. City of Westminster*, 32 Cal. 3d 197 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*De Anda v. City of Long Beach,* 7 F.3d 1418 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Douglas v. Oregonian Pub. Co.*, 465 F. App'x 714 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . 40

*Eberhard v. California Highway Patrol*, 73 F.Supp.3d 1122 (N.D. CA 2014).. . . . . . . . . . . . . . 40

*Elder v. Holloway* 510 U.S. 510 (1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ervin v. Cty of San Diego*, 2019 U.S. Dist. Lexis 171492 (S.D. CA Oct. 2, 2019). . . . . . . . . . . 43

*Estate of Tucker ex. rel. Tucker v. Interscope Records Inc.,*
515 F.3d 1019 (9th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Flores v. Satz*, 137 F.3d 1275 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Forte v. Merced Cty*., 2016 U.S. Dist. LEXIS 106561 (E.D. CA Aug. 11, 2016). . . . . . . . . . . . 35

*Frazier v. Cupp*, 394 U.S. 731 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Galvin v. Hay*, 374 F.3d 739 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Gantt v. City of Los Angeles* 717 F.3d 702 (9th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gausik v. Perez*, 345 F.3d 813 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gerstein v. Pugh*, 420 U.S. 103 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gillespie v. Civiletti*, 629 F. 2d 637 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

v

1  *Gini v. Las Vegas Metro Police Dep't*, 40 F.3d 1041 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 23

2  *Goss v. Lopez,* 419 U.S. 565 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3  *Hand v. Gary*, 838 F.2d 1420 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

4  *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

5  *Harper v. City of L.A*, 533 F.2d 1010 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

6  *Harris v. Smith*, 157 Cal. App. 3d 100 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

7  *Hartman v Moore*, 547 U.S. 250 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

8  *Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

9  *Henry v. United States*, 361 U.S. 98, 103 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

10 *Herb Hallman Chevrolet v. Nash-Holmes*, 169 F.3d 636 (9th Cir. 1999). . . . . . . . . . . . . . . . . . 39

11 *Hervey v. Estes*, 65 F.3d 784 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

12 *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

13 *Hoffman v. Gibson*, 2017 U.S. Dist. LEXIS 128183 (S.D. CA Aug. 11, 2017). . . . . . . . . . . . . . 26

14 *Hughes v. Pair*, 46 Cal. 4th 1035 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

15 *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

16 *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

17 *Jeffers v. Gomez*, 267 F.3d 895 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 *Johnson v. Cty. of Santa Clara*, 2019 U.S. Dist. LEXIS 64373 (N.D. CA Apr. 15, 2019). . . . . . 26

19 *Jones v. City of Santa Monica*, 382 F.3d 1052 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

20 *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

21 *King v. Jones*, 824 F.2d 324 (4th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

22 *Koistra v. Cty. of San Diego*, 310 F. Supp. 3d 1066 (S.D. CA 2018). . . . . . . . . . . . . . . . . . . . . . 46

23 *Lassiter v. City of Bremerton,* 556 F.3d 1049 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

24 *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

25 *Lies v. Farrell Lines, Inc.*, 641 F.2d 765 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

26 *Liston v. Cty. of Riverside*, 120 F.3d 965 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

27 *Lucido v. Superior Court,* 51 Cal. 3d 335 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

28 *Malley v. Briffs*, 475 U.S. 335 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1   *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2   *Maryland v. Pringle*, 540 U.S. 366 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).. . . . . . . . . . . . . . . . 22

4   *Mazzeo v. Gibbons*, 649 F.Supp.2d 1182 (D. NV 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

5   *McClurg v. Maricopa Cnty.*, 2012 U.S. Dist. LEXIS 121042 (D. AZ Aug. 27, 2012). . . . . . . . . 44

6   *McCune v. City of Grand Rapids*, 842 F.2d 903 (6th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . 35

7   *Mills v. Super. Ct.*, 42 Cal. 3d 951 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8   *Molko v. Holy Spirit Assoc.*, 46 Cal.3d 1092 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

9   *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192 (S.D. CA 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 21

10  *Morgan v. Gertz*, 166 F.3d 1307 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

11  *Mueller v. Auker*, 700 F.3d 1180 (9th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

12  *Mullenix v. Luna*, 136 S. Ct. 305 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

13  *Newman v. Cty. of Orange*, 457 F.3d 991 (9th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . 28, 38

14  *Ooley v. Citrus Heights Police Dep't*, 603 F. App'x 628 (9th Cir. 2015). . . . . . . . . . . . . . . . . 40

15  *Oppenheimer v. City of Los Angeles*, 104 Cal.App.2d 545 (1951). . . . . . . . . . . . . . . . . . . . . . 47

16  *Ortiz v. Uribe*, 671 F.3d 863 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

17  *Pallas v. Accornero*, 2019 U.S. Dist. Lexis 93569 (N.D. CA June 3, 2019).. . . . . . . . . . . . . . . 47

18  *Partington v. Gedan*, 961 F.2d 852 (9th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

19  *Patterson v. City of Utica*, 370 F.3d 322 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

20  *Patterson v. City of Yuba City*, 884 F.3d 838 (9th Cir. 2018).. . . . . . . . . . . . . . . . . . . . . . . . . . 26

21  *Patterson v. City of Yuba City*, 748 F. App'x 120 (9th Cir. 2018).. . . . . . . . . . . . . . . . . . . . . . . 26

22  *Patterson v. New York,* 432 U.S. 197 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

23  *Paul v. Davis*, 424 U.S. 693 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

24  *Pearson v. Callahan*, 129 S.Ct. 808 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

25  *Pollard v. Galaza*, 290 F.3d 1030 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

26  *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

27  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 48

28  *Price v. County of San Diego*, 990 F. Supp. 1230 (S.D. CA 1998). . . . . . . . . . . . . . . . . . . . . . . 47

*Puccetti v. Spencer*, 476 F. App'x 658 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rangel v. Bridgestone Retail Operations, LLC*, 200 F. Supp. 3d 1024 (C.D. CA 2016). . . . . . . 48

*Ravel v. Hewlett-Packard Enterprise, Inc.*,
228 F. Supp. 3d 1086, 2017 U.S. Dist. LEXIS 4299 (E.D. CA Jan. 11, 2017). . . . . . . . . . . . . . 47

*Rehberg v. Paulk*, 611 F.3d 828 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Romero v. Kitsap County* 932 F.2d 624 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Salazar v. Upland Police Dept.*, 116 Cal. App.4th 934 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sanders v. City of Fresno*, 551 F.Supp.2d 1149 (E.D. CA 2008). . . . . . . . . . . . . . . . . . . . . . . . 47

*Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972 (8th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . 23

*Santosky v. Kramer*, 455 U.S. 745 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Saucier v. Katz*, 55 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Schedelbower v. Estelle*, 885 F.2d 570 (9th Cir. 1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Siegert v. Gilley*, 500 U.S. 226 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Slusher v. City of Napa*, 2015 U.S. Dist. LEXIS 166565 (N.D. CA Dec. 10, 2015). . . . . . . . . . 45

*Smiddy v. Varney*, 803 F.2d 1469 (9th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Souliotes v. City of Modesto*, 2016 U.S. Dist. Lexis 84729 (E.D. CA June 29, 2016). . . . . . . . . 23

*Spence-Jones v. Rundle*, 991 F. Supp. 2d 1221 (S.D. FL 2013). . . . . . . . . . . . . . . . . . . . . . . . . 40

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 42

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987). . . . . . . 22

*Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Tavakoli v. City of Los Angeles*, 2019 U.S. Dist. LEXIS 47331 (C.D. CA Mar. 18, 2019). . . . . 26

*Texas v. Brown*, 460 U.S. 730 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Texas v. Thompson*, 70 F.3d 390 (5th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Tyner v. Brunswick Cty. Dep't of Soc. Servs.*, 776 F. Supp. 2d 133 (E.D. NC 2011). . . . . . . . . . 44

*United States v. Agurs*, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Bagley*, 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1    *United States v. Brown*, 582 F.2d 197 (2d. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2    *United States v. Dupuy*, 760 F.2d 1492 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

3    *United States v. Esparza*, 546 F.2d 841 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4    *United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5    *United States v. Leon Guerrero*, 847 F.2d 1363 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . 33

6    *United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

7    *United States v. Miller*, 984 F.2d 1028 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

8    *United States v. Okafor*, 285 F.3d 842 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

9    *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

10   *United States v. Ventresca*, 380 U.S. 102 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

11   *Usher v. City of Los Angeles*, 828 F. 2d 556 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

12   *Valencia v. Cty. of San Bernardino*,
     2017 U.S. Dist. LEXIS 203523 (C.D. CA Dec. 8, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

13   *Ward v. City of Barstow*,  2017 U.S. Dist. LEXIS 178626 (C.D. CA June 23, 2017). . . . . . . . . . 34

14   *Washington v. White*, 2018 U.S. Dist. LEXIS 84215 (N.D. CA May 18, 2018). . . . . . . . . . 28, 35

15   *Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

16   *Whitmore v. Cty. of Los Angeles*,
17   2010 U.S. Dist. LEXIS 148373 (C.D. CA Aug. 9, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

18   *Whittenberg v. Bortolamedi*, 2007 U.S. Dist. Lexis 10587 (E.D. CA Feb. 15, 2007). . . . . . . . . 32

19   *Wige v. City of L.A*, 713 F.3d 1183 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

20   *Wilkins v. National Broad. Co., Inc*., 71 Cal. App. 4th 1066 (1999). . . . . . . . . . . . . . . . . . . . . . 47

21   *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

22   *Wilson v. City of Bakersfield*,  2017 U.S. Dist. LEXIS 201009 (E.D. CA Dec. 6, 2017). . . . . . . 46

23   *Wisconsin v. Constantineau*, 400 U.S. 433 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

24   *Wong Sun v. United States*, 371 U.S. 471, 482 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25   *Woodrum v. Woodward County*, 866 F.2d 1121 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . 43, 44

26   *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . 21, 22

27   *Wright v. Lehman*, 5 Fed. Appx 654 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

28   *Yarris v. County of Delaware*, 465 F.3d 129 (3d. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1 | *Younger v. Harris*, 401 U.S. 37 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2 | *Zamos v. Stroud*, 32 Cal. 4th 958 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3 | **STATUTES**

4 | 42 United States Code Section 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

5 | California Penal Code Section 836. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

6 | California Penal Code Section 847. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

7 | Federal Rule of Civil Procedure 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

8 | Federal Rule of Civil Procedure 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9 | United States Constitution Amendment XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1   COMES NOW, Defendants City of Bakersfield and Joseph Galland and hereby submit the

2   following Memorandum of Points and Authorities in Support of their Motion for Summary Judgment

3   or, in the Alternative, Summary Adjudication.

4   **INTRODUCTION**

5   Plaintiff's position appears, on its face, to be an emotionally compelling one.  A young man,

6   who claims he wanted nothing more to be a good father, was arrested, incarcerated, and prosecuted

7   for child abuse crimes.  The Plaintiff contends that the lead detective, Defendant Joseph Galland,

8   falsified evidence, withheld exonerating evidence, and coerced a false confession from Mr. Flores to

9   prove the Plaintiff guilty, all in violation of his constitutional rights.  Mr. Flores was incarcerated for

10   approximately two years before he was ultimately acquitted and during the pendency of the criminal

11   proceedings, the child was put up for adoption following an investigation conducted by Child

12   Protective Services.

13   However, contrary to the position taken by the Plaintiff in this case, the Constitution does not

14   guarantee only the guilty will be arrested, nor does the criminal justice system guarantee only the

15   innocent are acquitted.  Moreover, merely being acquitted of criminal charges, does not entitle the

16   acquitted to make a 42 U.S.C. § 1983 claim.

17   While the Plaintiff seems to want to make this case about the fact that there is a dispute in the

18   medical science and that the doctors in this case mis-diagnosed M.F. as being abused[1], the Plaintiff

19   did not sue the doctors involved.  Instead, the Plaintiff sued the police officer who relied on the

20   medical expertise of two well qualified doctors who saw and treated M.F.  Whether or not these

21   doctors were correct – that M.F. was the victim of child abuse – is not really an issue in this case and

22   to the extent the Plaintiff attempts to create a genuine issue of material fact by proffering evidence to

23   the contrary, such evidence is completely irrelevant and is a red herring.  This is not the criminal case

24   where the Plaintiff had to demonstrate that the case against him did not rise to the level of being

25   "beyond a reasonable doubt".

26   ///

27

28

---

[1] Indeed, the Plaintiff designated two retained experts to testify about M.F.'s medical conditions and why such conditions did not necessarily indicate abuse.

1    Instead, the primary questions in this case are:  (1) whether Defendant Galland had probable

2    cause to arrest the Plaintiff based on a thorough investigation which included consultation with

3    medical professionals (one of whom was the Medical Director of The Guilds Child Abuse Prevention

4    and Treatment Center at Valley Children's Hospital in Madera and a board certified child abuse

5    pediatrician) and (2) whether Defendant Galland acted with malice in initiating the prosecution against

6    him or whether the initiation of the criminal case was pursuant to an independent decision made by

7    the District Attorney.  The Plaintiff alleges a number of derivative claims – that he was defamed by

8    being labeled a "child abuser," that he was the subject of a coercive interrogation, that Defendant's

9    conduct deprived him of his familial relationship with M.F., etc.

10    However, none of these claims are supported by either the evidence or the law and as such, the

11    Defendants' Motion for Summary Judgment should be granted in its entirety.

12    **STATEMENT OF FACTS**

13    **A.    INCIDENT AND SUBSEQUENT INVESTIGATION**

14    On May 21, 2015 at approximately 4:14 p.m., Bakersfield Police and Fire responded to 8709

15    Domingo Street regarding a request for medical aid for a two-month old boy (referred to herein as

16    M.F.) who had trouble breathing.  [JSUF[2] No. 1 and 2.]

17    At approximately 5:15 p.m., Bakersfield Police Detective Joseph "Mitch" Galland[3] was

18    advised that there was a possible child abuse incident and that the baby was at Memorial Hospital.

19    [JSUF No. 3.]  Detective Galland prepared a report detailing his investigation into this incident.

20    [JSUF No. 4.]

21    Detective Galland and Sergeant Burdick responded to Bakersfield Memorial Hospital and upon

22    their arrival, they learned that M.F. had been placed in a medically induced coma and was on a

23    ventilator.  [DSUF No. 1[4].]  Upon his arrival, Detective Galland spoke with Dr. Burny, a pediatric

24    specialist, and then with emergency room physician, Dr. Wade Naven, the attending physician.

25

26    _____

[2]"JSUF refers to the accompanying Joint Statement of Undisputed Facts.

27

[3] At the time of this incident, Joseph Galland was a detective with the Bakersfield Police Department. He has

28    since been promoted to Sergeant. However, for purposes of this motion, he will be referred to as a detective.

[4]DSUF refers to the accompanying Defendant's Statement of Undisputed Facts.

1   [DSUF No. 2.]  Dr. Naven advised Detective Galland that M.F. had injuries to his brain and that Dr.

2   Naven was very worried that M.F. was the victim of child abuse.  [DSUF No. 3.]  Dr. Naven showed

3   Detective Galland M.F.'s CT Scan depicting multiple hematomas because Dr. Naven felt even a "non-

4   medical person could see" that it was not normal.  [DSUF No. 4.]  Dr. Naven diagnosed M.F. with

5   "non-accidental trauma" and  had a "**strong belief" that M.F. had been abused "over the course**

6   **of the last two and a half months since birth repeatedly**."   [DSUF No. 5.]

7          Dr. Naven prepared a report which noted multiple subdural hematomas, the majority of which

8   contain acute hemorrhage mixed with additional hemorrhage of varying ages.  The diagnoses were as

9   follows: (1) Subdural hematoma; (2) Evaluate non-accidental trauma; and (3) Respiratory alkalosis

10   with metabolic acidosis.  [DSUF No. 6.]

11          Since Detective Galland was not/is not a medical doctor, he relied on what Dr. Naven had

12   communicated to him in terms of what was shown on the CT and that M.F.'s injuries were "non

13   accidental".  Detective Galland's report states that he "asked Dr. Naven how recent the acute brain

14   injuries had been caused and he stated he believed the injuries were no more than 2 hours old."[5]

15   [DSUF No. 7.]

16          Detective Galland proceeded to see M.F. and took digital photographs depicting bruising on

17   M.F.'s left and right cheeks.  [DSUF No. 10.]  Dr. Naven told Detective Galland he did not believe

18   the bruising on M.F.'s cheeks was caused by CPR.  [JSUF No. 5.]

19          Detective Galland made contact with M.F.'s mother, Sara Guzman.  This interview was

20   digitally recorded and booked into evidence and detailed in Detective Galland's report.  [JSUF No.

21   6.]  Ms. Guzman advised Detective Galland that M.F. had no medical problems or allergies that she

22   was aware of and had been seen about a month earlier for a checkup.  Detective Galland also asked

23   Ms. Guzman about M.F.'s schedule that day and she indicated that she and her mother, aunt, and

24   cousins had left the house around 2 p.m. to get a haircut and look at a gym memberships, leaving M.F.

25
26          ――――――――――――――――
27          [5] On Jul 6, 2017, two years after his discussion with Detective Galland, Dr. Naven testified in the criminal
     case that he didn't remember specifically telling Sergeant Galland that the acute subdural hematoma could be as recent
     as two hours but "**it definitely could have**." [DSUF No. 8.]  At the time of his deposition on April 16, 2019, four
28   years after the discussion with Detective Galland, Dr. Naven testified that he didn't "have a direct recollection of
     saying that to him.  In – my standard practice would be to say " within a few hours" and that he believed the acute
     injury had occurred "within the last few hours." [DSUF No. 9.]

1    alone with Plaintiff Jesus Flores.  Ms. Guzman indicated that they returned to the residence around

2    3:00 or 3:15 p.m., at which point Ms. Guzman and her mother left to go to the Farmer's Market and

3    that Ms. Guzman's aunt and cousins also left, again leaving M.F. alone with Plaintiff Jesus Flores.

4    [DSUF No. 11.]  Detective Galland also obtained a medical release for M.F.'s medical records from

5    Bakersfield Memorial Hospital from Ms. Guzman.  [JSUF No. 7.]

6         Detective Galland re-contacted Dr. Naven who advised that M.F. was being transferred to

7    Valley Children's Hospital and that M.F. had a reasonable chance of survival but indicated he thought

8    there was a high probability the child would suffer significant permanent brain damage as a result of

9    the injuries.  [DSUF No. 12.]  Detective Galland took a copy of the CT Imaging Report so that it could

10   be booked into evidence. [JSUF No. 8.]

11        Following his discussion with Dr. Naven, Detective Galland spoke with Detective McAfee,

12   who was at the subject residence and who was going to return to the police department to author a

13   search warrant.

14        Detective Galland returned to the Bakersfield Police Department and he, along with Detective

15   Davenport, conducted interviews of M.F's family members.  All of these interviews were audio and

16   video recorded and booked into evidence.  In addition, the interviews were summarized in Detective

17   Galland's report.  [DSUF No. 13 and  14.]  From these interviews, it was determined that M.F. was

18   alone with his father, Plaintiff Jesus Flores, from approximately 2:00 p.m to 3:00 or 3:15 p.m. and

19   from approximately 3:40 p.m. or 3:45 p.m. until medical personnel arrived at the residence around

20   4:20 p.m. [JSUF No. 10, DSUF Nos. 15-17.]  In addition, Jose Mendez, M.F.'s grandfather, told

21   Detective Galland that Jesus Flores did not take very good care of the baby because he was always

22   busy playing video games and that he had observed Jesus Flores lose his temper when M.F. was fussy

23   and that Jesus Flores had yelled at M.F. so loudly that the child became startled.  [DSUF No. 18.]

24   In regard to the bruises on both of M.F.'s cheeks, the interviews made it clear to Detective Galland

25   that they pre-existed the CPR that was performed earlier in the day.  [DSUF No. 19.]  In addition, it

26   was disclosed that Mr. Flores takes medicine for stress and has an anti-anxiety prescription which is

27   taken as needed (Alphrazolam).  [DSUF No. 21.]

28   ///

During the interview of Mr. Flores, he recounted the prior couple of days.  Mr. Flores noted that M.F. had been fussy, at least that day, and possibly the day before.  At approximately 1 p.m., Jesus Flores noted that M.F. was being fussy and took him outside to rock him.  Jesus Flores gave M.F. a shower, changed him, and made him a bottle and M.F. then took a nap.  Mr. Flores stated that he was alone with M.F. while everyone else was gone.  After everyone came back and left again, Mr. Flores recounted that M.F. was in his bassinet sleeping when he started coughing and then choking.  Jesus Flores noticed that M.F. stopped breathing.  Jesus Flores picked M.F. up and M.F. started to breathe again and then stopped.  Mr. Flores went to the shower, turned the water on, and splashed some water on M.F.'s face, at which point he gasped and seemed to wake up, but then immediately lost consciousness again.  Mr. Flores stated he called 9-1-1 and performed CPR.  Mr. Flores stated that while he was performing CPR, there seemed to be blood coming out of the baby's nose.  [DSUF No. 21.]

Jesus Flores denied seeing anyone mistreat the baby or get frustrated but as the Detectives continued to question him, admitted that he does sometimes get frustrated and flustered with M.F., but has never been angry.  [DSUF No. 22.]  Mr. Flores admitted that he got frustrated because he cannot seem to make the baby stop crying.  This was frustrating to Mr. Flores because he was supposed to be online playing the live stream video game at 1 p.m. but the baby was still fussy.  [DSUF No. 23.]

During this interview, Mr. Flores was given a doll and asked to demonstrate how he shook Mason Flores.  [DSUF No. 24.]

Detective Galland observed Mr. Flores start as though he was rocking the baby in his lap and then it accelerated and showed a more violent shaking motion.  Based on Detective Galland's observations, as well as his education, training, and experience, he knew that the doll was not that heavy and so it took a significant amount of energy to make the doll's head move.  [DSUF No. 25.]

After Jesus Flores admitted he had become frustrated and could not figure out why M.F. would not stop crying, Mr. Flores told the Detectives:

1.   He didn't "know if it was just like a hard shake.  I don't remember if it was a hard shake or if it was a little shake, it was a medium shake, he was hitting his face against my chest or if it was just like this."  [DSUF No. 26a.]

2.  "I mean, I might've got a little frustrated and been like – you know, calm down or something like –" "and maybe that I shook like a little too hard." [DSUF No. 26b.]

3.  Then I'll admit – I'll admit that the only time that I actually moved him hard was when I was outside in the patio." [DSUF No. 26c.]

4.  "I saw him and he was laid back – I mean, he would just cry, and cry, and cry, and I didn't know what to do, and nobody else knew what to do, and every time I grabbed him, he stays quiet.  He wasn't staying quiet." [DSUF No. 26d.]

5.  "So I didn't know what was wrong with him.  Maybe I did shake him too hard.  Maybe I did it." [DSUF No. 26e.]

6.  "I didn't know I was shaking him too hard.  I was outside in the patio and did it.  I didn't know I was shaking him too hard.  I'm sorry I did that.  I had no intentions in doing that.  I would never hurt my kid on purpose." [DSUF No. 26f.]

7.  "Did I mean to shake him like even if I did shake him hard which I don't remember because I had so much things going on, I had this stream that I was supposed to start and I was late.  I had to fee him.  I changed his poopie, big-o diaper that like weighs five pounds.  He was being fussy still so I tried feeding him.  He didn't eat. I took him outside.  He calmed down for a little bit and then he just started being fussy again and I didn't know what was wrong with him.  I did– you know, try to comfort him and stuff but I didn't know if I was doing it too hard.   It really wasn't and I hate myself for it.  I would never hurt my kid.  My baby is my life.  I didn't know I was shaking him too hard." [DSUF No. 26g.]

This interview of Mr. Flores lasted 85 minutes. [JSUF No. 12.]

The Detectives suspended the interview to consult with the on-scene social worker and Sergeant Burdick.  Since there had been no updated medical information, Detective Galland made the decision not to arrest anyone based on a lack of updated medical information from Children's Hospital.  [DSUF No. 27.]

On May 22, 2015, Detective Galland received medical reports on M.F. from Madera Children's Hospital which reflected that a bone scan had been conducted which showed several fractures to M.F.'s left humerus and both of his femurs, as well as a possible fracture to his left ulna. The medical report classified the injuries as "non accidental trauma".  Additionally, an MRI conducted by Valley Children's Hospital showed several brain injuries and was characterized as "non accidental trauma".   [JSUF No. 13. and DSUF No. 28.]

Detective Galland also spoke briefly with Dr. Phillip Hyden, who was the Medical Director of The Guilds Child Abuse Prevention and Treatment Center at Valley Children's Hospital in Madera ///

1    and a board certified child abuse pediatrician. Dr. Hyden advised that based on what he had seen at

2    that point, there were signs of child abuse. [DSUF No. 29.]

3          On May 25, 2015, Detective Galland received notification from Valley Children's Hospital

4    that M.F.'s eye exam revealed numerous retinal hemorrhages and the child had likely suffered severe

5    irreversible brain damage. [JSUF No. 15.]

6          On May 26, 2015, Detective Galland interviewed M.F.'s mother, Sara Guzman, again.  [JSUF

7    No. 18.]  The interview was video and audio recorded and downloaded into evidence.  This interview

8    was summarized in Detective Galland's Report.  [DSUF No. 30.]  At the outset of the interview,

9    Detective Galland obtained a medical release to obtain M.F.'s records from San Joaquin Memorial

10   Hospital, Bakersfield Memorial Hospital, and Kaiser Medical.  [JSUF No. 19.]  Detective Galland

11   inquired further with Ms. Guzman about whether or not Jesus Flores was ever alone with M.F.  Ms.

12   Guzman confirmed that Mr. Flores was alone with M.F. two times a week.  Detective Galland asked

13   Ms. Guzman who else could have done this and she stated she did not know. [DSUF No. 31.]  Ms.

14   Guzman ruled out her father as causing these problems and expressed concern she may have injured

15   M.F. by picking him up by the arms.  [DSUF No. 32.]  In addition, Ms. Guzman told Detective

16   Galland that Jesus Flores told her that during the time he was taking care of M.F., and during the time

17   M.F. was in respiratory distress, Jesus Flores had anxiety attacks and blacked out.  [DSUF No. 33.]

18         Detective Galland went back over the timeline of events on May 21, 2015 with Ms. Guzman.

19   In addition to leaving M.F. alone with Mr. Flores when she and her family went to look at the gym and

20   when she and her mother went to the Farmer's Market, Jesus Flores was alone with M.F. while Ms.

21   Guzman and her mother were making lunch.  [DSUF No. 34.]  Ms. Guzman stated that when M.F.

22   gets fussy, Jesus Flores usually hands him off but Ms. Guzman did not know what Mr. Flores did

23   when he was unable to hand him off.  [DSUF No. 35.]

24         Later in the afternoon, Detective Galland spoke with Dr. Hyden again.  Dr. Hyden stated he

25   was still in the process of reviewing medical records and had not formed his formal opinion but the

26   injuries that he had seen and the documents strongly indicated that [M.F.] had been abused, and that

27   he had been abused on previous occasions as well.  This was detailed in Detective Galland's report.

28   [DSUF No. 36.]  Detective Galland questioned Dr. Hyden about the window of time in which the

1    injury occurred. Detective Galland's report states that "Dr. Hyden stated that based on the injuries he

2    had seen he would state that it was highly likely that the brain injury which caused [M.F.] to stop

3    breathing likely occurred no more than 10 minutes before [M.F.] stopped breathing and possibly

4    immediately after the injury occurred." [DSUF No. 37.] The only person alone with M.F. during this

5    window of time was Jesus Flores. [DSUF No. 38.]

6        On May 27, 2015 and May 28, 2015, Detective Galland received updates from medical social

7    workers and nurses at Valley Children's Hospital. This was detailed in Detective Galland's Report

8    [DSUF No. 39.]

9        On May 29, 2015 at approximately 2:50 p.m., Jesus Flores was taken into custody. He was

10   transported to the Bakersfield Police Department. He was advised of his *Miranda* rights again and

11   interviewed. The interview was audio and video recorded and put into evidence. A summary of the

12   interview is detailed in Detective Galland's Report. [DSUF No. 40.]

13       During the interview, Detective Galland advised Mr. Flores that the injuries suffered to M.F.'s

14   brain which caused him to go into respiratory distress had likely happened 10 to 15 minutes prior to

15   when M.F. stopped breathing and that he was the person alone with M.F. during that time. Mr. Flores

16   denied shaking M.F. and just said he had rocked him hard, but never shook him. Detective Galland

17   also showed Mr. Flores the picture that Genoveva Ramirez had provided depicting the obvious

18   hemorrhage in M.F.'s eye and advised Mr. Flores that Ms. Ramirez could not have caused it because

19   she had not been at the residence fora week. Jesus Flores said if he had done this, even by accident,

20   then he should be taken to jail. [DSUF No. 41.] This interview lasted 82 minutes. [JSUF No. 20.]

21       When it became clear to Detective Galland that Jesus Flores had no intention of explaining the

22   incident or taking any type of responsibility, and continued to talk in circles and blame others,

23   Detective Galland ended the interview and arrested Mr. Flores for: (1) child abuse causing significant

24   brain injury or paralysis; (2) violation of Penal Code 243a(a) – wilful harm or injury to a child; and

25   (3) violation of penal code 245(a)(4) – assault resulting in great bodily harm. This was detailed in

26   Detective Galland's Police Report. [DSUF No. 42.]

27       Detective Galland testified that the arrest was based on "specific articulable facts provided to

28   him by medical professionals and no alternate explanation." [DSUF No. 43.]

1      On May 29, 2015 at approximately 4:22 p.m., Detective Galland submitted the Kern County

2  – Arietis form stating as follows:

> On 4/21/15 [sic] the victim, a 2 month old infant, was brought to the hospital in respiratory distress and with bruises on his face. Medical testing revealed the child had an acute brain injury. Follow-up medical testing showed numerous prior brain injuries and fractures in various states of healing. Medical experts have determined the child has suffered severe, permanent brain injury, and is currently in a coma being kept alive with a ventilator. Medical experts determined the child had suffered the most recent brain injuries as little as 10 minutes prior to the onset of the respiratory distress that prompted the call to 911. The only person alone with the child during the time period the injury occurred was the father, JESUS FLORES. Under Miranda, JESUS FLORES admitted to shaking the baby due to his frustration.
>
> [JSUF No. 21.]

      The Probable Cause Declaration was "Approved by Judge" on May 29, 2015 at 5:02 p.m and signed by Judge Brian McNamara on May 30, 2015 at 12:02 a.m.  [JSUF No. 22.]

      On June 1, 2015, Detective Galland talked to Jesus Flores's sister in law, Maria Guillen.  This interview was video recorded and put into evidence.  Ms. Guillen reiterated that Sara Guzman thought that her mother, Genoveva Ramirez, had caused injuries to M.F.  This was detailed in Detective Galland's Police Report.  [JSUF No. 23.]

      Later in the day, Detective Galland spoke with Dr. Hyden again who advised that M.F.'s prognosis was likely poor due to a severe traumatic brain injury and that M.F.'s injuries were the result of child abuse.  Dr. Hyden indicated that the injuries that were significant to him were the severe traumatic brain hemorrhage, as well as the multiple hemorrhages, multiple subdural blood collections of differing ages, which indicated prior injury and current injury.  M.F. had undergone an eye exam which revealed several hemorrhages to both retinas which was listed as non-accidental and was indicative of shaking.  The bone survey indicated numerous fractures of differing ages including fractures to the left humerus, right humerus, right ulna, left femur, right femur, left ulna, and a broken rib. Dr. Hyden ruled out the possibility that the fractures were caused during child birth or by picking the child up by his arms.  Dr. Hyden saw no reason for the fractures other than abuse.  This was detailed in Detective Galland's Police Report.  [DSUF No. 44.]

///

1   Detective Galland's police report notes that "Dr. Hyden said the brain injury most likely

2   occurred no more than 10 minutes prior to the onset of the respiratory failure." [JSUF No. 24.]

3   On June 10, 2015, Detective Galland spoke with a "friend of Jesus Flores", Crystal Espinoza.

4   This conversation was digitally recorded and downloaded into evidence. [DSUF No. 45.]  Ms.

5   Espinoza indicated that she had talked to Jesus Flores who told her that M.F. was choking on throw-up

6   so Mr. Flores shook him because he thought M.F. might pass out.  Detective Galland confirmed that

7   Mr. Flores used the work "shook".  This was detailed in Detective Galland's Police Report.  [DSUF

8   No. 46.]

9   Other than as detailed in the Police Report, Detective Galland was not provided additional

10  information as to M.F.'s condition, foster care, and/or custody issues.  Detective Galland was never

11  advised of any time subsequent to Mr. Flores's arrest that M.F. was allegedly displaying symptoms

12  similar to what prompted his investigation or that there was a remote possibility that M.F.'s problems

13  were the result of anything other than non-accidental trauma.  [DSUF No. 48.]

14  **B.      CRIMINAL CHARGES, PRELIMINARY HEARING, AND CRIMINAL TRIAL**

15  Detective Galland  submitted his report to the Kern County District Attorney on June 2, 2015[6]

16  and had no other communication regarding whether or not the District Attorney intended to pursue

17  criminal charges against Mr. Flores.  [DSUF No. 49.]  The decision to pursue criminal charges is

18  solely in the discretion of the District Attorney and it was not influenced or encouraged by Detective

19  Galland or anyone else at the Bakersfield Police Department.  [DSUF No. 51-56.]

20  The information submitted by Detective Galland to the Kern County District Attorney's Office

21  was truthful and in accordance with Detective Galland's observations during his investigation. [DSUF

22  No. 58.]  Detective Galland did not provide misinformation, conceal exculpatory evidence, or

23  otherwise engage in wrongful or bad faith conduct when communicating with the Kern County

24  District Attorney's Office arising out of the arrest of Mr. Flores.  [DSUF No. 57.]  The actions

25  undertaken by Detective Galland in investigating and arresting Mr. Flores were motivated out of

26

27

28  [6] Obviously, when the report was submitted on June 2, 2015, the Report did not detail the information
obtained between June 10, 2015 and August 19, 2015 as detailed in the evidence submitted herewith.  Subsequent to
June 2, 2015, the District Attorney obtained additional evidence from the Bakersfield Police Department, including the
audio and video interviews and the updated report. [DSUF No. 50.]

1    legitimate law enforcement objectives of protecting children from possible child abuse.  Prior to

2    Detective Galland's interview of Mr. Flores on May 21, 2015, he had never had any contact with Mr.

3    Flores.  [DSUF No. 59.]  Detective Galland was not motivated by any malice, animus, or hostility

4    towards Mr. Flores in conducting the investigation and arrest of him.  [DSUF No. 60.]

5          Prior to prosecuting Mr. Flores, the Kern County District Attorney's office requested and

6    obtained copies of the police report (on multiple occasions), copies of all video and audio interviews,

7    including those depicting Mr. Flores' interview, and copies of all photographs. They had all of the

8    available material from Officer Galland's investigation from which they could independently evaluate

9    the evidence and conduct its own investigation.  [DSUF No. 61.]

10          On June 2, 2015, a criminal complaint was filed and Mr. Flores was arraigned.  A "Pre-

11   Preliminary Hearing" was set for June 11, 2015 at 9 a.m. and a Preliminary Hearing was set for June

12   12, 2015 at 8 a.m.  Judge Michael Bush set the bail at $1,000,000 and issued a "criminal protective

13   order" preventing Mr. Flores from having any contact with Mason Flores.  [DSUF No. 25.]  Detective

14   Galland had no contact with Judge Bush or anyone else about how much bail should be set at or the

15   issuance of a "criminal protective order" and certainly did not testify at that hearing.  [DSUF No. 62.]

16          There were multiple hearings wherein Mr. Flores agreed to delay the Preliminary Hearing.

17   Detective Galland had nothing to do with the delay in the Preliminary Hearing and did not appear at

18   any of these hearings.  [DSUF No. 63.]

19          On October 21, 2015, the preliminary hearing was held in *People v. Jesus Flores*, Case No.

20   BF160324A.  Mr. Flores was represented by counsel, David Faulkner.  [JSUF No. 26.]  The District

21   Attorney called two witnesses at the Preliminary Hearing and Mr. Flores's counsel called no

22   witnesses.  Bakersfield Police Officer Helmuth Achtmann was the first witness called and testified

23   about his being dispatched to the subject residence on May 21, 2015 and his communications with Mr.

24   Flores.  [JSUF No. 27.]  Detective Galland was the second witness called.  Detective Galland testified

25   that Dr. Naven advised him that M.F. was in acute respiratory distress and that he noticed bruises on

26   M.F.'s cheeks and that Dr. Naven ordered a CAT Scan from which he noticed subdural hematomas

27   and bleeding in the brain.  At least one of the hematomas was fresh and there were older healing

28   ///

1    subdural hematomas.  In addition, Detective Galland testified Dr. Naven told him that he did not

2    believe that the bruising on the baby's cheeks would be caused by CPR.  [DSUF No. 64.]

3        In addition, Detective Galland was asked about his interview with Jesus Flores.  Detective

4    Galland testified that Mr. Flores was playing video games when he noted M.F. having problems and

5    had been fussy.  The child began to cry and Mr. Flores picked him up.  M.F. became unresponsive and

6    Mr. Flores splashed some water on his face and called 9-1-1.  [DSUF No. 65.]  Detective Galland

7    testified that Mr. Flores admitted to shaking the child.  He started off rocking the child and when that

8    didn't work, he demonstrated using a "stuffed animal" and demonstrated shaking the child.  Detective

9    Galland testified that Mr. Flores indicated he was frustrated with M.F. because he would not stop

10   crying.  [DSUF No. 66.]  Detective Galland also testified about his discussion with Dr. Hyden and

11   relayed details about those conversations including Dr. Hyden's conclusion that M.F.'s injuries were

12   the result of child abuse and that the hemorrhaging in both retinas was the result of shaking and child

13   abuse.  [DSUF No. 67.]

14       Mr. Flores's attorney, David Faulker, proceeded to cross examine Detective Galland about the

15   interviews with Mr. Flores and asked Detective Galland to describe the shaking that Mr. Flores

16   demonstrated.  [JSUF No. 28.]  In addition, Mr. Faulker established that M.F. had bruises on his face

17   prior to the date in question.  [JSUF No. 29.]  Mr. Faulker proceeded to attempt to elicit medical type

18   testimony from Detective Galland regarding M.F.'s injuries.  [DSUF No. 68.]

19       Mr. Faulker did not present any additional witnesses, did not move to dismiss the case, and

20   did not seek to impeach Detective Galland's testimony.   The matter was submitted by both sides and

21   the Court found sufficient probable cause to believe that the offenses alleged had been committed and

22   sufficient cause to believe that the Defendant committed those offenses.  [DSUF No. 69.]

23       On May 31, 2017, the Court held a 402 hearing regarding the statements made by Mr. Flores

24   when he spoke with the Detectives during their investigation.  Mr. Flores' lawyer argued that he

25   believed there was a *Miranda* issue relative to the second interview.  In addition, Mr. Flores  lawyer

26   argued that Mr. Flores' statements should be suppressed in their entirety because they were

27   purportedly given involuntarily.  [DSUF No. 70.]  The Court concluded that: (1) Detective Galland

28   was required to  and did give the *Miranda* advisal in both the May 21 and May 29 engagements with

1    Mr. Flores and that Mr. Flores waived such rights; (2) while there was no confession by Mr. Flores,

2    there were quite a few admissions, particularly as to when Mr. Flores took M.F outside; and (3) Mr.

3    Flores is quite intelligent and during the course of the questioning, he was able to see and understand

4    when the Detectives were trying to corner him on things and he jousted back thereby demonstrating

5    that he is "bright", "able to reason", "able to comprehend", and "able to resist".  The Court concluded

6    by finding that the statements made by Mr. Flores were voluntary. [DSUF No. 71.]

7         The criminal trial against Mr. Flores commenced on May 15, 2017.

8          On June 7, 2017, Dr. Naven testified that he was concerned that M.F."s injuries were the

9    result of  non-accidental trauma, which means abuse and that the injuries could be as recent as two

10   hours.  [DSUF No. 72.]

11        On June 7, 2017, Dr. Hyden testified that M.F. had old and new bleeding in the brain in

12   subdural spaces, in multiple locations, broken bones, and that he had diagnosed M.F with "abusive

13   head trauma", "altered mental status", "traumatic brain injury", "seizure after head injury", "retinal

14   hemorrhage", "injury of cervical spine" (which he corrected to be swelling and fluid in the cervical

15   neck space), and "multiple fractures".  In addition, he "determined that [M.F.] was subjected to severe

16   nonaccidental trauma by repetitive shaking and possibly slamming onto a soft surface, possibly not.

17   It could have just been shaking. And that it was severe enough that it caused these injuries and the

18   subsequent apparent life threatening event."  It is  usually right after an event occurs that there is a

19   sudden change in neurological behavior.  It could be within minutes to an hour but it does not take a

20   long time.  [DSUF No. 73.]

21   **C.    CHILD PROTECTIVE SERVICES ACTION/REMOVAL OF CHILD**

22        Social Services became involved in investigating M.F.'s welfare on or about May 22, 2015.

23   [DSUF No. 103.]  At that point, the agency was solely responsible for conducting an independent

24   investigation, separate and apart from any investigation conducted by the police, to evaluate M.F.

25   [DSUF No. 74.]  And, in fact, Detective Galland was not involved in Social Services' investigation

26   except for purposes of providing photographs, interviews, and other evidence as specifically requested

27   by Social Services.  [DSUF No. 75.]

28   ///

1        **Social Services conducted its own investigation and based on its own investigation**,

2    recommended that Jesus Flores and Sarah Guzman's parental rights be terminated.  This was **entirely**

3    **independent** of any investigation or conclusion drawn by Detective Galland or the Bakersfield Police

4    Department.  [DSUF No. 76.]

5        On June 26, 2015, the Kern County Department of Health Services filed a petition alleging:

6    (1) M.F. was at risk of suffering serious physical harm inflicted nonaccidentally by a parent or as a

7    result of a parent's failure to adequately protect him (§ 300, subd. (A)) and (2) M.F, who was under

8    the age of five, suffered severe physical abuse by a parent or another person known by the parent, and

9    the parent know or reasonably should have known that person was physically abusing the child (§300

10   subd. (E)).  [DSUF No. 104.]

11       There were Court proceedings related to whether the child should be put up for adoption and

12   Mr. Flores was given an opportunity to respond to the position taken by Child Protective Services

13   regarding M.F.  [DSUF No. 105.]

14       On May 12, 2016, the Disposition Hearing was held wherein the Department of Health

15   Services recommended denial of reunification services for both parents.  While the Department was

16   not convinced that Jesus Flores was the sole source of M.F.'s multiple injuries, the Department felt

17   that both parents failed to protect M.F.  [DSUF No. 106.]

18       In a report prepared for the section 366.26 hearing, the Department recommended termination

19   of parental rights, thereby freeing M.F. for adoption.  [DSUF No. 78.]

20       It was not until **September 9, 2016**, that Mr. Flores's attorney informed the juvenile court that

21   she had received an email from Mr. Flores's criminal attorney in which the defense attorney stated that

22   he "had top physicians in the field who had "**new evidence**" that Mr. Flores had not injured M.F.

23   [DSUF No. 79.]  In a subsequently filed petition, Mr. Flores's attorney stated that "**new evidence had**

24   **come to light that was not previously available which showed that father was not responsible**

25   **for M.F's condition**..." [Emphasis added]. [DSUF No. 80.]  This "**new evidence**" was two experts,

26   Dr. Charles Hyman[7] and Janice J. Ophoven. [DSUF No. 81.]  Mr. Flores's attorney admitted that

27   while Mr. Flores's attorney "did seek out an expert opinion, 'they did not make these same findings.'"

28

---

[7] The Plaintiff also designated Dr. Hyman in this case. See DSUF No. 94.

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1   [DSUF No. 82.]  However, despite this "new evidence" the Family Court Judge determined that Mr.

2   Flores's and Ms. Guzman's parental rights should still be terminated.  [DSUF No. 83- 84.]

3   **D.      CIVIL LAWSUIT**

4   **1.      Plaintiff's Discovery Responses**

5        The Defendants propounded discovery seeking all facts which would support each of the

6   Plaintiff's claims. [DSUF No. 85.]  The responses were substantially the same for each of the causes

7   of action alleged.  [DSUF No. 86.]  In terms of the Defendant Galland's alleged wrongdoing, the

8   Plaintiff contends:

9       a.   During the interview, Detective Galland abruptly accused Plaintiff of shaking the child.

10      b.   Detective Galland then gave Plaintiff a doll that was supposed to represent Plaintiff's son. Defendant Galland proceeded to bully and browbeat Plaintiff, trying to get Plaintiff to violently shake the doll.

11      c.   Defendant Galland continued to bully the Plaintiff who was in "great distress" and Detective Galland tried to exploit Plaintiff's grief and distress and to psychologically manipulate Plaintiff into stating that he had shaken the child. Defendant Galland conducted the interview in bad faith, trying to take advantage of Plaintiff's age and inexperience to pressure him into a false confession.

12      d.   Defendant Galland told Plaintiff that the only explanation for M.F.'s condition is that he had been shaken in the period leading up to the 9-1-1 call.

13      e.   Defendant Galland refused to accept Plaintiff's insistence that he did not violently shake his child. He repeatedly interrupted Plaintiff and stated that he would not accept Plaintiff's lies and demanded that Plaintiff "take responsibility" and "own up to it."

14      f.   Defendant Galland wrote in his report: "JESUS FLORES showed us, using a doll, how he shook [M.F.]. He started as though he was rocking the baby in his lap, and then accelerated and showed a significantly more violent shaking motion. The doll JESUS FLORES was using is stuffed and not that heavy. It takes a significant amount of energy to make the doll's head move, and JESUS FLORES made the doll's head move a great deal. . .."

15      g.   On the basis of Plaintiff's supposed "shaking" of the doll and other false and misleading statements by Defendant Galland, and on the basis of the above recommendations, criminal charges were brought against Plaintiff that carried a maximum sentence of life in prison.

16      h.   Defendant Galland had one or more contacts with Child Protective Services. Defendant Galland unequivocally indicated to CPS that Plaintiff had abused his son. Defendant Galland also told Plaintiff's girlfriend and her family members that Plaintiff had abused his son. Defendant Galland further caused a restriction to be imposed that prevented Plaintiff from visiting his son in the hospital.

i.  Defendant Galland also caused an investigative hold to be placed on the child. A transfer of custody form transmitted by Defendant Galland states: "The child suffered a severe brain injury at the hand of his father."

j.  At the preliminary hearing on October 21, 2015, Defendant Galland testified falsely about what had occurred during his interview with Plaintiff. Defendant Galland repeated his false statements that Plaintiff shook the doll and stated that "the head was violently snapping back and forth" during the interview. Defendant Galland further testified that the head was unsupported while the alleged violent snapping motion was taking place.

k.  Defendant Galland withheld information that a medical exam had taken place in November 2015 revealed that M.F. was experiencing substantially the same symptoms that were supposedly the "constellation of injuries" proving his "abuse" at the hands of Plaintiff immediately before he was admitted into the hospital on the night of May 21, 2015.

[DSUF Nos. 85-87.]

**2.      Plaintiff's Deposition Testimony**

Mr. Flores did not testify at either the preliminary hearing or  the criminal trial.  [JSUF No. 34.]  However, in his deposition during this civil suit, he testified:

a.  He was the only one in the room with M.F.  [DSUF NO. 88a.]

b.  He does not recall what happened because he has a condition that would cause him to black in and out.  [SUF No. 88b.]

c.  The issue of whether he was rocking M.F. on the evening in question or shaking him is subject to interpretation.   [DSUF No. 88c.]

d.  He did use the word "shake" during his interview with Detective Galland. [DSUF No. 88d.]

**3.      Dr. Naven's Deposition Testimony**

Dr. Naven was deposed twice in this civil suit, once as a fact witness and once as a "non retained expert" **designated by the Plaintiff**.  [DSUF No. 89.]  Dr. Naven testified that:

a.  He stands behind his medical report wherein he stated that M.F.'s injuries appeared to be nonaccidental trauma and that remains his opinion.  [DSUF No. 89a.]

b.  He stands by his testimony at the criminal trial wherein he testified that while he did not recall whether or not he told a police officer that "based on the acute subdural hematoma that the timeline could be as recent as two hours".  [DSUF No. 89b.]

///

///

1

### 4.   Dr. Hyden's Deposition Testimony

2   Dr. Hyden was also a "non retained expert" **designated by the Plaintiff**. [DSUF No. 94.] Dr.

3   Hyden was deposed in this civil suit on July 31, 2019, which is more than four years from when he

4   originally expressed his opinions to Detective Galland. [DSUF No. 90 and 94.] Notably, he testified

5   at that time that he did not even recall speaking with Detective Galland, but he was sure he did.

6   [DSUF No. 91.] Dr. Hyden testified that:

7   a.   M.F.'s injuries were the result of "non accidental trauma" and that it is his
        normal practice to relate truthfully and clearly that opinion to law enforcement.
8        [DSUF No. 92a.]

9   b.   M.F. had multiple, multi-layered retinal hemorrhages which are not seen in
        anything but major accelerative/decelerative traumatic injuries.   M.F. had
10       some fractures of the proximal humerus.   There were bucket handle or
        metaphyseal fractures, which are classic fractures of child abuse.   In addition,
11       M.F. had swelling around the paraspinous ligaments.  [DSUF No. 92b.]

12   c.   He believes that the injury happened immediately, though at the criminal trial,
        he gave a broad range between minutes and one hour.  [DSUF No. 92c.]
13

14   d.   If Detective Galland had posed a hypothetical when talking to Dr. Hyden
        wherein he asked Dr. Hyden whether the injury occurred within 10 minutes of
15       the event that may have caused the injury, Dr. Hyden would have said yes and
        possibly immediately after the injury occurred.  [DSUF No. 92d.]

16   e.   If "we saw this event occur, the time between the perpetration, depending on
        how severe it is, **like in this case, would be almost immediate**." [Emphasis
17       added.]  [DSUF No. 92e.]

18   f.   Any history provided to him, whether it be from law enforcement, the parent,
        social worker, etc., would not change his opinion that the child sustained
19       severe accelerative/decelerative rotational accelerational forces upon the head
        and neck to cause the subdural hematomas, the retinal hemorrhages the global
20       enclphalopathy, the possible cortical atrophy and other injuries from a prior
        experience. [DSUF No. 92f.]

21

22   ### 5.   Plaintiff's Expert Disclosure

23   Pursuant to this Court's Scheduling Orders, the Parties disclosed expert witness opinions.  The

24   Plaintiff designated retained witnesses: (1)  Dr. Richard Leo, a Professor of Law and Psychology who

25   is critical of the interrogation of Mr. Flores ; (2) Dr. Charles Hyman, a pediatrician who maintains that

26   M.F. was not abused; and (3) Dr. Joseph Scheller, a child neurologist and board certified pediatrician.

27   [DSUF No. 93.]   In addition, the Plaintiff designated Drs. Naven and Hyman as "non retained"

28   experts.   [DSUF No. 94.]   All three of the Plaintiff's retained experts testified in the Plaintiff's

1    criminal trial.  [DSUF No. 95.]  The Plaintiff did not designate a police procedures expert.  [DSUF

2    No. 96.]

3        In his deposition, Dr. Leo testified that: (1) he had not personally met with Mr. Flores or

4    spoken directly with him or interviewed him; (2) he has never worked as a law enforcement officer;

5    (3) he has never conducted a police interview or an interrogation of a suspect; (4) he has not

6    investigated a crime as a police investigator; (5) he has not qualified in court to testify on the veracity

7    of an investigation; (6) Mr. Flores did not make a confession during the interrogation; and  (7) he did

8    not speak to any physicians or law enforcement officers in regard to this case.  [DSUF No. 97.]

9        Dr. Hyman testified that: (1) he offered opinions in opposition to the testimony of Dr. Hyden

10   at the criminal trial; (2) he never provided his opinions to anyone at the Bakersfield Police

11   Department; (3) he never suggested that his opinions be shared with Detective Galland before the

12   criminal case commenced; (4) he did not instruct Mr. Flores's criminal attorney to share his opinions

13   with the District Attorney; (5) there is a dispute in the science in  terms of the cause of pediatric

14   injuries as to whether or not that equates to nonaccidental child abuse versus some other cause; and

15   (6) he is rendering medical opinions as to whether or not Dr. Hyden's conclusions that M.F. was a

16   victim of child abuse.  [DSUF No. 98.]

17       In his deposition, Dr. Scheller testified that: (1) he analyzed whether M.F.'s injuries were the

18   result of accidental trauma versus another medical condition; (2) no one other than Mr. Flores was

19   present when M.F. became traumatically ill and so he can only say what is most likely to have

20   happened but, "**it's true, what may have happened was that he did suffer an inflicted or abusive**

21   **injury**"; (3) he did not meet with or speak with Detective Galland to discuss his views of M.F.

22   [DSUF No. 99.]

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

**6.      Defendant's Expert Disclosure**

2

Defendants designated Curtis Cope, a police procedures expert to review materials in this case

3

and render expert opinions.  [DSUF No. 100.]  Mr. Cope opined that:

4

      a.    Any reasonable officer would evaluate the information, physical evidence and statements provided and determine there was possible child abuse involved in

5

this call for service.  It is also his opinion based upon the fact pattern of the call for service it would be expected that a detective response would be appropriate

6

and it comports with BPD policy. It is also his opinion it would be appropriate for additional law enforcement personnel to respond to the hospital to inquire

7

further regarding Mason's condition and injuries.  [DSUF No. 101a.]

8

      b.    Any reasonable detective would consider the information supplied by the medical personnel as part of the basis for continuing to conduct a child abuse

9

investigation. Law enforcement is not expected to be able to diagnose a child's injuries; however; it is expected that law enforcement will rely on the expertise

10

of the medical professionals treating a child to provide some basis for considering that Mason was possibly a victim of child abuse and that a

11

continued criminal investigation was warranted.  [DSUF No. 101b.]

12

      c.    The securing of a search warrant demonstrates BPD's handling of the investigation comports to expected police procedures to assist detectives in

13

establishing whether a crime had occurred, seize possible evidence, as well as identifying possible suspect (s) involved in the child's abuse.  [DSUF No.

14

101c.]

15

      d.    The investigation record reflects that J. Flores was the only person who was present with Mason at the time that the injuries are likely to have occurred.  In

16

his opinion the investigative steps taken by Galland and other detectives during this time frame were appropriate investigative steps for a reasonable detective.

17

It is further his opinion that the focus of the investigation as to whether J. Flores was the person responsible for Mason's injuries was appropriate for the

18

circumstances based upon the investigative findings to that point.  [DSUF No. 101d.]

19

20

      e.    Advanced Law enforcement training provides detectives with methods of conducting interviews and interrogations.  Typically, the interviews fall into

21

two types:  free format interview and cognitive interview.  Interviews are typically used for dealing with persons not under arrest or those not identified

22

as suspects in criminal activity. Interrogation training is typically geared towards dealing with possible or actual suspects of criminal activity.  Often,

23

these interrogations can be confrontational, in that it is not often criminals immediately confess to criminal activity. Thus, there is advanced training that

24

demonstrates methods of conducting confrontational interrogations.  The record shows BPD provides their personnel with advanced interview and

25

interrogation training, internally and externally, which Galland has attended or taught.  It is his opinion BPD's training program meets or exceeds the POST

26

Standards for conducting child abuse types of crimes and Galland is well trained for conducting those types of investigations.  [DSUF No. 101e.]

27

      f.    Any reasonable detective would have concluded the focus of the investigation towards J. Flores as the person responsible for Mason's injuries was

28

appropriate at that point in the investigation.  [DSUF No. 101f.]

1   g.   The methods Galland utilized to conduct his investigation and interview during this time frame comport to proper police procedures and were reasonable for the circumstances. It is not uncommon for law enforcement to be taught to utilize interview and interrogation techniques that challenge the person being interviewed with confrontational questions in order to determine whether the individual may have involvement with the crime being investigated. There can be questions that are offered to suggest involvement in or methods used during the crime being investigated. There can be questions that are used to overcome objections by the person being interrogated. These types of questions are expected and reasonable for the well-trained detective to rely on when conducting interrogations. These types of questions can be utilized to assist the well-trained detective to find the truth from the person being interrogated. I did not find any evidence of Galland utilizing improper interview and interrogation techniques, or that he was bullying or browbeating J. Flores during the interview process. [DSUF No. 101g.]

9   h.   The investigation conducted by Galland would have provided any reasonable detective with probable cause to believe J. Flores had abused Mason and that J. Flores' arrest was appropriate for the circumstances. It is also his opinion it is reasonable and expected for law enforcement to utilize and rely on medical expertise to assist in developing investigations of this nature and to make a determination whether child abuse has occurred. [DSUF No. 101h.]

13   i.   Galland's follow-up activities demonstrate appropriate police procedures in conducting the child abuse investigation.   [DSUF No. 101i.]

14   j.   The record reveals the District Attorney found there was sufficient evidence that J. Flores had caused the injuries to Mason and they filed criminal charges against him. [DSUF No. 101j.]

16   k.   There is no evidence to support any contention that any member of BPD acted negligently during any of the investigation or criminal prosecution of the case against Plaintiff. [DSUF No. 101m.]

18   **PROCEDURAL BACKGROUND**

19   The operative complaint is Plaintiff's First Amended Complaint which alleges causes of action for: (1) Deprivation of Civil Rights under the Fourth, Fifth, and Fourteenth Amendments of the Constitution  against Defendant Galland; (2) Interference with Familial Relationship under the Fourteenth Amendment against Defendant Galland; (3) Municipal Liability against the City of Bakersfield; (4) False Arrest/Imprisonment against all Defendants; (5) Negligence against all Defendants; (6) Wrongful Prosecution against all Defendants; and (7) Intentional Infliction of Emotional Distress against all Defendants.[8] [See Dkt. No. 17.]

26   ///

---

28   [8] A Stipulation was filed on October 21, 2019, wherein the Plaintiff has agreed to dismiss his third cause of action for Municipal Liability against the City of Bakersfield and the state law cause of action for "Wrongful Prosecution" against all Defendants [Dkt. No. 31].

1    The Defendants' answer alleges forty separate affirmative defenses including but not limited

2    to: (1) failure to state a claim; (2) immunity including qualified immunity, absolute immunity,  and

3    various immunities under the Government Code and California Welfare and Institutions Code; (3)

4    good faith; (4) res judicata; (5) probable cause; and (6) estoppel. [Dkt. No. 20.]

5                          **CERTIFICATION OF MEET AND CONFER**

6         Pursuant to this Court's Scheduling Order [Dkt. No. 14], the Parties met and conferred about

7    the issues raised in this Motion on September 30, 2019.

8                                  **LEGAL ARGUMENT**

9    **A.    SUMMARY JUDGMENT IS APPROPRIATE WHERE THERE ARE NO GENUINE
10           ISSUES OF MATERIAL FACT**

11        Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

12   as to any material fact, and that the moving party is entitled to judgment as a matter of law.  F.R.C.P.

13   56(c).  A court may also grant summary adjudication, or partial summary judgment, when there is no

14   genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56; See

15   also *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981). The standards that apply on a

16   motion for summary judgment and a motion for summary adjudication are the same. See Fed. R. Civ.

17   P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. CA 1998); *Chavez v. County*

18   *of Kern*, 2014 U.S.Dist.LEXIS 13193, at *5 (E.D. CA Feb. 3, 2014)[Honorable Judge Jennifer L.

19   Thurston presiding].

20        A party seeking summary judgment bears the "initial responsibility" of demonstrating the

21   absence of a genuine issue of material fact. *Celotex Corp., v. Catrett*, 477 U.S. 317, 323 (1986).  An

22   issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the

23   non-moving party, while a fact is material if it "might affect the outcome of the suit under the

24   governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem*

25   *Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). The moving party demonstrates summary

26   judgment is appropriate by "informing the district court of the basis of its motion, and identifying

27   those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

28   ///

1    together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of

2    material fact." *Celotex*, supra, 477 U.S. at 323 (citation omitted).

3         If the moving party meets its burden, the opposing party must then produce affirmative

4    evidence sufficiently probative such that a jury could reasonably decide the issue in its favor.

5    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-586 (1986).  In attempting to

6    establish the existence of this factual dispute, the opposing party may not rely upon the denials, but

7    is required to tender actual  evidence in support of its contention that the dispute exists and that the

8    disputed fact in contention was material.  Fed. R. Civ. Pro 56(e); *Matsushita*, supra, 475 U.S. at 586

9    n.11; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec.*

10   *Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); *Wool v. Tandem Computers, Inc.,* 818 F.2d

11   1433, 1436 (9th Cir. 1987) [emphasis added].  While inferences from the facts must be viewed in the

12   light most favorable to the opposing party, that party "must do more than simply show that there is

13   some metaphysical doubt as to the material facts."  Id at 586.  If the opposing party's "evidence is

14   merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*,

15   supra, 477 U.S. 249-250.

16   **B.**    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S**
        **FIRST CLAIM FOR RELIEF – THAT HIS CONSTITUTIONAL RIGHTS WERE**
17      **VIOLATED BY DEFENDANT JOSEPH GALLAND**

18        The Plaintiff's first cause of action alleges that Defendant Galland violated the Plaintiff's

19   rights under the Fourth, Fifth, *and* Fourteenth Amendments to the Constitution.  [First Amended

20   Complaint (Dkt. No. 17) at  ¶ 62.]  More specifically, the Plaintiff contends that Defendant Galland

21   violated the Plaintiff's civil rights by: (1) violating his right to be free from detention and arrest absent

22   reasonable suspicion or probable cause; (2)  by falsely labeling and defaming him as a child abuser;

23   (3) by falsifying or misrepresenting the evidence against him; (4) by prolonging his prosecution and

24   incarceration once clear proof of his innocence came to light; and/or (5)  by maliciously causing him

25   to be prosecuted over a more than two year period. [First Amended Complaint (Dkt. No. 17), ¶¶ 62-

26   63.]

27        The Defendants propounded written discovery to obtain the facts to support this cause of

28   action.  [DSUF No. 85.]  The gist of the response is that:  (1) Defendant Galland made false and

1    misleading statements which led to the filing of criminal charges; (2) M.F. was separated from his

2    parents; (3) Defendant Galland had contact with Child Protective Services which "indicated to CPS

3    that Plaintiff abused his son; (4) Defendant told Plaintiff's girlfriend and family that Mr. Flores abused

4    his son; (5) Defendant Galland caused a restriction preventing Plaintiff from visiting his son at the

5    hospital; (6) Defendant Galland caused an investigative hold to be put on M.F.; (7) Defendant Galland

6    testified falsely as to what occurred during his interviews with Plaintiff; (8) an examination of the

7    child while he was in foster care supposedly exonerated the Plaintiff but he was not released and the

8    prosecution continued; and (9) as a result of Defendant Galland's conduct, Plaintiff spent two years

9    in jail and bail was fixed at or above $1,000,000.  [DSUF No. 85.]

10       The fundamental problem with the Plaintiff's claims is that they are nothing more than

11   unsupported rhetoric.  When this Court reviews the actual evidence, including the declaration filed

12   concurrently herewith from CPS and the declaration filed concurrently herewith from the District

13   Attorney's office, it is abundantly clear that this claim has no merit and must be dismissed.

14       **1.    The Fact That Plaintiff Was Acquitted or Did Not Like the Result of the Investigation Is Not Enough to State a 42 U.S.C. § 1983 Claim**

15

16       As an initial premise, the "Constitution does not guarantee that only the guilty will be arrested"

17   or "that criminal charges will be filed only against the guilty." *Baker v. McCollan,* 443 U.S. 137, 145

18   (1979)*; Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 977 n.6 (8th Cir. 1993). Moreover, every

19   defendant ultimately acquitted of criminal charges does not have a § 1983 cause of action. *Baker v.*

20   *McCollan*, 443 U.S. 137, 145  (1979).

21       Furthermore, the manifold procedural protections afforded criminal defendants under the Bill

22   of Rights are not "without limits." *Patterson v. New York,* 432 U.S. 197, 208 (1977)."Due process

23   **does not require** that every conceivable step be taken, at whatever cost, to eliminate the possibility

24   of convicting an innocent person." Ibid.  Police officers have no affirmative duty to a plaintiff to

25   investigate in a particular way. *Gini v. Las Vegas Metro Police Dep't*, 40 F.3d 1041, 1045 (9th Cir.

26   1994); *Devereaux*, 263 F.3d 1070, 1075 (9th Cir. 2001); *Souliotes v. City of Modesto*, 2016 U.S. Dist.

27   Lexis 84729, at * 35 (E.D. CA June 29, 2016); *Constanich v. Washington*, 2008 U.S. Dist. Lexis

28   36086 (W.D. WA May 2, 2008).

**2.    The Issue of Probable Cause Has Already Been Judicially Determined (Twice)**

The issue of **probable cause to arrest** has already been decided – **twice**.  First, Judge McNamara determined that there was probable cause to arrest Mr. Flores on May 30, 2015 at 12:02 a.m. based on the information set forth in the Kern County – Arietis form submitted by Detective Galland. [DSUF No. 21.]  The Plaintiff has not alleged, nor could he credibly, information that was contained in the Kern County – Arietis form and signed by Judge McNamara was based on inaccurate information.  Secondly, the existence of probable cause to prosecute was also confirmed at the Preliminary Hearing[9].

**a.    Judge McNamara Has Confirmed There Was Probable Cause to Arrest Thereby Barring Plaintiff's Claim for False Arrest/False Imprisonment**

In an action for false arrest and related torts, because the arrest was for a felony, even if misdemeanor charges are later filed, the officer has authority to make the arrest without having witnessed the incident as provided in Cal. Pen. Code § 836(a).  *Salazar v. Upland Police Dept.*, 116 Cal. App.4[th] 934 (2004).  Under the California Penal Code, a peace officer may make an arrest without a warrant if the person arrested has committed a felony, whether or not in the presence of the officer, or if the officer has probable cause to believe that the person to be arrested has committed a felony, whether or not the felony was actually committed.  Therefore, a warrant is not necessary for an arrest if the officer has reasonable cause to believe an individual is guilt of a felony.  Cal. Pen. Code § 836(a)(2012), underline supra at fn.2.

"The United States Supreme Court held that suspects who are arrested without a warrant must generally be provided with a judicial determination of probable cause within 48 hours of arrest."  *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).  A post-arrest probable cause determination performs the same function for those arrested without warrants as a pre-arrest probable

---

[9]A preliminary hearing is a post facto determination of probable cause that is concerned primarily with whether the prosecution meets  its burden of proof, see generally *Mills v. Super. Ct.*, 42 Cal. 3d 951 (1986), and, at least in some instances, can result in a dismissal of criminal charges even though the existence of probable cause is not considered." *De Anda v. City of Long Beach,* 7 F.3d 1418, 1422 (9th Cir. 1993). In contrast, probable cause to arrest must be based on objectively reasonable information known to the officer at the time of the arrest, and cannot be based on facts or evidence obtained as a result of the arrest. See *Wong Sun v. United States*, 371 U.S. 471, 482 (1963); *Henry v. United States*, 361 U.S. 98, 103 (1959).

1    cause determination does for suspects arrested with warrants. *King v. Jones*, 824 F.2d 324, 327 (4th

2    Cir. 1987); *Jones v. City of Santa Monica*, 382 F.3d 1052, 1055-56 (9th Cir. 2004).  That is, when

3    a person is arrested without the benefit of a warrant supported by probable cause, the Fourth

4    Amendment requires a judicial determination of probable cause to occur "promptly after the arrest.

5    *Jones,* 382 F.3d at 1055 (9th Cir. 2004); See also *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975).

6         Although the Supreme Court in *Gerstein* stated that States may choose to incorporate a

7    post-arrest probable cause determination into the suspect's first appearance before a judicial officer

8    or into the procedure for setting bail (thereby involving a personal appearance), see *Gerstein*, 420 U.S.

9    at 123-24, such incorporation was a suggestion, not a constitutional requirement. The Supreme Court

10   further stated:

11             The sole issue is whether there is probable cause for detaining the
               arrested person pending further proceedings. This issue can be
12             determined reliably with-out an adversary hearing. The standard is the
               same as that for arrest. That standard -- probable cause to believe the
13             suspect has committed a crime -- traditionally has been decided by a
               magistrate in a nonadversary proceeding on hearsay and written
14             testimony, and the Court has approved these informal methods of
               proof.
15

16         *Gerstein*, 420 U.S. at 120. (footnote omitted).

17         Probable cause merely requires that "the facts available to the officer would 'warrant a man of

18   reasonable caution in the belief'" that a crime had been committed.  *Dawson v. City of Seattle*, 435

19   F.3d 1054, 1062 (9th Cir. 2006) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).  It "does not

20   demand any showing that such a belief be correct or more likely true than false." Id.; see also  [*24]

21   *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) ("[T]he probable-cause standard is a practical,

22   nontechnical conception that deals with the factual and practical considerations of everyday life on

23   which reasonable and prudent men, not legal technicians, act.") (internal quotation marks omitted).

24         Judicial determinations of probable cause to arrest that are made within 48 hours of arrest are

25   **presumptively reasonable**, *i.e.*, they do not violate the Fourth Amendment; judicial determinations

26   of probable cause to arrest that are made more than forty-eight hours after arrest are presumptively

27   unreasonable, *i.e.*, they violate the Fourth Amendment.  See *McLaughlin*, 500 U.S. at 56-57;

28   *Anderson*, 232 F.3d at 1069.

1    In this case, probable cause was determined post arrest by Judge McNamara following Mr.

2    Flores' arrest.  This was based on the Kern County – Arietis form signed and submitted by Detective

3    Galland.

4    As such, the post arrest confirmation by Magistrate McNamara who approved the Probable

5    Cause declaration is outcome determinative and should serve as collateral estoppel to the Plaintiff's

6    claims in this lawsuit.

7    **b.      Probable Cause Was Determined as a Matter of Law at the Preliminary Hearing**

8    Kern County Superior Court determined that there was probable cause for Plaintiff's arrest and

9    that the Plaintiff should stand trial.  [DSUF No. 84.]  Because the issue of whether there was probable

10    cause for Plaintiff's arrest has already been decided, the Plaintiff is precluded from re-litigating the

11    issue vis-a-vis the instant federal civil rights action.  As such, the Plaintiff's claims for false arrest,

12    false imprisonment, and malicious prosecution **fail as a matter of law despite his subsequent**

13    **acquittal**.

14    The doctrine of collateral estoppel applies in § 1983 actions.  *Allen v. McCurry*, 449 U.S. 90,

15    105 (1980) citing *Younger v. Harris*, 401 U.S. 37, 43-45 (1971). "Under collateral estoppel, once a

16    court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-

17    litigation of the issue in a suit on a different cause of action involving a party to the first case." Id. at

18    94. Collateral estoppel is applicable  if the party against whom the earlier decision is asserted had a

19    "full and fair opportunity" to litigate the issue in the earlier case. Id. at 95; See also *Patterson v. City*

20    *of Yuba City*, 884 F.3d 838 (9th Cir. 2018); *Patterson v. City of Yuba City*, 748 F. App'x 120, 121 n.1

21    (9th Cir. 2018); see also *Tavakoli v. City of Los Angeles*, 2019 U.S. Dist. LEXIS 47331, 2019 WL

22    1297950, at *6 n.10 (C.D. CA Mar. 18, 2019); *Hoffman v. Gibson*, 2017 U.S. Dist. LEXIS 128183,

23    2017 WL 3457525, at *3 (S.D. CA Aug. 11, 2017); *Beckway v. DeShong*, 717 F. Supp. 2d 908, 919

24    (N.D. CA 2010), on reconsideration in part (July 28, 2010);  *Johnson v. Cty. of Santa Clara*, 2019

25    U.S. Dist. LEXIS 64373 (N.D. CA Apr. 15, 2019).

26    "Federal courts must give 'preclusive effect to state-court judgments whenever the courts of

27    the State from which the judgments emerged would do so.'" *Wige*, 713 F.3d at 1185 (quoting *Allen*,

28    449 U.S. at 96).  Under California law, collateral estoppel applies when: (1) the issue to be  re-litigated

1   is identical to the issue decided in the earlier action; (2) the issue was actually litigated and (3)

2   necessarily decided in the earlier action; (4) the earlier decision was final and on the merits; and (5)

3   the party against whom collateral estoppel is asserted was a party (or in privity) to the earlier action.

4   Id.; See *Lucido v. Superior Court,* 51 Cal. 3d 335, 341 (1990).

5       A probable cause determination is a "final, conclusive determination of the issue" of probable

6   cause. *Haupt v. Dillard*, 17 F.3d 285, 288-289 (9th Cir. 1994)[questioned on other grounds](citing

7   *Allen v. McCurry*, 449, U.S. 90, 95 (1980). In *Haupt*, a determination of probable cause at a

8   preliminary hearing was held to be a final, conclusive determination, explaining "the probable cause

9   determination was immediately appealable) [in the form of a petition for a writ of habeas corpus].

10      With respect to the preclusive effect of a preliminary hearing, "the identity of issues

11  requirement will generally be satisfied because in most cases the issue resolved at the preliminary

12  hearing is identical to the issue that must be resolved in a false arrest . . . action – namely, whether the

13  evidence supports a finding of probable cause. *Wige v. City of L.A*, 713 F.3d 1183, 1185 (9th Cir.

14  2013). "So long as the evidence known to the arresting officers is not materially different from the

15  evidence presented at the preliminary hearing, a 'finding of sufficiency of evidence to require the

16  defendant to stand trial is a finding of probable cause to arrest the defendant.'" Id.

17      In this action, there was a preliminary hearing held on the amended felony complaint filed

18  against Mr. Flores, at which time Mr. Flores was represented by counsel.  During the hearing,

19  Detective Galland testified,  and Mr. Flores' counsel had every opportunity to cross examine Detective

20  Galland, regarding any perceived inaccuracies.  At the conclusion of the preliminary hearing, the

21  Superior Court determined that there was probable cause to believe that Mr. Flores committed the

22  offenses alleged in the felony complaint and Mr. Flores was held to answer for that complaint.

23  Therefore, the issue of probable cause was already determined by the Superior Court, and Defendant

24  Galland is entitled to summary judgment as a matter of law because of the doctrine of collateral

25  estoppel.                                    .

26      While it is anticipated that the Plaintiff will argue that  the issue of collateral estoppel does not

27  apply because he contends that Detective Galland lied or fabricated evidence, an examination of the

28  evidence demonstrates that Detective Galland's testimony was materially accurate and truthful.

1    In order for this Court to conclude that the doctrine of collateral estoppel does not apply, the

2    Plaintiff must present evidence that **establishes** Detective Galland lied or fabricated evidence at the

3    preliminary hearing.  See *Wige*, 713 F.3d at 1186. [Emphasis added].  A suspect's account of an

4    incident, by itself, cannot "serve as evidence that the officers interfered with the prosecutor's

5    decision." *Newman v. Cty. of Orange*, 457 F.3d 991 (9th Cir. 2006); *Washington v. White*, 2018 U.S.

6    Dist. LEXIS 84215 (N.D. CA May 18, 2018)[ allegations that there were "self serving" statements and

7    a biased and incomplete police report was not sufficient to overcome summary judgment].

8    Here, there is no evidence that Detective Galland's testimony was fabricated.  While the

9    Plaintiff will attempt to argue that the time frame upon which M.F.'s injuries occurred was not as

10   represented by Detective Galland, that is simply not the case and is a complete manipulation of the

11   evidence.  Indeed, Dr. Hyden confirmed that M.F.'s injuries likely happened immediately.  While,

12   years after the interview, Dr. Hyden broadened the window of time to up to an hour, the evidence still

13   confirms that it was Mr. Flores who was alone with M.F. during this time and it was Mr. Flores who

14   was caring for him and who admitted that he had shaken M.F.

15   While it would be easy for a Plaintiff years after the fact to attempt to impeach the content of

16   a police report by presenting evidence that a doctor "does not recall" saying particular things, that

17   would be a completely unfair way to consider whether or not Detective Galland fabricated evidence.

18   The bottom line is that both Dr. Naven and Dr. Hyden confirmed during the course of this case a time

19   frame within which the Plaintiff was responsible for the care of M.F.

20   The bottom line is that there was probable cause to arrest the Plaintiff based both on the

21   statements of the doctors at the time and based on the statement of the doctors now (i.e any alleged

22   change in the doctors' analysis still puts M.F in Mr. Flores' care at the time the injury was caused).

23   As such, the Plaintiff's claim that Detective Galland did not have probable cause fails as a matter of

24   law.

25   ///

26   ///

27   ///

28   ///

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1

**3.      Detective Galland Did Not Violate the Plaintiff's Rights by Falsifying or Misrepresenting the Evidence Against Him**

2

3      The Plaintiff claims that Detective Galland falsified and/or misrepresented evidence against

4      him.

5      To state a plausible claim for deliberate fabrication of evidence under *Devereaux v. Abbey*, 263

6      F.3d 1070, 1076 (9th Cir. 2001), the plaintiff must: (1) identify the evidence alleged to have been

7      fabricated; and (2) **state facts to show that the fabrication was deliberate**. *Bradford v. Scherschligt*,

8      803 F.3d 382, 386 (9th Cir. 2015)[emphasis added].   Because this is a due process claim, *Devereaux*

9      imposes a stringent test requiring a showing that the defendants acted with "deliberate indifference

10      to or in reckless disregard for an accused's rights."  *Gantt v. City of Los Angeles* 717 F.3d 702, 708

11      (9th Cir. 2013).

12      A claim for fabrication of evidence requires a plaintiff to show that the defendant deliberately

13      fabricated evidence, and that this fabricated evidence caused plaintiff to be deprived of his liberty.

14      *Spencer v. Peters,* 857 F.3d 789, 798 (9th Cir. 2017).   Deliberate fabrication of evidence may be

15      shown by any of the following: (1) the defendant deliberately reporting something the defendant knew

16      to be untrue, or deliberately mischaracterized a witness statement; (2) continued the investigation of

17      the plaintiff despite knowing plaintiff was innocent or being deliberately indifferent to his innocence;

18      or (3) used investigative techniques that were so coercive and abusive that defendant knew, or was

19      deliberately indifferent, that those techniques would yield false information. Id.  Evidence of negligent

20      inaccuracy on the part of investigators alone is insufficient to prove a fabrication of evidence claim,

21      See *Devereaux* at 1077.

22      There is a complete lack of evidence to support a claim against Detective Galland under any

23      of these theories.

24      **a.      There Is No Evidence That Detective Galland Deliberately Reported Something He Knew to Be Untrue, or Deliberately Mischaracterized a Witness Statement**

25

26      The evidence in this case does not support a finding that Detective Galland deliberately

27      reported something he knew to be untrue or deliberately mischaracterized a witness statement.  In fact,

28      the evidence unequivocally comports to what was reported.  However, even viewing the evidence in

1    the broadest possible way, there is no way that a fact finder could find Detective Galland's statements

2    tantamount to deliberate fabrication.

3          In *Gausik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003), the Ninth Circuit found that errors in an

4    affidavit for probable cause was not sufficient to establish deliberate fabrication of evidence. Id. The

5    affidavit in *Gausvik* stated that three children had tested "positive" for sexual abuse when really the

6    tests were only "suggestive" or "consistent" with abuse. Id. Further, the affidavit stated that eight

7    children had accused the suspect, when only two had, but one of them told the officer that the suspect

8    had abused at least eight other children. Id. The court chalked these errors up the officer being

9    "careless with the facts", but that the errors did not rise to the level of deliberate fabrication. Id; *Black*

10   *v. Montgomery County*, 835 F.3d 358, 372 (3d Cir. 2016) (noting the limitations on a

11   fabricated-evidence claim), cert. denied, 137 S. Ct. 2093, 197 L. Ed. 2d 895, 2017 U.S. LEXIS 2806,

12   2017 WL 1540522 (U.S. May 1, 2017) (No. 16-846); *Whitlock*, 682 F.3d at 586 (same).

13         There is simply no evidence that Detective Galland deliberately reported something he knew

14   to be untrue.  Again, Detective Galland prepared a report which detailed the investigation in great

15   detail.

16         While it is anticipated that the Plaintiff will argue the time frame within which the injuries

17   occurred, as testified to by Dr. Naven and Dr. Hyden, **four years** after the fact, is not *exactly* as

18   reflected in the police report, that simply does not mean that they did not report the information that

19   was reflected in Detective Galland's Report.  Furthermore, as reflected above, Drs. Naven and Hyden

20   confirmed that the time frame within which the injuries occurred did occur while Mr. Flores was being

21   supervised and is entirely consistent with what is contained in Detective Galland's Report.

22         In addition, it is anticipated that the Plaintiff will testify that Detective Galland "lied" when

23   he said that during the interview of the Plaintiff, the Plaintiff did not support the doll's head when he

24   demonstrated the manner in which he had "shaken" M.F.  Again, this is a red herring.  A review of

25   the video, submitted herewith, confirms that Mr. Flores did not support the doll's head in particular

26   portions of the interview.[10]  While at trial, Mr. Flores's attorney showed a different portion of video,

27

28         _____

           [10] See Exhibit 26 to the Declaration of Michael G. Marderosian submitted herewith at File VTS_01_7.VOB,
     0:00:50-0:01:20, 02:46-03:31.

1   that is not the only portion of the video that dealt with Mr. Flores using the doll to show the Detectives

2   how Mr. Flores had shaken his son.

3       There is simply no evidence that Detective Galland reported that he knew to be untrue or

4   which can be considered a "deliberate mischaracterization". Plaintiff's claim on this basis must be

5   dismissed.

6           **b.      There Is No Evidence That Detective Galland Continued the Investigation
             Despite Knowing That Mr. Flores Was Innocent or That Detective
7            Galland Was Deliberately Indifferent to Mr. Flores' Alleged Innocence**

8       There is no evidence to support a claim that Detective Galland continued the investigation

9   despite "knowing that Mr. Flores was innocent" or that Detective Galland was deliberately indifferent

10  to Mr. Flores' alleged innocence.

11      There is no evidence whatsoever to support the Plaintiff's contention that Detective Galland

12  was aware of a medical exam conducted on M.F. while he was in foster care and all of Plaintiff's

13  "expert witnesses" confirmed that they did not communicate their opinions to Detective Galland,

14  anyone at the Bakersfield Police Department, or anyone at the District Attorney's office. Instead,

15  Detective Galland relied on the medical opinions of qualified medical personnel who communicated

16  to him that they believed (and still believe) that M.F sustained "non-accidental trauma" and that the

17  window of time in which this trauma was sustained coincides with the time frame that Mr. Flores was

18  watching him.

19      The Plaintiff's claim on this basis must be dismissed.

20          **c.      There Is No Evidence That Detective Galland's "Investigative Techniques
             Were Coercive or Abusive or That Detective Galland Knew or Was
21           Deliberately Indifferent to the Possibility That Those Techniques Would
             Yield False Information**

22

23      The Plaintiff claims that Detective Galland's "interview techniques were coercive and

24  abusive." However, there is no evidence to support the contention that the techniques implemented

25  by Detective Galland were, in any way, inappropriate or unconstitutional.

26      Initially, it should be noted that the Criminal Court considered the issue of whether or not the

27  statements made by Mr. Flores were "voluntary" during a 402 hearing. The Criminal Court

28  unequivocally concluded that they were and that Mr. Flores was "quite intelligent and during the

1   course of the questioning, he was able to see and understand when the Detectives were trying to corner

2   him on things and he jousted back thereby demonstrating that he is "bright", "able to reason", "able

3   to comprehend", and "able to resist'". As such, ,this issue as already been determined as a matter of

4   law. <u>See</u> Section B3 re Collateral Estoppel.

5   To the extent the doctrine of Collateral Estoppel does not apply, there is still no evidence to

6   support the Plaintiff's position that the techniques employed by Detective Galland were inappropriate.

7   "[U]nder the Fourteenth Amendment, an interrogation is coercive only when, in light of the

8   totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to

9   exercise free will." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003).   "The

10   standard for showing a Fourteenth Amendment substantive due process violation . . . is **quite**

11   **demanding**." *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009). "[O]nly **the most egregious**

12   **official conduct** can be said to be 'arbitrary in the constitutional sense' and therefore a violation of

13   substantive due process." <u>Id</u>. (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "More

14   specifically, a Fourteenth Amendment claim of this type is cognizable only if the alleged abuse of

15   power 'shocks the conscience' and 'violates the decencies of civilized conduct.'" <u>Id</u>. (quoting *Lewis*,

16   523 U.S. at 846).

17   Mere allegations that the Defendants used interview techniques that were in some sense

18   improper, or that violated state regulations, without more, cannot serve as the basis for a claim under

19   § 1983." *Deveraux v. Abbey*, 263 F.3d at 1075.   Indeed, the following conduct during police

20   interviews/interrogations have repeatedly been determined to be constitutional:

21       a.   The use of elevated, stern or firm voices and/or expressing annoyance is not

22   unconstitutional. <u>See</u> *Ortiz v. Uribe*, 671 F.3d 863, 872 (9th Cir. 2011); *Devereaux*, 263 F.3d at 1077; *Whittenberg v. Bortolamedi*, 2007 U.S. Dist. Lexis 10587, at * 10 (E.D. CA Feb. 15, 2007).

23

24       b.   Yelling is not unconstitutional *Whittenberg v. Bortolamedi*, 2007 U.S. Dist. Lexis. 10587, at * 10 (E.D. CA Feb. 15, 2007).

25       c.   Making false representations concerning the crime or the investigation does not render

26   a confession coerced. *United States v. Preston*, 751 F.3d 1008, 1026 (9th Cir. 2014); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Whittenberg v. Bortolamedi*, 2007 U.S. Dist. Lexis. 10587, at * 10 (E.D. CA Feb. 15, 2007)[allegations that defendant

27   manipulated witness statements and lied about interviewing all the plaintiff's witnesses do not state a claim for violation pf due process rights and are not actionable.]; *Yarris v. County of Delaware*, 465 F.3d 129, 143 (3d. Cir. 2006)[Holding detectives who

28   used trickery or deceit to obtain false evidence did not support constitutional claims.];

United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993); Schedelbower v. Estelle, 885 F.2d 570, 574 (9th Cir. 1989).

    d.    Advising a suspect he could be arrested if he failed to tell the truth or withholding information is not unconstitutional or unlawful. United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir. 2003).

    e.    The use of ruses or lies are permitted in police interviews and are not unconstitutional. See United States v. Preston, 751 F.3d 1008, 1026 (9th Cir. 2014); Pollard v. Galaza, 290 F.3d 1030, 1034 (9th Cir. 2002).

    f.    Allegations that an interviewer disbelieved an initial denial and continued with aggressive questioning is not unconstitutional. Devereaux, 263 F.3d at 1076-77; Gausvik v. Perez, 345 F.3d 813 (9th Cir. 2003)[continued interrogation after denial and telling victim she could not leave until she admitted the truth was not so coercive and abusive that the officer knew or should have known he would receive false information].

    g.    Continuing to question a suspect after the suspect claims he is innocent does not constitute coercion and is often "necessary to achive the truth". Cunningham, 345 F.3d at 810; United States v. Leon Guerrero, 847 F.2d 1363, 1366-67 (9th Cir. 1988).

    h.    Threats of criminal charges are not coercive. Stoot, 582 F.3d at 928-929; United States v. Okafor, 285 F.3d 842, 846-847 (9th Cir. 2002)[Telling a suspect he would be subject to 10-20 years in prison did not render confession involuntary].

Setting aside the fact that the Plaintiff's own expert opined that the Plaintiff did not actually confess and that the Superior Court already determined, as a matter of law, that the statements by Mr. Flores were not coerced, there is nothing about Detective Galland's conduct in conducting the interviews of the Plaintiff which could be considered unconstitutional. See Cunningham v. City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003)[suspect's eight (8) hour interrogation with "unsettling" questions not coercive). While the Plaintiff relies on a professor of psychology, Dr. Leo, to opine that Detective Galland's techniques were somehow "inappropriate", Dr. Leo's opinions are nothing more than "academic" and are not a standard upon which to gage the constitutionality of Detective Galland's conduct. Mr. Flores was advised of his Miranda rights. He was not detained for a prolonged period of time. There is simply not any basis to contend that Detective Galland's conduct during the interviews was unconstitutional.

    As such, this claim must be dismissed.

///

///

///

1

**4.       The Defendants Did Not Violate the Plaintiff's Rights by Prolonging His Prosecution and Incarceration Once Clear Proof of His Innocence Came to Light**

2

3        Initially, it must be noted that once probable cause is established, a police officer is not

4    constitutionally required to "investigate independently every claim of innocence." *Broam v. Bogan*,

5    320 F.3d 1023, 1032 (9th Cir. 2003) (internal citation and quotation marks omitted).   Although

6    officers may not ignore evidence known to be possibly exculpatory when determining if probable

7    cause exists, they are not required to investigate beyond an initial determination of probable cause or

8    to "look for additional evidence which may exculpate the accused." Id.; See also *Criss v. City of Kent*,

9    867 F.2d 259, 263 (6th Cir. 1988) (law enforcement "is under no obligation to give any credence to

10   a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego

11   arrest pending further investigation if the facts as initially discovered provide probable cause");

12   *Valencia v. Cty. of San Bernardino*, 2017 U.S. Dist. LEXIS 203523, at *13-14 (C.D. CA Dec. 8,

13   2017).

14       A claim for a constitutional violation based upon failure to disclose exculpatory evidence

15   under *Brady* and *Tatum* requires plaintiff to establish that:  (1) defendants withheld material evidence

16   that was favorable to plaintiff; (2) that this withholding prejudiced plaintiff; and (3) that defendants

17   acted with deliberate indifference or reckless disregard of the consequences in withholding the

18   material, favorable evidence. *Brady v. Maryland*, 373 U.S. 83 (1963); *Tatum v. Moody,* 768 F.3d 806,

19   816 (9th Cir. 2014). Evidence is material "if there is a reasonable probability that, had the evidence

20   been disclosed to the defense, the result of the proceeding would have been different." *Bailey v. Rae*,

21   339 F.3d 1107, 1115 (9th Cir. 2003) (quoting *United States v. Bagley*, 473 U.S. 667, 682  (1985)).

22       District Courts within the Ninth Circuit, an unpublished Ninth Circuit opinion, and other

23   "sister circuits", have routinely found that "a conviction is required to establish prejudice for a Section

24   1983 claim based on a *Brady* violation. See *Ward v. City of Barstow*,  2017 U.S. Dist. LEXIS 178626,

25   2017 WL 4877389, at *15-16 (C.D. CA June 23, 2017) (collecting cases); see also *Puccetti v. Spencer*,

26   476 F. App'x 658 (9th Cir. 2011); *Cooley v. City of Walnut Creek*, 2018 U.S. Dist. LEXIS 205358

27   (N.D. CA  Dec. 4, 2018);  *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any

28   misconduct by government agents before or during trial, a defendant who is acquitted cannot be said

1  to have been deprived of the right to a fair trial"); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998)

2  ("Plaintiff, however, was never convicted and, therefore, did not suffer the effects of an unfair trial.

3  As such, the facts of this case do not implicate the protections of *Brady*"); *McCune v. City of Grand*

4  *Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) ("Because the underlying criminal proceeding terminated

5  in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory

6  evidence."); *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) cert. Denied, 531 U.S. 1076 (2001)

7  *Washington v. White,* 2018 U.S. Dist. LEXIS 84215, at *21-22 (N.D. CA May 18, 2018).

8       Absent a conviction, a plaintiff cannot state a claim under *Brady* because he cannot show

9  prejudice. *Forte v. Merced Cty.*, 2016 U.S. Dist. LEXIS 106561 (E.D. CA Aug. 11, 2016).  Here, the

10  Plaintiff was acquitted and as such, there is no basis whatsoever for this *Brady* claim.

11       However, even if this Court were to disregard the "acquittal" issue, there is no evidence to

12  support the Plaintiff's claim that the Defendants prolonged the Plaintiff's incarceration and

13  prosecution by withholding exculpatory evidence.

14       Information that is equally available to a criminal defendant does not constitute *Brady* material.

15  *United States v. Marashi*, 913 F.2d 724, 733-734 (9th Cir. 1990).  Further "where the defendant is

16  aware of the essential facts enabling him to take advantage of any exculpatory evidence, the

17  Government does not commit a *Brady* violation by not bringing the evidence to the attention of the

18  defense." *United States v. Brown*, 582 F.2d 197, 200 (2d. 1978); See also *United States v. Dupuy*, 760

19  F.2d 1492*,* 1501 n.5 (9th Cir. 1985)[citing *Brown*].  There is "no constitutional requirement the

20  prosecution make a complete and detailed accounting to the defense of all police investigatory work

21  on a case." *United States v. Agurs*, 427 U.S. 97, 109 (1976).  The "mere possibility that an item of

22  undisclosed information might have helped the defense, or might have affected the outcome of the

23  trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. at

24  109-10.

25       Initially, there has never been "clear proof" of Mr. Flores's innocence.  If anything, the

26  criminal trial including the testimony by Drs. Naven and Hyden and the deposition testimony given

27  in this civil suit confirms that they remain convinced that M.F. was the victim of nonaccidental trauma

28  and that the time frame comports with the time that Mr. Flores was with M.F.  The Plaintiff's own

1  expert, Dr. Scheller, could not even opine that there was no way that M.F.'s injuries were not the

2  result of non-accidental trauma.  Furthermore, while the Plaintiff retained "experts" in the criminal

3  case, which were also designated by the Plaintiff in this case, these experts did not communicate with

4  Detective Galland or anyone with the police department.  [DSUF No. 95.]  The documents submitted

5  by Plaintiff's counsel in regard to the child custody hearings confirm, at a minimum, that the Plaintiff

6  himself was "unaware" of this exculpatory evidence until at least September 9, 2016.

7       There is simply no evidence to support the Plaintiff's *Brady* claim and as such, it must be

8  dismissed.

9       **5.    Detective Galland Did Not Violate the Plaintiff's Rights by Maliciously Causing
        Him to Be Prosecuted Over a More than Two Year Period**

10

11       Malicious prosecution claims under § 1983 are based on state law elements.  (See *Usher v.*

12  *City of Los Angeles*, 828 F. 2d 556, 562 (9th Cir. 1987).  In California, a plaintiff may demonstrate

13  malicious prosecution by establishing that the underlying prosecution: (1) was commenced by or at

14  the direction of the defendant and was pursued to legal termination in his, plaintiff's, favor; (2) was

15  brought without probable cause; and (3) was initiated with malice."  See *Zamos v. Stroud*, 32 Cal. 4th

16  958, 965 (2004); *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006); See also *Blankenhorn*

17  *v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007).  The malice must be directed against the "adverse

18  party", that is, plaintiff.  "Malice is established when 'the former suit was commenced in bad faith to

19  vex, annoy, or wrong the adverse party." *Ayala v. KC Envtl. Health*, 426 F. Supp 2d 1070, 1091 (E.D.

20  CA 2006); *Brown v. Selfridge*, 224 U.S. 189, 191 (1912); *Hartman v Moore*, 547 U.S. 250, 258

21  (2006).

22       **a.    Probable Cause Defeats This Claim Without Further Analysis**

23       Initially, as is set forth in Section B2 above, the Plaintiff's claim for malicious prosecution fails

24  because the existence of probable cause is a complete defense to a claim for malicious prosecution.

25  *Lassiter v. City of Bremerton,* 556 F.3d 1049, 1054-55 (9th Cir. 2009).

26       **b.    Defendant Galland Did Not Act With Malice Toward The Plaintiff**

27       Even if this Court were to ignore the "probable cause" issue, there is absolutely no evidence

28  to support the Plaintiff's contention  that the underlying prosecution was initiated with malice.

1    Where malice must be shown, as is necessary in this case, only "other, additional evidence"

2    apart from a lack of probable cause, is sufficient.  *Estate of Tucker ex. rel. Tucker v. Interscope*

3    *Records Inc.,* 515 F.3d 1019, 1032 (9th Cir. 2008).   When evidence of malice is presented by a

4    plaintiff, a cause of action for malicious prosecution fails when the defense meets their burden of

5    rebutting that evidence. *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988).  Evidence of malice may

6    be rebutted either by showing that the mental state of defendant had no effect on the course of the

7    prosecution, or by undercutting the inference of malice itself.  Id.

8    Here, the Plaintiff has not and cannot offer any evidence that the Plaintiff acted with malice

9    toward the Plaintiff. Detective Galland had never met Mr. Flores before this incident and there is

10   nothing to suggest that anything he did relative to Mr. Flores was motivated by some malice or ill will.

11   As such, the Plaintiff's claim for malicious prosecution fails.

12                    **c.    The District Attorney Made The Independent Decision To Charge and
                              Prosecute Mr. Flores**

13

14   Even if the Plaintiff were somehow able to overcome the fatal flaws with the first two

15   elements, the District Attorney made an independent decision to charge and prosecute Mr. Flores and

16   Plaintiff has no evidence suggesting the decision was made or influenced by anyone other than the

17   District Attorney's office.   [DSUF Nos. 51, 52, 54, 57, 58 and 61.]

18                    **d.    The Plaintiff Cannot Overcome the Presumption The Prosecutor
                              Exercised Independent Judgment In Filing Criminal Charges**

19

20   The Ninth Circuit has long employed an evidentiary presumption in section 1983 cases arising

21   out of false arrests and/or malicious prosecutions, that "the filing of a criminal complaint immunizes

22   the investigating officers...from damages suffered thereafter because it is presumed that the prosecutor

23   filing the complaint exercised independent judgment in determining that probable cause for an

24   accused's arrest exists at the time." *Whitmore v. Cty. of Los Angeles*, 2010 U.S. Dist. LEXIS 148373,

25   at *5 (C.D. CA Aug. 9, 2010), aff'd, 473 Fed. App'x 575 (9th Cir. 2012).

26   In *Smiddy v. Varney*, 665 F.2d 261, 266-67 (9th Cir. 1981)["Smiddy I"] and *Smiddy v. Varney*,

27   803 F.2d 1469, 1472-73 (9th Cir. 1986)["Smiddy II"], the courts held "there is a rebuttal presumption

28   that a prosecutor exercises independent judgment regarding the existence of probable cause in filing

1   a complaint.  The presumption can be overcome, for example, by evidence that the officers knowingly

2   submitted false information or pressured the prosecutor to act contrary to her independent judgment."

3   Id. *Smiddy I,* at 266067.  Unless overcome, the presumption insulates the arresting officers from

4   liability for harm suffered after the prosecutor initiated formal prosecution. Id.  "[I]f Smiddy had

5   contrary evidence, *e.g.*, . . . that the officers knowingly withheld relevant information with the intent

6   to harm *Smiddy*, or that the officers knowingly supplied false information, *Smiddy* had the burden to

7   produce it.  In the absence of the evidence to rebut the presumption, the presumption was sufficient

8   to require summary judgment for the defendants..." *Smiddy II*, at 1471.

9       To rebut the presumption, "a plaintiff must provide more than an account of the incident in

10  question that conflicts with the account of the officers involved." *Newman v. Cty. of Orange*, 457 F.3d

11  991, 995 (9th Cir. 2006).  Conclusory allegations are not sufficient.  See also *Whitmore v. Cty. of Los

12  Angeles*, 2010 U.S. Dist. LEXIS 148373,  at *5 (C.D. CA Aug. 9, 2010), aff'd, 473 Fed. App'x 575

13  (9th Cir. 2012) (plaintiff had not "create[d] a triable issue of fact in connection with the presumption

14  of prosecutorial independence," in part, because "[p]laintiff's own declaration denying [the officer's]

15  version of events, standing alone, is not sufficient to rebut the presumption"); *Daniels v. Quintard*,

16  2018 U.S. Dist. LEXIS 224530, at *13 (C.D. CA Sep. 12, 2018). Further, such evidence must be

17  substantial.  *Harper v. City of L.A*, 533 F.2d 1010, 1027 (9th Cir. 2008).

18      Plaintiff cannot overcome the ordinary presumption that the decision to file criminal charges

19  "resulted from an independent determination on the part of the prosecutor" which precludes liability

20  for those who participated in the investigation or filed a report that resulted inn the initiation of the

21  proceedings.  *Awabdy v. City of Adelanto*, 368 F.3 1062, 1067 (9th Cir. 2004).

22      Indeed, the District Attorney in this case confirmed in the Declaration filed concurrently

23  herewith that the decision to file criminal charges and to prosecute was the District Attorneys' alone

24  and that Detective Galland did not exercise any influence or pressure to prompt or promote the

25  criminal charges.

26      As such, the Plaintiff's claim for malicious prosecution fails as a matter of law.

27  ///

28  ///

1

**6.      Detective Galland Did Not Violate the Plaintiff's Rights By Falsely Labeling and Defaming Him as a Child Abuser**

2

3      As part of the Plaintiff's omnibus "First Claim for Relief", the Plaintiff alleges that his civil

4   rights were violated when Defendant Galland falsely labeled him a "child abuser" and as a result, he

5   was not able to visit his son and/or lost custody of him. Further, his relationships with his girlfriend

6   and their family members was apparently ruined. [DSUF No. 85].  This is not enough to make a claim

7   for defamation under 42. U.S.C. § 1983.

8      The Fourteenth Amendment's Due Process Clause prohibits a state actor from depriving a

9   citizen of her life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. It is

10  well settled that "[a] person's interest in his or her good reputation alone, apart from a more tangible

11  interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due

12  Process Clause to create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322,

13  329-30 (2d Cir. 2004) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

14      To state a cognizable claim for defamation under § 1983, "a plaintiff must allege loss of a

15  recognizable property or liberty interest in conjunction with the allegation of injury to reputation."

16  *Cooper v. Dupnik*, 924 F.2d 1520, 1532 (9th Cir. 1991) (emphasis added), on reh'g, 963 F.2d 1220

17  (9th Cir. 1992); see *e.g.*, *Marrero v. City of Hialeah*, 625 F.2d 499, 517 (5th Cir. 1980). This is known

18  as the "stigma-plus" test. *Cooper*, 924 F.2d at 1532; *Rowe v. County of San Diego*, 608 F.3d 406, 444

19  (9th Cir. 2010); *Wright v. Lehman*, 5 Fed. Appx 654, 655 (9th Cir. 2001); *Partington v. Gedan*, 961

20  F.2d 852, 860-61 (9th Cir. 1992); *Hyland v. Wonder*, 972 F.2d 1129, 1142 (9th Cir. 1992); See also

21  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). ("Defamation, by itself, is a tort actionable under the laws

22  of most States, but not a constitutional deprivation.")

23      To meet the "plus" part of the test, plaintiffs must show they were denied "a right specifically

24  secured by the Bill of Rights (such as the right to free speech or counsel), or the denial of a

25  state-created property or liberty interest" in violation of plaintiffs' procedural due process rights.

26  *Cooper*, 924 F.2d at 1539 n.22;  See *Herb Hallman Chevrolet v. Nash-Holmes*, 169 F.3d 636, 645 (9th

27  Cir. 1999). "[A] person's interest in his reputation is neither 'liberty' nor 'property' for purposes of the

28  due process." *Buckley v. Fitzsimmons*, 20 F.3d 789, 797 (7th Cir. 1994) (citing *Paul*, 424 U.S. at 703).

"[T]he Fourteenth Amendment [is not] a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul,* 424 U.S. at 700-01; See *Cooper*, 924 F.2d at 1533-34;  *Bey v. City of Glendale*,  2015 U.S. Dist. LEXIS 170864, at *35-36 (C.D. CA Sep. 29, 2015).

Thus, to demonstrate such a "stigma-plus" theory of defamation, a plaintiff must establish (1) stigma consisting of "concrete, false factual assertions" and (2) infringement upon a protected liberty interest, which occurs when "the state '[seeks] to remove or significantly alter a life, liberty, or property interest recognized and protected by state law' or the federal constitution as incorporated against  the states." Id. (quoting *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995)).

Additionally, the "stigma-plus" test requires that the defamation be accompanied by an injury directly caused by the state, rather than an injury caused by the act of some third party in reaction to the State's defamatory statements. *Mazzeo v. Gibbons*, 649 F.Supp.2d 1182, 1197 (D. NV 2009); *Douglas v. Oregonian Pub. Co.*, 465 F. App'x 714, 715 (9th Cir. 2012) (unpublished); *Ooley v. Citrus Heights Police Dep't*, 603 F. App'x 628, 629 (9th Cir. 2015) (unpublished); See also *Eberhard v. California Highway Patrol*, 73 F.Supp.3d 1122, 1131 (N.D. CA 2014) (finding the defamation and deprivation must have been committed by the same state actor).

Examples of tangible interests recognized by the Supreme Court include the loss of the right to purchase alcohol, *Wisconsin v. Constantineau*, 400 U.S. 433, 434 (1971), foreclosure of the freedom to take advantage of government employment, *Bd. of Regents v. Roth*, 408 U.S. 564, 573-74 (1972), and the extinguishment of the right to public education, *Goss v. Lopez,* 419 U.S. 565, 574-75 (1975); see also *Sadallah*, 383 F.3d at 38 ("Burdens that can satisfy the 'plus' prong under this doctrine include the deprivation of a plaintiff's property, and the termination of a plaintiff's government employment." (citations omitted)).

Furthermore, the prosecution itself (the indictment and arrest) cannot be used as the basis for constitutional injury supporting a 1983 defamation claim.  *Rehberg v. Paulk*, 611 F.3d 828 (11th Cir. 2010);  *Spence-Jones v. Rundle*, 991 F. Supp. 2d 1221 (S.D. FL 2013);  *Buckley v. Fitzsimmons*, 20 F.3d 789, 797 (7th Cir. 1994), cert. denied, 513 U.S. 1085 (1995) (rejecting plaintiff's arrest as a sufficient "plus" under the stigma-plus test).

1    The Plaintiff has not and cannot demonstrate that Detective Galland's statements damaged his

2    reputation or that he suffered some other stigma sufficient to satisfy this claim.  As such, the Plaintiff's

3    claim based on defamation under 42 U.S.C. § 1983 must be dismissed.

4            **7.        Defendant Galland Is Entitled To Qualified Immunity**

5            Qualified immunity applies to Fourth Amendment claims, thereby giving a defendant police

6    officer two levels of reasonableness protection, one under the Fourth Amendment and one under

7    qualified immunity.  *Saucier v. Katz*, 55 U.S. 194 (2001).  Qualified immunity protects "government

8    officials . . . from liability for civil damages insofar as their conduct does not violate clearly

9    established statutory or constitutional rights of which a reasonable person would have known."

10   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The issue of qualified immunity is "a pure question

11   of law" and is intended to weed out insubstantial excessive force claims prior to trial.  *Elder v.*

12   *Holloway* 510 U.S. 510, 514 (1994); *Romero v. Kitsap County* 932 F.2d 624, 627-628 (9th Cir. 1991).

13   Indeed, it was the Supreme Court's intent that qualified immunity provides a protection to officers

14   such that it protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley*

15   *v. Briffs*, 475 U.S. 335, 341 (1986).

16           When the defense of qualified immunity is raised, the Court must conduct a multi-prong

17   inquiry: (1) do the undisputed facts make out a constitutional violation; and (2) was the law governing

18   the officers' conduct clearly established.  *Saucier,* supra, 533 U.S. at 201-202.  The Supreme Court

19   has instructed that district courts are no longer restricted to the order in which they address this two

20   part test.  *Pearson v. Callahan*, 129 S.Ct. 808 (2008).  Furthermore, notwithstanding the two part

21   inquiry in *Saucier*, there is also potential for a third inquiry as to whether a reasonable officer could

22   have believed his conduct was lawful under the law.  *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir.

23   2001).

24           The Supreme Court has consistently made it clear that the analysis of qualified immunity must

25   be from the perspective of an objectively reasonable officer under the totality of the circumstances at

26   the time and not some theory developed later on.  It simply cannot be overstated that the question a

27   court must decide as a matter of law is whether a reasonable officer under the circumstances could

28   ///

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

41

1   have reasonably believed, even mistakenly, that his conduct was justified. *Billington v. Smith*, 292

2   F.3d 1177, 1189 (9th Cir. 2002).

3       In a recent Supreme Court case, *City & Cnty of San Francisco v. Sheehan*, 135 S. Ct 1765

4   (Mar. 23, 2015), Justice Alito noted, "Qualified immunity is intended to "give government officials

5   breathing room to make reasonable but mistaken judgments" by "protecting all but the plainly

6   incompetent or those who knowingly violate the law". Id. citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074

7   (2011).  Justice Alito goes on to state "we have repeatedly told courts- and the Ninth Circuit in

8   particular- not to define clearly established law at a high level of nature of *particular* conduct is clearly

9   established." *Mullenix v. Luna*, 136 S. Ct. at 305, 308 (2015).

10      For a judicial deception claim to survive summary judgment on the ground of qualified

11  immunity, Mr. Flores "must 1) make a 'substantial showing' of deliberate falsehood or reckless

12  disregard for the truth and 2) establish that, but for the dishonesty, the [arrest] would not have

13  occurred." *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (citing *Hervey v. Estes*, 65

14  F.3d 784, 788-89 (9th Cir. 1995)). Courts "must test and interpret affidavits which underlie an arrest

15  in a 'commonsense and realistic fashion.'" *United States v. Esparza*, 546 F.2d 841, 843 (9th Cir. 1976)

16  (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). Moreover, "not all inaccuracies in an

17  investigative report give rise to a constitutional claim." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir.

18  2017) (citing *Black v. Montgomery Cty.*, 835 F.3d 358, 372 (3d Cir. 2016)). False statements and

19  omissions are material if the probable cause affidavit, "once corrected and supplemented," would not

20  support probable cause. *Chism v. Washington*, 661 F.3d 380, 389 (9th Cir. 2011);  *Chen v. D'Amico*,

21  2019 U.S. Dist. LEXIS 88063, at *46 (W.D. WA May 24, 2019).

22      Detective Galland is entitled to qualified immunity for each and every theory of liability set

23  forth above. There is a complete absence of case authority to support any argument that it was not

24  appropriate for Detective Galland to rely on the opinions on qualified medical professionals or that the

25  information they provided to him **four years** prior to their depositions in this case was somehow

26  materially inaccurate despite the fact that these doctors still confirmed the time frame which still

27  supports the arrest and prosecution of the Plaintiff.  There is likewise no authority to find that

28  Detective Galland could, in any way, be liable for defaming the Plaintiff under federal law as a result

1  of what was done during his investigation or what was contained in his police report or that his

2  interview of the Plaintiff was, in anyway, inappropriate. There is simply no authority which would

3  support any finding that Detective Galland could be liable. The entire premise of the Plaintiff's denial

4  of the allegations against him is that science has supposedly evolved such that Detective Galland

5  should have known that the concept of "shaken baby syndrome" was essentially being challenged.

6      While it is Defendants' position that there is no basis whatsoever to find a genuine issue of

7  material fact relative to any of the allegations against him, at a minimum, case authority does not

8  clearly establish that anything done by Detective Galland was unconstitutional.

9   **C.    DETECTIVE GALLAND IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
          AS TO HIS CLAIMS THAT DEFENDANTS INTERFERED WITH HIS FAMILIAL**
10  **         RELATIONSHIP**

11      The Plaintiff's second cause of action alleges that the Defendant Galland interfered with

12  Plaintiff's right to enjoy a close familial relationship with his child in violation of the Fourteenth

13  Amendment.

14      Initially, the Plaintiff's parental relationship was previously adjudicated as a matter of law and

15  as such, the Plaintiff's claim is barred un the doctrine of collateral estoppel.

16      The Ninth Circuit recently explained that the constitutional right to familial association "is

17  entirely judge-made" and courts "have variously relied on the Fourteenth, First, and Fourth

18  Amendments" as the source of the right. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).

19      Under the Fourteenth Amendment, "[a] parent has a fundamental liberty interest in the

20  companionship and society of his or her child and  the state's inference with that liberty interest

21  without due process of law is remediable under 42 U.S.C. § 1983." *Lee v. City of Los Angeles*, 250

22  F.3d 668, 685 (9th Cir. 2001).  However, the constitutional liberty interest in the maintenance of

23  familial relationships is not absolute. *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012). "The

24  interest of the parents must be balanced against the interests of the state and, when conflicting, against

25  the interests of the children." *Woodrum v. Woodward Cnty.*, 866 F.2d 1121, 1125 (9th Cir. 1989).

26      "['T]he right to family integrity clearly does not include a constitutional right to be free from

27  child abuse investigations,'" *Ervin v. Cty of San Diego*, 2019 U.S. Dist. Lexis 171492, at * 25 (S.D.

28  CA Oct. 2, 2019);  *Hodge v. Jones*, 31 F.3d 157, 164 (4th Cir. 1994) (quoting *Watterson v. Page*, 987

F.2d 1, 8 (1st Cir. 1993)), and the State "has a legitimate interest in curtailing the abuse and neglect of its minor citizens." Id. (citing *Santosky v. Kramer*, 455 U.S. 745, 766 (1982) (state has "*parens patriae* interest in preserving and promoting the welfare of the child")). *Tyner v. Brunswick Cty. Dep't of Soc. Servs.*, 776 F. Supp. 2d 133, 142 (E.D. NC 2011). "**This liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children—particularly where the children need to be protected from their own parents.**" *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)[emphasis added]. "The interest of the parents must be balanced against the interests of the state and, when conflicting, against the interests of the children." *Woodrum*, 866 F.2d at 1125.

To prevail on a Fourteenth Amendment claim arising out of the loss of a familial relationship, a plaintiff must show that the defendants conduct "shocks the conscience". *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)[quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). That a parent might have been subjected to an investigation by the Department of Social Services is not sufficient to state a claim for violation of the liberty interest in familial relations. *Woodrum v. Woodward County*, 866 F.2d 1121, 1124 (9th Cir. 1989). Further, where law enforcement officers are forced to react to sudden situations with haste and under pressure without the opportunity to fully consider the potential consequences of their conduct, their conduct shocks the conscience **only when it is motivated by a purpose to harm**. *County of Sacramento v. Lewis*, 523 U.S. 833, 852-53 (1998). Under this standard, if an officer's instinct is to do his or her job as a law enforcement officer and not to terrorize, cause harm, or kill, there is no substantive due process violation even if prudence should have repressed the officer's reaction. *Lewis*, 523 U.S. at 855; *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008).

The Ninth Circuit has intimated that an underlying due process violation is a prerequisite to a claim for denial of familial association claim based on the Fourteenth Amendment. See, *e.g.*, *Lee*, 250 F.3d at 685 ("[T]he state's interference with [the right of familial association] without due process of law is remediable under 42 U.S.C. § 1983.") (internal quotations omitted, emphasis added); accord *McClurg v. Maricopa Cnty.*, 2012 U.S. Dist. LEXIS 121042, 2012 WL 3655318, at *9 (D. AZ Aug. ///

1  27, 2012) ("[T]he right to familial association can only be violated if there is an underlying due process

2  violation."); *Slusher v. City of Napa*, 2015 U.S. Dist. LEXIS 166565, at *20 (N.D. CA Dec. 10, 2015).

3        The Plaintiff cannot state a viable claim under the Fourteenth Amendment for deprivation of

4  his familial rights.  The decision to remove M.F. from the custody of both of M.F.'s parents was the

5  decision of the Department of Social Services and was done pursuant to an entirely independent

6  investigation which was not influenced by Detective Galland.  [See DSUF Nos. 51, 52, 54, 57, 58, 61,

7  74-78.]

8        Furthermore, the Plaintiff has not and cannot demonstrate that Detective Galland's conduct,

9  if any, relative to M.F., was motivated by a purpose to harm.

10        As such, the Plaintiff's claim fails as a matter of law.

11        However, to the extent, the Court believes that somehow Detective Galland could be liable

12  under this claim, Detective Galland is again entitled to qualified immunity. First, the child was in a

13  medically induced coma and was admitted to the hospital, something Detective Galland had nothing

14  to do with. To the extent that the Plaintiff claims he was not permitted to see his child, and to the

15  extent the Plaintiff can demonstrate that this was the result of Detective Galland's conduct, again,

16  Detective Galland was relying on medical professionals who advised him that M.F. was likely the

17  victim of child abuse and provided a window of time which was consistent with the time period during

18  which Mr. Flores was solely responsible for M.F.'s care.  Further, Detective Galland was relying on

19  the evaluation of Social Services who was involved from the very beginning of this incident and who

20  conducted its own analysis and the family court independently concluded Plaintiff's parental rights

21  should be terminated, something Detective Galland had nothing to do with.

22        There is a complete absence of law that would put Detective Galland on notice that his conduct,

23  in any way, was unconstitutional.  As such, and at a minimum, Detective Galland is entitled to

24  judgment as a matter of law.

25  ///

26  ///

27  ///

28  ///

1    **D.    THE PLAINTIFF'S STATE LAW CLAIM FOR FALSE ARREST/FALSE**
     **IMPRISONMENT FAILS FOR THE SAME REASONS THE PLAINTIFF'S § 1983**
2    **CLAIM FAILS – THERE WAS PROBABLE CAUSE TO ARREST**

3         The Plaintiff's fourth cause of action for false arrest/false imprisonment fails for the same

4    reasons the Plaintiff's federal law claim fails.  The Defendants had probable cause to arrest.  See

5    Section B2 above.

6         False imprisonment is defined by statute as "the unlawful violation of the personal liberty of

7    another." Cal. Pen. Code. § 236.  The tort is defined similarly and consists of the "nonconsensual,

8    intentional confinement of a person, without lawful privilege, for an appreciable length of time,

9    however short." *Molko v. Holy Spirit Assoc.*, 46 Cal.3d 1092, 1123 (1988).

10        California Penal Code § 847 provides that a peace officer shall have no liability for false arrest

11   or false imprisonment arising out of an arrest that was lawful or the officer had reasonable cause to

12   believe that the arrest was lawful.  Cal. Penal Code § 847.  *Koistra v. Cty. of San Diego*, 310 F. Supp.

13   3d 1066, 1088 (S.D. CA 2018).  Thus, a law enforcement officer is protected from liability for false

14   arrest where the officer, acting within the scope of his or her authority, either (1) effects a lawful arrest

15   or (2) has reasonable cause to believe the arrest is lawful. *Galvin v. Hay*, 374 F.3d 739 (9th Cir. 2004);

16   *Wilson v. City of Bakersfield*,  2017 U.S. Dist. LEXIS 201009, at *43-44 (E.D. CA Dec. 6, 2017).

17        As is set forth above, Defendant Galland had probable cause to arrest Mr. Flores.  See Section

18   B2 above.  As such, the Plaintiff's claim for false arrest/false imprisonment fails.

19   **E.    THE PLAINTIFF'S  CLAIM FOR NEGLIGENCE FAILS AS A MATTER OF LAW**

20        The Plaintiff's fifth cause of action against Defendants is for negligence and appears to be

21   based on predominately the same facts as Plaintiff's other causes of action.  This claim is not supported

22   by the facts or the law and as such, it fails as a matter of law.

23        In order to prevail on a claim for common law negligence against a police officer, Plaintiffs

24   must show that (1) the officer owed plaintiff a duty of care; (2) the officer breached the duty by failing

25   "to use such skill, prudence, and diligence as other members of the [the] profession commonly possess

26   and exercise," (3) there was a "proximate causal connection between the [officer's] negligence conduct

27   and the resulting injury" to the plaintiff; and (4) the officer's negligence resulted in  [*1027]  "actual

28   loss or damage" to the plaintiff. *Harris v. Smith*, 157 Cal. App. 3d 100, 104 (1984). Therefore, "to

1    prevail on the negligence claim, Plaintiffs must show that   the Defendant officers acted unreasonably

2    and that the unreasonable behavior harmed Plaintiffs. *Price v. County of San Diego*, 990 F. Supp. 1230

3    (S.D. CA 1998).

4         Significantly, where a "federal court factually finds that the police officers' conduct was

5    objectively reasonable and grants summary judgment, that decision bars a state negligence action

6    premised upon violation of the same primary right." *Sanders v. City of Fresno*, 551 F.Supp.2d 1149,

7    1181 (E.D. CA 2008) (citing *City of Simi Valley v. Superior Court*, 111 Cal. App. 4th 1077, 1084

8    (2003));  *Oppenheimer v. City of Los Angeles*, 104 Cal.App.2d 545, 549 (1951); *Pallas v. Accornero*,

9    2019 U.S. Dist. Lexis 93569 (N.D. CA June 3, 2019)[State law claim for negligence fails where there

10   was probable cause for arrest].

11        As such, based on the previous arguments set forth above in regard to the Plaintiff's

12   Constitutional claims, the Plaintiff's cause of action for negligence fails.

13        Even if this Court were to find otherwise, the Plaintiff's claim for negligence still fails as there

14   is no evidence that Detective Galland was negligent in any way.  The Plaintiff has not designated a

15   police procedures expert who can opine as to what a reasonable officer under the circumstances would

16   do.  As such, this claim must be dismissed.

17   **G.     THE PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL
         DISTRESS FAILS AS A MATTER OF LAW**
18

19        The Plaintiff's seventh cause of action is for intentional infliction of emotional distress.  There

20   is no evidence to support this claim.

21        A claim for intentional infliction of emotional distress requires a plaintiff to establish, among

22   other elements, "extreme and outrageous conduct by the defendant with the intention of causing, or

23   reckless disregard [for] the probability of causing, emotional distress." *Ravel v. Hewlett-Packard*

24   *Enterprise, Inc.*, 228 F. Supp. 3d 1086, 1099, 2017 U.S. Dist. LEXIS 4299,  *10 (E.D. CA Jan. 11,

25   2017) (quoting *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009); see also *Wilkins v. National Broad.*

26   *Co., Inc.*, 71 Cal. App. 4th 1066, 1087 (1999).

27        To be sufficiently extreme and outrageous conduct, the actions alleged "must be so extreme

28   as to exceed all bounds of that usually tolerated in a civilized community." *Cochran v. Cochran*, 65

1    Cal. App. 4th 488, 494 (1998) (quotations omitted); see also *Potter v. Firestone Tire & Rubber Co.*,

2    6 Cal. 4th 965, 1001 (1993); *Rangel v. Bridgestone Retail Operations, LLC*, 200 F. Supp. 3d 1024,

3    1032 (C.D. CA 2016). The Court may conclude that the alleged conduct is  insufficiently outrageous

4    to sustain such a claim as a matter of law. See *Davidson v. City of Westminster*, 32 Cal. 3d 197, 210

5    1982).

6        There is no evidence in this case from which a jury could conclude that Detective Galland's

7    conduct was "so extreme" as to exceed all bounds of that usually tolerated in a civilized community.

8    Detective Galland acted pursuant to the authority vested in him to investigate crimes and make arrests

9    where there is probable cause to do so. There is no evidence of any impropriety by Detective Galland,

10   let alone conduct which would be considered "so extreme" as to exceed the bounds of that tolerated

11   in a civilized society.  As such, the Plaintiff's claim for Intentional Infliction of Emotional Distress

12   must be dismissed.

13   **H.       DOES 1 THROUGH 10 SHOULD BE DISMISSED**

14       Plaintiff  names Does 1 through 10 in his First Amended Complaint. Does 1 through 10 are

15   alleged to be officers for the Bakersfield Police Department.  [Dkt. No. 17, ¶ 10.]

16       The Ninth Circuit disfavors fictitious parties. *Gillespie v. Civiletti*, 629 F. 2d 637, 642 (9th Cir.

17   1980); *Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069, fn. 2 (N.D. CA 2008). Fed. R. Civ. P. 4(m)

18   provides that all defendants must be served within 90 days of a complaint's filing. Further, on January

19   11, 2018 the Court issued a Scheduling Order which set the Pleading Amendment Deadline as April

20   10, 2018. [Dkt. No. 14.] Plaintiff  did not seek to amend his First Amended Complaint to identify any

21   of the Doe Defendants or to otherwise specifically name another Defendant.  As such, the Doe

22   Defendants should be dismissed.

23                                    **CONCLUSION**

24       There is a complete absence of evidence to support the Plaintiff's claims in this case.  That the

25   Plaintiff was acquitted in the criminal trial is not sufficient.  Detective Galland conducted a thorough

26   and appropriate investigation.  The District Attorney elected to prosecute the Plaintiff.  This was

27   independent of Detective Galland.  The Department of Social Services determined that M.F. should

28   be removed from the custody of both of his parents.  This was independent of Detective Galland.

1  Detective Galland simply did not engage in any conduct for which a jury could conclude he is liable

2  to the Plaintiff.  As such, the Plaintiff's claims must be dismissed in their entirety.

3  Dated:  October 21, 2019                    MARDEROSIAN & COHEN

4

5                                              */s/ Michael G. Marderosian*
                                        By:_____

6                                              Michael G. Marderosian,
                                               Attorney for Defendants above-named.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28