1    Michael G. Marderosian, No. 077296
     Heather S. Cohen, No. 263093
2    MARDEROSIAN & COHEN
     1260 Fulton Street
3    Fresno, CA 93721
     Telephone:  (559) 441-7991
4    Facsimile: (559) 441-8170

5    Virginia Gennaro, No. 138877
     City Attorney
6    CITY OF BAKERSFIELD
     1501 Truxtun Avenue
7    Bakersfield, CA  93301
     Telephone:  (661) 326-3721
8    Facsimile:  (661) 852-2020

9    Attorneys for:  Defendants CITY OF BAKERSFIELD and JOSEPH GALLAND

10                       UNITED STATES DISTRICT COURT

11                       EASTERN DISTRICT OF CALIFORNIA

12

13   JESUS FLORES,                          )   Case No.  1:17-CV-01393-JLT
                                            )
14                   Plaintiffs,            )   **DEFENDANTS' SEPARATE**
                                            )   **STATEMENT OF UNDISPUTED**
15          v.                              )   **FACTS IN SUPPORT**
                                            )   **OF  MOTION FOR SUMMARY**
16   CITY OF BAKERSFIELD;                   )   **JUDGMENT OR, IN THE**
     JOSEPH GALLAND; and                    )   **ALTERNATIVE, PARTIAL**
17   DOES 1 to 10, inclusive,               )   **SUMMARY JUDGMENT**
                                            )
18                   Defendants.            )   **DATE:  November 25, 2019**
                                            )   **TIME: 9:30 a.m.**
19   _____       )   **JUDGE:  Jennifer L. Thurston**

20          Pursuant to Local Rule 260 and the Court's Scheduling Order, Defendants City of Bakersfield

21   and Joseph Galland submit the following Separate Statement of Undisputed Facts in Support of their

22   Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment:

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

| | |
|---|---|
| **UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE:** | **OPPOSING PARTY'S RESPONSE:** |

1.   In his report, Detective Galland reports that he and Sergeant Burdick responded to Bakersfield Memorial Hospital and that upon their arrival, they learned that M.F. had been placed in a medically induced coma to stabilize him.  He was also placed on a ventilator.

    Supporting Evidence:

    Declaration of Joseph Galland ("Galland Decl."), ¶ 4; Police Report, Ex. 3 to MGM Decl.

2.   In his report, Detective Galland reports that he spoke first with Dr. Burny, a pediatric specialist, and then with emergency room physician, Dr. Wade Naven, who was the attending physician at the time.

    Supporting Evidence:

    Deposition of Wade Naven M.D. taken April 16, 2019 ("Naven Depo. 1"), pp. 36:18-23, 40:5-14, Ex. 4 to MGM Decl.; Galland Decl., ¶ 5; Police Report, Exhibit 3 to MGM Decl.

3.   Detective Galland's report states that Dr. Naven advised him that M.F. had injuries to his brain and that Dr. Naven was very worried that M.F. was the victim of child abuse.

    Supporting Evidence:

    Naven Depo. 1, p. 28:6-12, Ex. 4 to MGM Decl.; Galland Depo., pp. 33:23-35:14, Ex. 2 to MGM Decl.

4.    Dr. Naven showed Detective Galland
      M.F.'s CT scan depicting multiple
      hematomas because Dr. Naven felt
      even a "non-medical person could
      see" that it was not normal.

      Supporting Evidence:

      Naven Depo. 1, pp. 43:3-45:14,
      47:12-18, 50:5-14, 51:2-4, 52:16-21,
      Ex. 4 to MGM Decl.; Galland Depo.,
      pp. 33:23-35:14, Ex. 2 to MGM Decl.

5.    Dr. Naven diagnosed M.F with "non-
      accidental trauma" and had a "strong
      belief" that M.F. had been abused
      "over the course of the last two and a
      half months since birth repeatedly.

      Supporting Evidence:

      Naven Depo., pp. 28:13-16, 30:4-13,
      31:12-32:6, 32:8-22, 66:18-67:21,
      69:23-71:3,  71:17-24, Ex. 4 to MGM
      Decl.; Galland Depo., pp. 23:3-8,
      38:24-41:11, 53:1-9, Ex. 2 to MGM
      Decl.

6.    Dr. Naven prepared a report which
      noted multiple subdural hematomas,
      the majority of which contain acute
      hemorrhage mixed with additional
      hemorrhage of varying ages.  The
      diagnoses were as follows: (1)
      Subdural hematoma; (2) Evaluate
      non-accidental trauma; and (3)
      Respiratory alkalosis with metabolic
      acidosis.

      Supporting Evidence:

      Naven Depo. 1, Ex. 2 thereto, Ex. 4 to
      MGM Decl.

7.   Since Sergeant Galland was not/is not a medical doctor, he relied on what Dr. Naven had communicated to him in terms of what was shown on the CT and that M.F.'s injuries were "non accidental". Detective Galland's report states that he "asked Dr. Naven how recent the acute brain injuries had been caused and Dr. Naven stated he believed the injuries were no more than two hours old."

Supporting Evidence:

Galland Depo., pp. 36:11-25, 37:7-19, Ex. 2 to MGM Decl.; Naven Depo. 1, pp. 52:23-53:9, 83:4-10, Ex. 4 to MGM Decl.

8.   On July 6, 2017, two years after his discussion with Detective Galland, Dr. Naven testified in the criminal case that he didn't remember specifically telling Sergeant Galland that the acute subdural hematoma could be as recent as two hours but "it definitely could have."

Supporting Evidence:

Criminal Testimony of Wade Naven M.D. ("Naven Crim."), pp. 53:13-20, Ex. 5 to MGM Decl.

9.   At the time of his deposition on April 16, 2019, four years after the discussion with Detective Galland, Dr. Naven testified that he didn't "have a direct recollection of saying that to him.  In – my standard practice would be to say " within a few hours" and that he believed the acute injury had occurred "within the last few hours."

Supporting Evidence:

Naven Depo. 1, pp. 23:17-24, 52:23-53:9, 60:9-16, 83:4-17, Ex. 4 to MGM Decl.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10.     Detective Galland proceeded to see M.F. and took digital photographs depicting bruising on M.F.'s left and right cheeks.

Supporting Evidence:

Galland Decl., ¶ 6.

11.     Ms. Guzman advised Detective Galland that M.F. had no medical problems or allergies that she was aware of and had been seen about a month earlier for a checkup. Detective Galland also asked Ms. Guzman about M.F.'s schedule that day and she indicated that she and her mother, aunt, and cousins had left the house around 2 p.m. to get a haircut and look at a gym memberships, leaving M.F. alone with Plaintiff Jesus Flores.  Ms. Guzman indicated that they returned to the residence around 3 or 3:15 p.m., at which point, Ms. Guzman and her mother left to go to the Farmer's Market and that Ms. Guzman's aunt and cousins also left, again leaving M.F. alone with Plaintiff Jesus Flores.

Supporting Evidence:

Galland Decl., ¶ 6.

12.     Detective Galland's report reflects that he also re-contacted Dr. Naven who advised that M.F. was being transferred to Valley Children's Hospital and that M.F. had a reasonable chance of survival but indicated he thought there was a high probability the child would suffer significant permanent brain damage as a result of the injuries.

Supporting Evidence:

Naven Depo. 1, p. 61:10-25, Ex. 4 to MGM Decl.; Galland Depo., p. 42:12-15, Ex. 2 to MGM Decl.; Police Report, Ex. 3 to MGM Decl.

1

2

3

4

5

6

7

8

9

13.    Detective Galland's report reflects that after his discussion with Dr. Naven, he reached out to Detective McAfee, who was at the subject residence and who was going to return to the Police Department to author a search warrant.  Detective Galland's report reflects that Jesus Flores would be transported to the Bakersfield Police Department via patrol car to be interviewed, and that two other relatives were going to drive themselves. In addition, Detective Galland asked Sara Guzman and her mother, Geneveva Ramirez, to come to the Police Department so that the investigation could be continued.

10

Supporting Evidence:

11

Galland Decl., ¶ 8 and 9; Galland Report, Ex. A to Galland Decl.

12

13

14

15

16

17

18

19

20

21

14.    Detective Galland and Detective Davenport proceeded to interview the family/witnesses including: (1) Mariana Ramirez, the aunt of Sara Guzman; (2) Araceli Reyes, the daughter of Mariana Ramirez; (3) Jose Mendez, M.F.'s grandfather; (4) Christopher Guzman, Sara Guzman's brother; (5) Geneveva Ramirez, Sara Guzman's mother; (6) Sara Guzman; and (7) Jesus Flores.  All of the interviews were audio and video recorded and booked into evidence. In addition, each of these interviews was summarized in Detective Galland's report.  Before both Ms. Guzman's interview and Mr. Flores' interview, *Miranda* rights were explained and waived.

22

23

Supporting Evidence:

24

25

26

Galland Decl., ¶ 10a-g; Galland Report, Ex. A to Galland Decl.; Interview of Sara Guzman ("SG Interview), Ex. 8 to MGM Decl.; Interview of Jesus Flores ("JF Interview), Ex. 13 to MGM Decl.

27

28

15.     During interviews, Detective Galland
        learned that Sara Guzman, Marianna
        Ramirez, Araceli Reyes, and
        Geneveva Ramirez were gone from
        the residence from approximately 2
        p.m. to approximately 3 p.m. or 3:15
        p.m. and left again around 3:40 p.m.
        or 3:45 p.m.

        Supporting Evidence:

        Galland Decl., ¶ 10e-f; Police Report,
        Ex. 3 to MGM Decl.; Transcript of
        interview of Sara Guzman ("SG
        Interview"), Ex. 8 to MGM Decl.;
        Transcript of interview of Mariana
        Ramirez ("MR Interview"), Ex. 9 to
        MGM Decl.; Transcript of interview
        of Araceli Reyes ("AR Interview"),
        Ex. 10 to MGM Decl.; Transcript of
        interview of Geneveva Ramirez ("GR
        Interview"), Ex. 11 to MGM Decl.

16.     At the criminal trial, Ms. Guzman
        testified that they left around 1:00,
        1:30ish and were gone until 3 p.m.

        Supporting Evidence:

        June 5, 2017, Criminal Trial
        Transcript, pp. 21:18-23:22, Ex. 12 to
        MGM Decl.

17.     During interviews, Detective Galland
        learned that Jesus Flores was alone
        with M.F. from approximately 2 p.m.
        to 3 p.m. or 3:15 p.m., and again from
        approximately 3:40 p.m. or 3:45 p.m.
        until the time that the Fire Department
        arrived around 4:20 p.m.

        Supporting Evidence:

        Galland Decl., ¶ 10a-g; Police Report,
        Ex. 3 to MGM Decl.; SG Interview,
        Ex. 8 to MGM Decl.; Transcript of
        Interview of Jesus Flores ("JF
        Interview"), Ex. 13 to MGM Decl.

18. In his interview, Jose Mendez told Detective Galland that Jesus Flores did not take very good care of the baby because he was always busy playing video games and that he had observed Jesus Flores lose his temper when M.F. was fussy and that Jesus Flores had yelled at M.F. so loudly that the child became startled

Supporting Evidence:

Galland Decl., ¶ 10c; Police Report, Ex. 3 to MGM Decl.; JM Interview, Ex. 7 to MGM Decl.

19. During interviews, Detective Galland inquired about the bruises M.F.'s relatives advised Detective Galland they observed before they left the residence. There were bruises on both M.F.'s cheeks that were observed by some of M.F.'s relatives before they left the residence. Ms. Guzman indicated she recalled seeing them on Monday morning but had no explanation as to what caused them. Jesus Flores told the Detectives he had seen them on Sunday night and had also seen red marks in the white portions of M.F.'s eyes. To Detective Galland, this meant the bruises pre-existed the CPR that was performed earlier in the day.

Supporting Evidence:

Galland Decl., ¶10f-g; Police Report, Ex. 3 to MGM Decl.; JM Interview, Ex. 7 to MGM Decl.; SG Interview, Ex. 8 to MGM Decl.; JF Interview, Ex. 13 to MGM Decl.

20. It was confirmed in the interviews that M.F. was a normal healthy child, though he had some breathing problems at birth due to swallowing his placenta and a month earlier, he had an infection in his throat.

Supporting Evidence:

Galland Decl., ¶ 10a; Police Report, Ex. 3 to MGM Decl.; SG Interview, Ex. 8 to MGM Decl.

21.    Detective Galland learned that Mr. Flores takes medicine for stress and has an anti-anxiety prescription which is taken as needed (Alphrazolam).  In addition, during the interview of Mr. Flores, Mr. Flores recounted the last couple of days.  Mr. Flores noted that M.F. had been fussy, at least that day, and possibly the day before.  At approximately 1 p.m. on the date of the incident, Jesus Flores noted that M.F. was being fussy and took him outside to rock him.  Jesus Flores gave M.F. a shower, changed him, and made him a bottle and M.F. then took a nap.   Mr. Flores stated that he was alone with M.F.  while everyone else was gone.  After everyone came back and left again, Mr. Flores recounted that  M.F. was in his bassinet sleeping when he started coughing and then began choking.  Jesus Flores noticed that M.F. stopped breathing.  Jesus Flores picked M.F. up and M.F. started to breath again and then stopped.  Mr. Flores went to the shower, turned the water on, and splashed some water on M.F.'s face, at which point M.F. gasped and seemed to wake up, but then he immediately lost consciousness again.  Mr. Flores stated he called 9-1-1 and began performing CPR.  Mr. Flores stated that while he was performing CPR, there seemed to be blood coming out of M.F.'s nose.

Supporting Evidence:

JF Interview, Ex. 13 to MGM Decl.

22.    Jesus Flores denied seeing anyone mistreat the baby or get frustrated but as the Detectives continued to question him, Mr. Flores admitted that he does sometimes get frustrated and flustered with M.F. but has never been angry.

Supporting Evidence:

JF Interview, Ex. 13 to MGM Decl.

23.   Mr. Flores admitted that on the day of the incident he got frustrated because he could not seem to make the baby stop crying.  This was frustrating to Mr. Flores because he was supposed to be online playing a live stream video game at 1 p.m. but the baby was still fussy.

Supporting Evidence:

JF Interview, Ex. 13 to MGM Decl.

24.   During this interview, Mr. Flores was given a doll and asked to demonstrate how he shook Mason Flores.

Supporting Evidence:

JF Interview, Ex. 13 to MGM Decl.; JF Video Interview at File VTS_01_7.VOB, 0:00:50-0:01:20, 02:46-03:31 Ex. 26 to MGM Decl.

25.   Detective Galland observed Mr. Flores start as though he was rocking the baby in his lap and then he accelerated and showed a more violent shaking motion.  Based on Detective Galland's observations, as well as his education, training, and experience, he knew that the doll was not that heavy and so it took a significant amount of energy to make the doll's head move.

Supporting Evidence:

Galland Decl., ¶ 10g; JF Interview, Ex. 13 to MGM Decl.; JF Video Interview at File VTS_01_5.VOB, 0:11:14 - 0:12:30, Ex. 26 to MGM Decl.; Police Report, Ex. 3 to MGM Decl.

26.   After Jesus Flores admitted he had
become frustrated and could not figure
out why M.F. would not stop crying,
Mr. Flores told the Detectives:

a.   He didn't "know if it was just
like a hard shake. I don't
remember if it was a hard
shake or if it was a little shake,
it was a medium shake, he was
hitting his face against my
chest or if it was just like this."

Supporting Evidence:

JF Interview, Ex. 13 to MGM
Decl.; Video of JF Interview,
Ex. 25 to MGM Decl.

b.   "I mean, I might've got a little
frustrated and been like– you
know, calm down or
something like–" "and maybe
that I shook like a little too
hard."

Supporting Evidence:

JF Interview, Ex. 13 to MGM
Decl.; Video of JF Interview,
Ex. 25 to MGM Decl.

c.   Then I'll admit– I'll admit that
the only time that I actually
moved him hard was when I
was outside in the patio."

Supporting Evidence:

JF Interview, Ex. 13 to MGM
Decl.; Video of JF Interview,
Ex. 25 to MGM Decl.

1

    d.     "I saw him and he was laid back– I mean, he would just cry, and cry, and cry, and I didn't know what to do, and nobody else knew what to do, and every time I grabbed him, he stays quiet.  He wasn't staying quiet."

2

3

4

5

            Supporting Evidence:

6

7

            JF Interview, Ex. 13 to MGM Decl.; Video of JF Interview, Ex. 25 to MGM Decl.

8

    e.     "So I didn't know what was wrong with him.  Maybe I did shake him too hard.  Maybe I did it."

9

10

11

            Supporting Evidence:

12

            JF Interview, Ex. 13 to MGM Decl.; Video of JF Interview, Ex. 25 to MGM Decl.

13

14

    f.     "I didn't know I was shaking him too hard.  I was outside in the patio and did it.  I didn't know I was shaking him too hard.  I'm sorry I did that.  I had no intentions in doing that.  I would never hurt my kid on purpose."

15

16

17

18

            Supporting Evidence:

19

            JF Interview, Ex. 13 to MGM Decl.; Video of JF Interview, Ex. 25 to MGM Decl.

20

21

22

23

24

25

26

27

28

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

g.     "Did I mean to shake him like even if I did shake him hard which I don't remember because I had so much things going on, I had this stream that I was supposed to start and I was late. I had to feed him. I changed his poopie, big-o diaper that like weighs five pounds. He was being fussy still so I tried feeding him. He didn't eat. I took him outside. He calmed down for a little bit and then he just started being fussy again and I didn't know what was wrong with him. I did– you know, try to comfort him and stuff but I didn't know if I was doing it too hard.   It really wasn't and I hate myself for it. I would never hurt my kid. My baby is my life. I didn't know I was shaking him too hard."

Supporting Evidence:

JF Interview, Ex. 13 to MGM Decl.; Video of JF Interview, Ex. 25 to MGM Decl.

27.    Detective Galland then suspended the interview to consult with the on-scene social worker and Sergeant Burdick. Since there had been no updated medical information, Detective Galland made the decision not to arrest anyone based on a lack of updated medical information from Children's Hospital.

Supporting Evidence:

Galland Decl., ¶ 11.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.   The reports that had been forwarded reflected that a bone scan had been conducted which showed several fractures to M.F.'s left humerus and both of his femurs, as well as a possible fracture to his left ulna.  The medical report classified the injuries as "non accidental trauma". Additionally, an MRI conducted by Valley Children's Hospital showed several brain injuries and was characterized as "non accidental trauma".  This was detailed in Detective Galland's Report.

Supporting Evidence:

Galland Decl., ¶ 12; Records from Valley Children's Hospital, Ex. 14 to MGM Decl.; Police Report, Ex. 3 to MGM Decl.

29.   Detective Galland also spoke briefly with Dr. Phillip Hyden, who was the Medical Director of The Guilds Child Abuse Prevention and Treatment Center at Valley Children's Hospital in Madera and is a board certified child abuse pediatrician. Dr. Hyden had been called by the pediatric intensive care unit to come and do a consultation to determine if Mason's injuries, and any further injuries that were found were the result of non-accidental trauma or due to some accidental means.  Dr. Hyden advised Detective Galland that more tests needed to be conducted and that he needed to review all the case files but what he had seen at that point was indicative of child abuse.  This was detailed in Detective Galland's report.

Supporting Evidence:

Galland Decl., ¶ 12; Police Report, Ex. 3 to MGM Decl.; Hyden Depo., p. pp. 18:16-19, 39:14-25, 96:20-22, 98:20-99:8, Ex. 20 to MGM Decl.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30.   At 3:19 p.m., Detective Galland began interviewing Ms. Guzman.  He advised her again of her *Miranda* Rights, which she stated she understood and agreed to speak with Detective Galland.  The interview was video and audio recorded and downloaded into evidence. This interview was summarized in Detective Galland's Report.

Supporting Evidence:

Galland Decl., ¶ 15; Police Report, Ex. 3 to MGM Decl.

31.   Detective Galland inquired further with Ms. Guzman about whether or not Jesus Flores was ever alone with M.F.  Ms. Guzman confirmed that Mr. Flores was alone with M.F. two times a week.  Detective Galland asked Ms. Guzman who else could have done this and she stated she did not know.

Supporting Evidence:

Galland Decl., ¶ 15; SG Interview, Ex. 8 to MGM Decl.

32.   Ms. Guzman ruled out her father as causing these problems and expressed concern she may have injured M.F. by picking him up by the arms.

Supporting Evidence:

Galland Decl., ¶ 15; SG Interview, Ex. 8 to MGM Decl.

33.   In addition, Ms. Guzman told Detective Galland that Jesus Flores told her that during the time he was taking care of M.F., and during the time he was in respiratory distress, that Jesus Flores had anxiety attacks and blacked out.

Supporting Evidence:

Galland Decl., ¶ 15; SG Interview, Ex. 8 to MGM Decl.

1

2

3

4

5

6

7

8

34. Detective Galland went back over the timeline of events on May 21, 2015 with Ms. Guzman.  In addition to leaving M.F. alone with Mr. Flores when she and her family went to look at the gym and when she and her mother went to the Farmer's Market, Jesus Flores was alone with M.F. while Ms. Guzman and her mother were making lunch.

   Supporting Evidence:

   Galland Decl., ¶ 15; SG Interview, Ex. 8 to MGM Decl.

9

10

11

35. Ms. Guzman stated that when M.F. gets fussy, Jesus Flores usually hands him off but Ms. Guzman did not know what Mr. Flores did when he was unable to hand him off.

12

   Supporting Evidence:

13

   Galland Decl., ¶ 15; SG Interview, Ex. 8 to MGM Decl.

14

15

16

17

18

19

20

36. Detective Galland's report summarized a discussion later in the afternoon with Dr. Hyden. Dr. Hyden stated he was still in the process of reviewing medical records and had not formed his formal opinion but the injuries that he had seen and the documents strongly indicated that [M.F.] had been abused, and that he had been abused on previous occasions as well.  This was detailed in Detective Galland's report.

21

   Supporting Evidence:

22

23

   Galland Depo., p. 119:2-9, Ex. 2 to MGM Decl; Galland Decl., ¶ 16; Police Report, Ex. 3 to MGM Decl.

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37. Detective Galland's report indicates that he questioned Dr. Hyden about the window of time in which the injury occurred. Detective Galland's report states that "Dr. Hyden stated that based on the injuries he had seen he would state that it was highly likely that the brain injury which caused [M.F.] to stop breathing likely occurred no more than ten minutes before [M.F.] stopped breathing and possibly immediately after the injury occurred."

Supporting Evidence:

Galland Decl., ¶ 16; Police Report, Ex. 3 to MGM Decl.

38. The only person alone with M.F. during this window of time was Jesus Flores.

Supporting Evidence:

Galland Depo., p. 119:10-25, Ex. 2 to MGM Decl; Galland Decl., ¶ 17; Police Report, Ex. 3 to MGM Decl.

39. On May 27, 2015 and May 28, 2015, Detective Galland received updates from medical social workers and nurses at Valley Children's Hospital. Detective Galland was advised that Sara Guzman was claiming that she believed her mother, Genoveva Ramirez, had caused M.F.'s injuries; however, based on the timeline provided by Dr. Hyden, Detective Galland did not believe Ms. Ramirez was responsible as the only person with Mason Flores 15 minutes prior to his respiratory distress was Jesus Flores. Furthermore, the fact that Ms. Guzman and her mother picked M.F. by the arms did not explain the fractures to M.F.'s femurs. This was detailed in Detective Galland's report.

Supporting Evidence:

Galland Decl., ¶ 17; Police Report, Ex. 3 to MGM Decl.

40.   On May 29, 2015 at approximately 2:50 p.m., Jesus Flores was taken into custody.  He was transported to the Bakersfield Police Department.  He was advised of his *Miranda* rights again and interviewed.  The interview was audio and video recorded and put into evidence.  A summary of the interview is detailed in Detective Galland's Report.

Supporting Evidence:

Galland Decl., ¶ 18; Police Report, Ex. 3 to MGM Decl.; JF Interview, Ex. 13 to MGM Decl.

41.   During the interview, Detective Galland advised Mr. Flores that the injuries suffered to M.F.'s brain which caused him to go into respiratory distress had likely happened 10 to 15 minutes prior to when M.F. stopped breathing and that he was the person alone with M.F. during that time.  Mr. Flores denied shaking M.F. and just said he had rocked him hard, but never shook him.  Detective Galland also showed Mr. Flores the picture that Genoveva Ramirez had provided depicting the obvious hemorrhage in M.F.'s eye and advised Mr. Flores that Ms. Ramirez could not have caused it because she had not been at the residence for a week.  Jesus Flores said if he had done this, even by accident, then he should be taken to jail.

Supporting Evidence:

Galland Decl., ¶ 18; Police Report, Ex. 3 to MGM Decl.; JF Interview, Ex. 13 to MGM Decl.

42.   When it became clear that Jesus Flores
      had no intention of explaining the
      incident or taking any type of
      responsibility for what had occurred,
      and continued to talk in circles and
      blame others, Detective Galland ended
      the interview and arrested Mr. Flores
      for: (1) child abuse causing
      significant brain injury or paralysis;
      (2) violation of Penal Code § 243a(a)
      – wilful harm or injury to a child; and
      (3) violation of Penal Code §
      245(a)(4) – assault resulting in great
      bodily harm.  This was detailed in
      Detective Galland's Police Report.

      Supporting Evidence:

      Galland Depo., pp. 123:22-24, 128:7-
      19, Ex. B to MGM Decl.; Police
      Report, Ex. 3 to MGM Decl.

43.   During his deposition, Detective
      Galland testified that the arrest was
      based on "specific articulable facts
      provided to him by medical
      professionals and no alternate
      explanation."

      Supporting Evidence:

      Galland Depo., pp. 128:20-129:9,
      129:24-130:1, Ex. B to MGM Decl.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44.    Detective Galland's report indicates he spoke with Dr. Hyden again who advised that M.F.'s prognosis was likely poor due to a severe traumatic brain injury and that M.F.'s injuries were the result of child abuse.  Dr. Hyden indicated that the injuries that were significant to him were the severe traumatic brain hemorrhage, as well as the multiple hemorrhages, multiple subdural blood collections of differing ages, which indicated prior injury and current injury.  M.F. had undergone an eye exam which revealed several hemorrhages to both retinas which was listed as non-accidental and was indicative of shaking.  The bone survey indicated numerous fractures of differing ages including fractures to the left humerus, right humerus, right ulna, left femur, right femur, left ulna, and a broken rib.  Dr. Hyden ruled out the possibility that the fractures were caused during child birth or by picking the child up by his arms.  Dr. Hyden saw no reason for the fractures other than abuse.  This was detailed in Detective Galland's Police Report.

Supporting Evidence:

Galland Decl., ¶ 20; Police Report, Ex. 3 to MGM Decl.

45.    On June 10, 2015, Detective Galland spoke with a "friend of Jesus Flores", Crystal Espinoza.  This conversation was digitally recorded and downloaded into evidence.

Supporting Evidence:

Galland Decl., ¶ 22; Transcript of Audio Interview of Crystal Espinoza, Ex. 27 to MGM Decl.

46. Ms. Espinoza indicated that she had talked to Jesus Flores who told her that M.F. was choking on throw-up so Mr. Flores shook him because he thought M.F. might pass out. Detective Galland confirmed that Mr. Flores used the work "Shook". This was detailed in Detective Galland's Police Report.

Supporting Evidence:

Galland Decl., ¶ 22; Police Report, Ex. 3 to MGM Decl.; Transcript of Audio Interview of Crystal Espinoza, Ex. 27 to MGM Decl.

47. On August 19, 2015, Detective Galland received a voicemail from Genoveva Ramirez indicating she thought accusations had been made against her and wanted to know if she needed to respond to BPD for questioning.  Detective Galland returned Ms. Ramirez's call. This conversation was recorded and uploaded into evidence.  Ms. Ramirez denied accusations of abuse and reiterated that M.F. was in her room, with Sara Guzman, the morning of the incident and there did not seem to be any problems.  This was summarized in Detective Galland's Police Report.

Supporting Evidence:

Galland Decl., ¶ 25; Police Report, Ex. 3 to MGM Decl.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

48.     Other than as detailed in the Police Report, Detective Galland was not provided additional information as to M.F.'s condition, foster care, and/or custody issues.  Detective Galland was never advised at any time subsequent to Mr. Flores's arrest that M.F. was allegedly displaying symptoms similar to what prompted his investigation or that there was a remote possibility that M.F.'s problems were the result of anything other than non-accidental trauma.

        Supporting Evidence:

        Galland Decl., ¶ 27; Police Report, Ex. 3 to MGM Decl.

49.     Detective Galland  submitted his report to the Kern County District Attorney on June 2, 2015 and had no other communication regarding whether or not the District Attorney intended to pursue criminal charges against Mr. Flores.

        Supporting Evidence:

        Galland Decl., ¶ 26; Police Report, Ex. 3 to MGM Decl.; Galland Depo., p. 149:3-22, Ex. 2 to MGM Decl.

50.     When the initial police report was submitted on June 2, 2015, the report did not detail the information obtained between June 10, 2015 and August 19, 2015 as detailed in the evidence submitted herewith.  Subsequent to June 2, 2015, the District Attorney obtained additional evidence from the Bakersfield Police Department, including the audio and video interviews and the updated report.

        Supporting Evidence:

        Galland Decl., ¶ 26; Declaration of Eric Smith ("Smith Decl."), ¶ 4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51.    The decision to pursue criminal charges is solely in the discretion of the District Attorney and it was not influenced or encouraged by Detective Galland or anyone else at the Bakersfield Police Department.

Supporting Evidence:

Galland Decl., ¶ 31; Smith Decl., ¶ 5.

52.    At no time during either the District Attorney's evaluation of whether to file criminal charges against Mr. Flores or during the criminal prosecution of Mr. Flores, did Detective Galland exert any control or direction over the decisions of the prosecuting district attorneys, who are employed by the Kern County District Attorney's office, or over any judge or judicial officer.

Supporting Evidence:

Galland Decl., ¶ 27; Smith Decl., ¶ 6.

53.    Detective Galland did not have any individual, personal interest in the outcome of the criminal proceedings initiated or maintained against Mr. Flores.

Supporting Evidence:

Galland Decl., ¶ 29.

54.    Detective Galland's role in the investigation and arrest of Mr. Flores was relegated to conducting the underlying investigation, while the decision to prosecute remained solely with the Kern County District Attorney's Office.

Supporting Evidence:

Galland Decl., ¶ 33; Smith Decl., ¶¶ 5, 6.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

55.   Detective Galland's participation in the criminal proceedings of the Plaintiff was merely attendant to the performance of his job duties as a Bakersfield Police Department Officer. Specifically, these job duties are to investigate crimes, arrest criminal suspects/ perpetrators, and if called to do so, testify at criminal proceedings.

Supporting Evidence:

Galland Decl., ¶ 34.

56.   At no time did Detective Galland file, or cause to be filed, a criminal complaint against Mr. Flores arising out of Mr. Flores' arrest.

Supporting Evidence:

Galland Decl., ¶ 31.

57.   Detective Galland did not provide misinformation, conceal exculpatory evidence, or otherwise engage in wrongful or bad faith conduct when communicating with the Kern County District Attorney's Office arising out of the arrest of Mr. Flores.

Supporting Evidence:

Galland Decl., ¶ 35.

58.   The information submitted by Detective Galland to the Kern County District Attorney's Office was truthful and in accordance with Detective Galland's observations during his investigation.

Supporting Evidence:

Galland Decl., ¶ 36.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

59.   The actions undertaken by Detective Galland in investigating and arresting Mr. Flores were motivated out of legitimate law enforcement objectives of protecting children from possible child abuse within the City of Bakersfield.  Prior to Detective Galland's  interview of Mr. Flores on May 21, 2015, he had never had any contact with Mr. Flores.

Supporting Evidence:

Galland Decl., ¶ 37, 38.

60.   Detective Galland was not motivated by any malice, animus, or hostility towards Mr. Flores in conducting the investigation and arrest of him.

Supporting Evidence:

Galland Decl., ¶ 39.

61.   Prior to prosecuting Mr. Flores, the Kern County District Attorney's office requested and obtained copies of the police report (on multiple occasions), copies of all video interviews, including those depicting Mr. Flores' interview, copies of the photographs, and copies of all audio interviews. They had all of the available material from Detective Galland's investigation from which they could independently make evaluations. Following the submission of Detective Galland's report, the District Attorney obtained copies of all of the photographs, records, interviews and evidence from the Bakersfield Police Department enabling the District Attorney to conduct its own investigation.

Supporting Evidence:

Galland Decl., ¶ 32; Smith Decl., ¶¶ 4, 5, 6.

62. Detective Galland had no contact with Judge Bush or anyone else about how much bail should be set at or the issuance of a "criminal protective order" and certainly did not testify at that hearing.

Supporting Evidence:

Galland Decl., ¶ 42; June 2, 2015 Criminal Hearing Transcript, Ex. A to RJN.

63. There were multiple hearings wherein Mr. Flores agreed to delay the Preliminary Hearing.  Detective Galland had nothing to do with the delay in the Preliminary Hearing and did not appear at any of these hearings.

Supporting Evidence:

Galland Decl., ¶ 42; June 11, 2015 Criminal Hearing Transcript at p. 3:5-10, Ex. B to RJN; July 30, 2015 Criminal Hearing Transcript at p. 3:5-13, Ex. C to RJN; September 15, 2015 Criminal Hearing Transcript at p. 3:5-16, Ex. D to RJN.

64. Detective Galland was the second witness called.  Detective Galland testified that Dr. Naven advised him that M.F. was in acute respiratory distress and that he noticed bruises on M.F.'s cheeks and that Dr. Naven ordered a CAT Scan from which he noticed subdural hematomas and bleeding in the brain.  At least one of the hematomas was fresh and there were older healing subdural hematomas.  In addition, Detective Galland testified Dr. Naven told him that he did not believe that the bruising on the baby's cheeks would be caused by CPR.

Supporting Evidence:

October 21, 2015 Preliminary Hearing Transcript at pp. 00014-00015, Ex. E to RJN.

1    65.    In addition, Detective Galland was
            asked about his interview with Jesus
2           Flores.  Detective Galland testified
            that Mr. Flores was playing video
3           games when he noted M.F. having
            problems and had been fussy.  The
4           child began to cry and Mr. Flores
            picked him up.  M.F. became
5           unresponsive and Mr. Flores splashed
            some water on his face and called 9-1-
6           1.

7           Supporting Evidence:

8           October 21, 2015 Preliminary Hearing
            Transcript at pp. 00018:3-00020:5,
9           Ex. E to RJN.

10   66.    Detective Galland testified that Mr.
            Flores admitted to shaking the child.
11          He started off rocking the child and
            when that didn't work, he
12          demonstrated using a "stuffed animal"
            and demonstrated shaking the child.
13          Detective Galland testified that Mr.
            Flores indicated he was frustrated with
14          M.F. because he would not stop
            crying.
15          Supporting Evidence:

16          October 21, 2015 Preliminary Hearing
            Transcript at pp. 00020:6-00021:8,
17          Ex. E to RJN.

18   67.    Detective Galland also testified about
            his discussion with Dr. Hyden and
19          relayed details about those
            conversations including Dr. Hyden's
20          conclusion that M.F.'s injuries were
            the result of child abuse and that the
21          hemorrhaging in both retinas was the
            result of shaking and child abuse.
22
            Supporting Evidence:
23
            October 21, 2015 Preliminary Hearing
24          Transcript at pp. 00026:6-00029:5,
            Ex. E to RJN.
25

26

27

28

| | | |
|---|---|---|
| 1 | 68. | Mr. Faulker proceeded to attempt to elicit medical type testimony from Detective Galland regarding M.F.'s injuries. |
| 2 | | |
| 3 | | |
| 4 | | Supporting Evidence: |
| 5 | | October 21, 2015 Preliminary Hearing Transcript at pp. 00040:21-00042:4, Ex. E to RJN. |
| 6 | | |
| 7 | 69. | Mr. Faulker did not present any additional witnesses and did not move to dismiss the case.   [DSUF No. 69.] |
| 8 | | |
| 9 | | Supporting Evidence: |
| 10 | | October 21, 2015 Preliminary Hearing Transcript at pp. 00042:13-14, 00042:19-24, Ex. E to RJN. |
| 11 | | |
| 12 | 70. | On May 31, 2017, the Court held a 402 hearing regarding the statements made by Mr. Flores when he spoke with the Detectives during their investigation.  Mr. Flores' lawyer argued that he believed there was a *Miranda* issue relative to the second interview.  In addition, Mr. Flores' lawyer argued that Mr. Flores' statements should be suppressed in their entirety because they were purportedly given involuntarily.  The Court concluded that: (1) Detective Galland was required to and did give the *Miranda* advisal in both the May 21 and May 29 engagements with Mr. Flores and that Mr. Flores waived such rights; (2) while there was no confession by Mr. Flores, there were quite a few admissions, particularly as to when Mr. Flores took M.F. outside; and (3) Mr. Flores is quite intelligent and during the course of the questioning, he was able to see and understand when the Detectives were trying to corner him on things and he jousted back thereby demonstrating that he is "bright", "able to reason", "able to comprehend", and "able to resist".  The Court concluded by finding that the statements made by Mr. Flores were voluntary. |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1

Supporting Evidence:

2

October 21, 2015 Preliminary Hearing
Transcript at pp. 00014-00020:21, Ex.

3

E to RJN.

4   71.   The Court concluded that: (1)
Detective Galland was required to

5   and did give the *Miranda* advisal in
both the May 21 and May 29

6   engagements with Mr. Flores and that
Mr. Flores waived such rights; (2)

7   while there was no confession by Mr.
Flores, there were quite a few

8   admissions, particularly as to when
Mr. Flores took M.F outside; and (3)

9   Mr. Flores is quite intelligent and
during the course of the questioning,

10  he was able to see and understand
when the Detectives were trying to

11  corner him on things and he jousted
back thereby demonstrating that he is

12  "bright", "able to reason", "able to
comprehend", and "able to resist".

13  The Court concluded by finding that
the statements made by Mr. Flores

14  were voluntary.

15  Supporting Evidence:

16  May 31, 2017 Criminal Trasncript,
pp.00014-00020:21, Ex. H to RJN.

17

18  72.   The criminal trial against Mr. Flores
commenced on May 15, 2017.  On
June 7, 2017, Dr. Naven testified:

19

20        a.   That he was the attending
physician on the evening that
M.F. was brought to the ER

21        and had special training
specific to infants in

22        emergency situations.

23        Supporting Evidence:

24        June 7, 2017 Criminal
Transcript, pp. 41:8-13, 42:4-

25        14, 42:25-27, 43:12-15, Ex. 29
to MGM Decl.

26

27

28

1

      b.    M.F. had bruising on the right side of his cheek and a weak cry, which is usually a bad sign. M.F.'s O2 saturation was very low which could be caused by trauma or infection. Dr. Naven also noted questionable blood behind the right Tympanic Membrane, which is indicative of head trauma in most cases. In addition, the head CT showed multiple subdural hematomas that were contained

2

3

4

5

6

7

8

                both acute hemorrhage along with old hemorrhage. This was significant to Dr. Naven because it's a sign that it was not just a single, isolated incident.

9

10

11

12

                <u>Supporting Evidence</u>:

13

                June 7, 2017 Criminal Transcript, pp. 44:1-45:23, 47:7-20, 48:1-6, Ex. 29 to MGM Decl.

14

15

16

      c.    That he was concerned that M.F.'s injuries were the result of non-accidental trauma, which means abuse.

17

18

                <u>Supporting Evidence</u>:

19

                June 7, 2017 Criminal Transcript, p. 51:7-9, Ex. 29 to MGM Decl.

20

21

      d.    Based on the acute subdural hematoma, the injuries could be as recent as two hours.

22

23

                <u>Supporting Evidence</u>:

24

                June 7, 2017 Criminal Transcript, p. 53:15-20, Ex. 29 to MGM Decl.

25

26

27

28

1

2   73.   On June 7, 2017,  Dr. Hyden testified
           in the criminal trial that:

3

4        a.    He saw M.F. in the Pediatric
               Intensive Care Unit at Valley
               Children's Hospital.

5

6              Supporting Evidence:

7              June 7, 2017 Criminal
               Transcript, p. 82:7-13, Ex. 29
               to MGM Decl.

8

9        b.    He saw M.F., reviewed M.F.'s
               chart including labs and other
               tests, and talked to medical
10             personnel about their
               observations and findings.

11

12       c.    M.F.  had sustained mixed
               density, which means a
               combination of old and new
13             bleeding in the brain in
               subdural spaces, in two
14             separate locations.

15             Supporting Evidence:

16             June 7, 2017 Criminal
               Transcript, p. 88:22-89:13, Ex.
17             29 to MGM Decl.

18       d.    In addition, there was a
               healing proximal humreus
19             fracture, corner fractures on
               the distal part of the femurs,
20             distal radius and ulna buckle
               fractures or periosteal
21             elevation on the left radius and
               ulna and a left anterior rib
22             fracture.

23             Supporting Evidence:

24             June 7, 2017 Criminal
               Transcript, p. 93:17-94:13, Ex.
25             29 to MGM Decl.

26

27

28

1

2   e.   He diagnosed M.F. with
3        "abusive head trauma",
         "altered mental status",
4        "traumatic brain injury",
         "seizure after head injury",
5        "retinal hemorrhage", "injury
         of cervical spine" (which he
6        corrected to be swelling and
         fluid in the cervical neck
7        space), and "multiple
         fractures".

8        Supporting Evidence:

9        June 7, 2017 Criminal
10       Transcript, pp. 98:28-102:16,
         Ex. 29 to MGM Decl.

11  f.   He "determined that [M.F.]
         was subjected to severe
12       nonaccidental trauma by
         repetitive shaking and possibly
13       slamming onto a soft surface,
         possibly not. It could have just
14       been shaking. And that it was
         severe enough that it caused
15       these injuries and the
         subsequent apparent life
16       threatening event."

17
         Supporting Evidence:
18
19       June 7, 2017 Criminal
         Transcript, p. 104:5-17, Ex. 29
20       to MGM Decl.

    g.   It is biomechanically possible
21       for Mason's subdural
         hematomas to have been
22       caused by shaking but not
         possible for it to be caused by
23       CPR.

24       Supporting Evidence:

25       June 7, 2017 Criminal
         Transcript, pp. 106:28-107:6,
26       Ex. 29 to MGM Decl.

27

28

1

2        h.      It is usually right after an
event occurs that there is a

3                    sudden change in neurological
behavior.  It could be within

4                    minutes to an hour but it does
not take a long time.

5

                    Supporting Evidence:

6

7                    June 7, 2017 Criminal
Transcript, pp. 158:26-159:10,
Ex. 29 to MGM Decl.

8

9   74.     The Department of Social Services
was solely responsible for conducting
an independent investigation, separate

10         and apart from any investigation
conducted by the police, to evaluate

11         M.F.

12         Supporting Evidence:

13         Holt Decl., ¶ 4.

14   75.     Detective Galland was not involved in
Social Services' investigation except

15         for purposes of providing
photographs, interviews, and other

16         evidence as specifically requested by
Social Services.

17

18         Supporting Evidence:

19

20         Holt Decl., ¶ 6.

   76.     Social Services conducted its own
investigation and based on its own

21         investigation, recommended that Jesus
Flores's and Sarah Guzman's parental

22         rights be terminated.  This was
entirely independent of any

23         investigation or conclusion drawn by
Detective Galland or the Bakersfield

24         Police Department.

25         Supporting Evidence:

26         Holt Decl., ¶¶ 6-12.

27

28

1

2 77. On May 12, 2016, the Disposition
3    Hearing was held wherein the
    Department of Health Services
4    recommended denial of reunification
    services for both parents.  While the
5    Department was not convinced that
    Jesus Flores was the sole source of
6    M.F.'s multiple injuries, the
    Department felt that both parents
7    failed to protect M.F.

8    Supporting Evidence:

9    Holt Decl., ¶ 12; Court of Appeal
    Opinion at p. J0361, Ex. G to RJN.

10 78. In a report prepared for the section
11    366.26 hearing, the Department
    recommended termination of parental
    rights, thereby freeing M.F. for
12    adoption.

13    Supporting Evidence:

14    Holt Decl., ¶ 12; Court of Appeal
    Opinion at p. J0362, Ex. G to RJN.
15

16 79. It was not until September 9, 2016,
    that Mr. Flores's attorney informed
17    the juvenile court that she had
    received an email from Mr. Flores's
18    criminal attorney in which the defense
    attorney stated that he "had top
19    physicians in the field who had "new
    evidence" that Mr. Flores had not
20    injured M.F.

21    Supporting Evidence:

22    Holt Decl., ¶ 12; Court of Appeal
    Opinion at p. J0362, Ex. G to RJN.

23 80. In a subsequently filed petition, Mr.
24    Flores's attorney stated that "new
    evidence had come to light that was
    not previously available which
25    showed that father was not responsible
    for M.F.'s condition...".
26

27    Supporting Evidence:

28    Court of Appeal Opinion at p. J0362,
    Ex. G to RJN.

81. This "new evidence" offered by Mr. Flores' counsel was two experts, Dr. Charles Hyman and Janice J. Ophoven.

Supporting Evidence:

Court of Appeal Opinion at p. J0363, Ex. G to RJN.

82. Mr. Flores's attorney admitted that while Mr. Flores's attorney "did seek out an expert opinion, 'they did not make these same findings.'"

Supporting Evidence:

Court of Appeal Opinion at p. J0365, Ex. G to RJN.

83. Despite this "new evidence" the Family Court Judge determined that Mr. Flores's and Ms. Guzman's parental rights should still be terminated.

Supporting Evidence:

Court of Appeal Opinion, Ex. G to RJN.

84. While Mr. Flores appealed the decision, the Court of Appeal upheld the trial court's decision because the "testimony father sought to present was based on evidence available at the time of the jurisdiction hearing 10 months earlier" and as such "the juvenile court did not err in determining he failed to make a prima facie case of 'new evidence' showing that the "'best interests of the child may be promoted by the proposed change of order.'"

Supporting Evidence:

Court of Appeal Opinion at pp. J0373-J0374, Ex. G to RJN.

1

2   85.   The Defendants propounded discovery
            seeking all facts which would support
3           each of the Plaintiff's claims.

4           Supporting Evidence:

5           Plaintiff's Responses to Defendant
            Joseph Galland's Interrogatories, Set
6           One, Ex. 16 to MGM Decl.; Plaintiff's
            Responses to Defendant Joseph
7           Galland's Interrogatories, Set Two,
            and Amended Responses, Ex. 17 to
8           MGM Decl.

9   86.   The responses were substantially the
            same for each of the causes of action.
10

11          Supporting Evidence:

12          Plaintiff's Responses to Defendant
            Joseph Galland's Interrogatories, Set
13          One, Ex. 16 to MGM Decl.; Plaintiff's
            Responses to Defendant Joseph
14          Galland's Interrogatories, Set Two,
            and Amended Responses, Ex. 17 to
15          MGM Decl.

16  87.   In terms of the Defendant Galland's
            alleged wrongdoing, the Plaintiff
17          contends:

18          a.   During the interview,
                 Detective Galland abruptly
19               accused Plaintiff of shaking
                 the child;
20
            b.   Detective Galland then gave
21               Plaintiff a doll that was
                 supposed to represent
22               Plaintiff's son. Defendant
                 Galland proceeded to bully
23               and browbeat Plaintiff, trying
                 to get Plaintiff to violently
24               shake the doll;

25

26

27

28

1

2          c.        Defendant Galland continued
                     to bully the Plaintiff who was
3                    in "great distress" and
                     Detective Galland tried to
4                    exploit  Plaintiff's grief  and
                     distress and to psychologically
5                    manipulate Plaintiff into
                     stating that he had shaken the
6                    child. Defendant Galland
                     conducted the interview in bad
7                    faith, trying to take advantage
                     of Plaintiff's age and
8                    inexperience to pressure him
                     into a false confession.
9

10         d.        Defendant Galland told
                     Plaintiff that the only
11                   explanation for M.F.'s
                     condition is that he had been
12                   shaken in the period leading
                     up to the 9-1-1 call.

13         e.        Defendant Galland refused to
                     accept Plaintiff's insistence
14                   that he did not violently shake
                     his child.  He repeatedly
15                   interrupted Plaintiff and stated
                     that he would not accept
16                   Plaintiff's lies and demanded
                     that Plaintiff "take
17                   responsibility" and "own up to
                     it.";
18

19         f.        Defendant Galland wrote in
                     his report:  "JESUS FLORES
20                   showed us, using a doll, how
                     he shook [M.F.].  He started as
21                   though he was rocking the
                     baby in his lap, and then
22                   accelerated and showed a
                     significantly more violent
23                   shaking motion.  The doll
                     JESUS FLORES was using is
24                   stuffed and not that heavy.  It
                     takes a significant amount of
25                   energy to make the doll's head
                     move, and JESUS FLORES
26                   made the doll's head move a
                     great deal. . .";

27

28

1

g. On the basis of Plaintiff's
supposed "shaking" of the doll
and other false and misleading
statements by Defendant
Galland, and on the basis of
the above recommendations,
criminal charges were brought
against Plaintiff that carried a
maximum sentence of life in
prison;

h. Defendant Galland had one or
more contacts with Child
Protective Services. Defendant
Galland unequivocally
indicated to CPS that Plaintiff
had abused his son. Defendant
Galland also told Plaintiff's
girlfriend and her family
members that Plaintiff had
abused his son.  Defendant
Galland further caused a
restriction to be imposed that
prevented Plaintiff from
visiting his son in the hospital;

i. Defendant Galland also
caused an investigative hold to
be placed on the child. A
transfer of custody form
transmitted by Defendant
Galland states:  "The child
suffered a severe brain injury
at the hand of his father.";

j. At the preliminary hearing on
October 21, 2015, Defendant
Galland testified falsely about
what had occurred during his
interview with Plaintiff.
Defendant Galland repeated
his false statements that
Plaintiff shook the doll and
stated that "the head was
violently snapping back and
forth" during the interview.
Defendant Galland further
testified that the head was
unsupported while the alleged
violent snapping motion was
taking place;

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

1

2    k.    Defendant Galland withheld
            information that a medical
3           exam had taken place in
            November 2015 revealed that
4           M.F. was experiencing
            substantially the same
5           symptoms that were
            supposedly the "constellation
6           of injuries" proving his
            "abuse" at the hands of
7           Plaintiff immediately before
            he was admitted into the
8           hospital on the night of May
            21, 2015.

9

      Supporting Evidence:
10

      Plaintiff's Responses to Defendant
11    Joseph Galland's Interrogatories, Set
      One, Ex. 16 to MGM Decl.; Plaintiff's
12    Responses to Defendant Joseph
      Galland's Interrogatories, Set Two,
13    and Amended Responses, Ex. 17 to
      MGM Decl.

14

15  88.   In his deposition during this civil suit,        Ex. 18 to MGM Decl.
           Mr. Flores testified:

16    a.    He was the only one in the
            room with M.F.
17

18          Supporting Evidence:

19          Flores Depo., p. 19:16-17, Ex.
            18 to MGM Decl.

20    b.    He does not recall what
            happened because he has a
21          condition that would cause
            him to black in and out.

22

23          Supporting Evidence:

24          Flores Depo., p. 19:18-20:18,
            Ex. 18 to MGM Decl.

25    c.    The issue of whether he was
            rocking M.F. on the evening
26          in question or shaking him is
            subject to interpretation.

27

28          Supporting Evidence:

            Flores Depo., p. 22:7-24:22,

1     d. He did use the word "shake" during his interview.

2

3      Supporting Evidence:

4      Flores Depo., p. 51:21-52:3, Ex. 18 to MGM Decl.

5 89. Dr. Naven was deposed twice in this civil suit, once as a fact witness and

6   once as a "non retained expert" designated by the Plaintiff.  Dr.

7   Naven testified that:

8     a. He stands behind his medical report wherein he stated that

9      M.F.'s injuries appeared to be nonaccidental trauma and that

10      remains his opinion.

11      Supporting Evidence:

12      Deposition of Wade Naven M.D. taken August 28, 2019

13      ("Naven Depo. 2"), pp. 7:6-14, 20:11-17, 22:18- 23:2, Ex.

14      19 to MGM Decl.

15     b. He stands by his testimony at the criminal trial wherein he

16      testified that while he did not recall what specifically he told

17      police officers, it is still his opinion that "based on the

18      acute subdural hematoma that the timeline could be as recent

19      as two hours".

20      Supporting Evidence:

21      Naven Depo. 2, pp. 7:15-19, 10:15-25, 24:21-25:2, Ex. 19

22      to MGM Decl.

23 90. Dr. Hyden was deposed in this civil suit on July 31, 2019, which was more

24   than four years from when he originally expressed his opinions to

25   Detective Galland.

26   Supporting Evidence:

27   Deposition of Philip Hyden M.D. ("Hyden Depo."), p. cover, Ex. 20 to

28   MGM Decl.; Galland Decl., ¶ 12.

91.  Dr. Hyden testified at that time that he did not even recall speaking with Detective Galland, but he was sure he did.

Supporting Evidence:

Hyden Depo., 21:23-22:16, 37:7-10, 96:9-22, 97:13-18, Ex. 20 to MGM Decl.

92.  Dr. Hyden testified that:

   a.   M.F.'s injuries were the result of "non accidental trauma" and that it is his normal practice to relate truthfully and clearly that opinion to law enforcement.

      Supporting Evidence:

      Hyden Depo., pp. 18:16-23, 98:20-99:16, 103:6-12, 109:16-22, Ex. 20 to MGM Decl.

   b.   M.F. had multiple, multi-layered retinal hemorrhages which are not seen in anything but major accelerative/ decelerative traumatic injuries. M.F. had some fractures of the proximal humerus. There were bucket handle or metaphyseal fractures, which are classic fractures of child abuse. In addition, M.F. had swelling around the paraspinous ligaments.

      Supporting Evidence:

      Hyden Depo., pp. 39:9-40:20, 42:13-43:10, 58:23-59:24, 105:1-24, 107:1-108:9, Ex. 20 to MGM Decl.

1

2

3

      c.     He believes that the injury happened immediately, though at the criminal trial, he gave a broad range between minutes and one hour.

4

               <u>Supporting Evidence</u>:

5

6

7

               Hyden Depo., pp. 45:14-16, 48:9-19, 51:11-54:22, 68:18-69:2, 78:18-79:3, 84:16-85:24, 100:6-21, 101:9-20, 103:6-17, Ex. 20 to MGM Decl.

8

9

10

11

12

      d.     If Detective Galland had posed a hypothetical where he asked Dr. Hyden whether the injury occurred within 10 minutes of the event that may have caused the injury, Dr. Hyden would have said yes and possibly immediately after the injury occurred.

13

               <u>Supporting Evidence</u>:

14

15

16

               Hyden Depo., pp. 45:14-16, 48:9-19, 51:11-54:22, 68:18-69:2, 78:18-79:3, 84:16-85:24, 100:6-21, 101:9-20, 103:6-17, Ex. 20 to MGM Decl.

17

18

19

20

      e.     If "we saw this event occur, the time between the perpetration, depending on how severe it is, like in this case, would be almost immediate."

21

               <u>Supporting Evidence</u>:

22

               Hyden Depo., pp. 74:17-75:21, Ex. 20 to MGM Decl.

23

24

25

26

27

28

MARDEROSIAN & COHEN
1260 Fulton Street
Fresno, CA 93721

1

2

    f.    Any history provided to him, whether it be from law enforcement, the parent, social worker, etc would not change his opinion that the child sustained severe accelerative/ decelerative rotational accelerational forces upon the head and neck to cause the subdural hematomas, the retinal hemorrhages the global encelphalopathy, the possible cortical atrophy and other injuries from a prior experience.

3

4

5

6

7

8

9

<u>Supporting Evidence</u>:

10

Hyden Depo, pp. 65:19-68:17, 80:11-21, 99:23-100:5, 110:13-18, Ex. 20 to MGM Decl.

11

12

93.    Pursuant to this Court's Scheduling Orders, the Parties disclosed expert witness opinions.  The Plaintiff designated retained witnesses:  (1) Dr. Richard Leo, a Professor of Law and Psychology; (2) Dr. Charles Hyman, a pediatrician; and (3) Dr. Joseph Scheller, a child neurologist and board certified pediatrician.

13

14

15

16

17

<u>Supporting Evidence</u>:

18

Plaintiff's Expert Disclosure (without reports), Ex. 21 to MGM Decl.

19

20

94.    The Plaintiff designated Drs. Naven and Hyman as "non retained" experts.

21

22

<u>Supporting Evidence</u>:

23

Plaintiff's Expert Disclosure, Ex. 21 to MGM Decl.

24

25

26

27

28

1

95.    All three of the Plaintiff's retained experts testified in the Plaintiff's criminal trial.

2

3           Supporting Evidence:

4           Deposition of Richard Leo M.D. ("Leo Depo."), p. 24:14-20, Ex. 22 to

5           MGM Decl.; Deposition of Charles Hyman M.D. ("Hyman Depo."), pp.

6           7:2-24, 6:22-25, Ex. 23 to MGM Decl.; Deposition of Joseph  Scheller

7           M.D. ("Scheller Depo"), p. 8:20-24, Ex. 24 to MGM Decl.

8

9

96.    The Plaintiff did not designate a police procedures expert.

10          Supporting Evidence:

11          Plaintiff's Expert Disclosure, Ex. 21 to MGM Decl.

12

13

97.    In his deposition, Dr. Leo testified that: (1) he had not personally met with Mr. Flores or spoken directly with him or interviewed him; (2) he has never worked as a law enforcement officer; (3) he has never conducted a police interview or interrogation of a suspect; (4) he has not investigated a crime as a police investigator; (5) he has not qualified in court to testify on the veracity of an investigation; (6) Mr. Flores did not make a confession during the interrogation; (7) he did not speak to any physicians or law enforcement officers in regard to this case.

14

15

16

17

18

19

20

21          Supporting Evidence:

22          Leo Depo., pp. 9:12-20, 16:7-17, 18:10-24, 22:10-18, 27:6-25, Ex. 22 to

23          MGM Decl.

24

25

26

27

28

98.    Dr. Hyman testified that:  (1) he offered opinions in opposition to the testimony of Dr. Hyden at the criminal trial; (2) he never provided his opinions to anyone at the Bakersfield Police Department; (3) he never suggested that his opinions be shared with Detective Galland before the criminal case commenced; (4) he did not instruct Mr. Flores's criminal attorney to share his opinions with the District Attorney; (5) there is a dispute in terms of the cause of pediatric injuries as to whether or not that equates to nonaccidental child abuse versus some other cause; and (6) he is rendering medical opinions as to whether or not Dr. Hyden's conclusions that M.F. was a victim of child abuse.

Supporting Evidence:

Hyman Depo., pp. 21:9-21, 22:10-22, 23:5-10, 23:19-24:1, 27:24-28:8, 30:2-8, Ex. 24 to MGM Decl.

99.    Dr. Scheller testified that:  (1) he analyzed whether M.F.'s injuries were the result of accidental trauma versus another medical condition; (2) no one other than Mr. Flores was present when M.F. became traumatically ill and so he can only say what is most likely to have happened but, "it's true, what may have happened was that he did suffer an inflicted or abusive injury" ; (3) he did not meet with or speak with Detective Galland to discuss his views of M.F.

Supporting Evidence:

Scheller Depo., pp. 9:22-10:6, 11:18-12:11, 27:22-28:6, 29:1-25, Ex. 23 to MGM Decl.

100.    Defendants designated Curtis J. Cope, a police procedures expert, to review materials in this case and render expert opinions.

Supporting Evidence:

Declaration of Curtis J. Cope ("Cope Decl."), ¶ 3.

101.   Mr. Cope opined that:

a.   Any reasonable officer would evaluate the information, physical evidence and statements provided and determine there was possible child abuse involved in this call for service.  It is also his opinion based upon the fact pattern of the call for service it would be expected that a detective response would be appropriate and it comports with Bakersfield Police Department policy. It is also his opinion it would be appropriate for additional law enforcement personnel to respond to the hospital to inquire further regarding M.F.'s condition and injuries.

Supporting Evidence:

Cope Decl., ¶ 4a.

b.   Any reasonable detective would consider the information supplied by the medical personnel as part of the basis for continuing to conduct a child abuse investigation. Law enforcement is not expected to be able to diagnose a child's injuries; however; it is expected that law enforcement will rely on the expertise of the medical professionals treating a child to provide some basis for considering that M.F. was possibly a victim of child abuse and that a continued criminal investigation was warranted.

Supporting Evidence:

Cope Decl., ¶ 4b.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

c.      The securing of a search
        warrant demonstrates
        Bakersfield Police
        Department's handling of the
        investigation comports to
        expected police procedures to
        assist detectives in
        establishing whether a crime
        had occurred, seize possible
        evidence, as well as
        identifying possible suspect(s)
        involved in the child's abuse.

        <u>Supporting Evidence</u>:

        Cope Decl., ¶ 4c.

d.      The investigation record
        reflects that Jesus Flores was
        the only person who was
        present with M.F. at the time
        that the injuries are likely to
        have occurred. In his opinion
        the investigative steps taken
        by Galland and other
        detectives during this time
        frame were appropriate
        investigative steps for a
        reasonable detective. It is
        further his opinion that the
        focus of the investigation as to
        whether Jesus Flores was the
        person responsible for M.F.'s
        injuries was appropriate for
        the circumstances based upon
        the investigative findings to
        that point.

        <u>Supporting Evidence</u>:

        Cope Decl., ¶ 4d.

MARDEROSIAN & COHEN
1260 FULTON STREET
FRESNO, CA 93721

e.   Advanced Law enforcement
training provides detectives
with methods of conducting
interviews and interrogations.
Typically, the interviews fall
into two types: free format
interview and cognitive
interview.  Interviews are
typically used for dealing with
persons not under arrest or
those not identified as
suspects in criminal activity.
Interrogation training is
typically geared towards
dealing with possible or actual
suspects of criminal activity.
Often, these interrogations can
be confrontational, in that it is
not often criminals
immediately confess to
criminal activity.  Thus, there
is advanced training that
demonstrates methods of
conducting confrontational
interrogations.  The record
shows the Bakersfield Police
Department provides their
personnel with advanced
interview and interrogation
training, internally and
externally, which Galland has
attended or taught.  It is his
opinion that the Bakersfield
Police Department's training
program meets or exceeds the
POST Standards for
conducting child abuse types
of crimes and Galland is well
trained for conducting those
types of investigations.

Supporting Evidence:

Cope Decl., ¶ 4e.

f.   Any reasonable detective
would have concluded the
focus of the investigation
towards Jesus Flores as the
person responsible for M.F.'s
injuries was appropriate at that
point in the investigation.

Supporting Evidence:

Cope Decl., ¶ 4f.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

g.   The methods Galland utilized to conduct his investigation and interview during this time frame comport to proper police procedures and were reasonable for the circumstances. It is not uncommon for law enforcement to be taught to utilize interview and interrogation techniques that challenge the person being interviewed with confrontational questions in order to determine whether the individual may have involvement with the crime being investigated.  There can be questions that are offered to suggest involvement in or methods used during the crime being investigated.  There can be questions that are used to overcome objections by the person being interrogated. These types of questions are expected and reasonable for the well-trained detective to rely on when conducting interrogations.  These types of questions can be utilized to assist the well-trained detective to find the truth from the person being interrogated. He did not find any evidence of Galland utilizing improper interview and interrogation techniques, or that he was bullying or browbeating Jesus Flores during the interview process.

Supporting Evidence:

Cope Decl., ¶ 4g.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

h.    The investigation conducted by Galland would have provided any reasonable detective with probable cause to believe Jesus Flores had abused M.F. and that Jesus Flores' arrest was appropriate for the circumstances. It is also his opinion that it is reasonable and expected for law enforcement to utilize and rely on medical expertise to assist in developing investigations of this nature and to make a determination whether child abuse has occurred.

Supporting Evidence:

Cope Decl., ¶ 4h.

i.    Galland's follow-up activities demonstrate appropriate police procedures in conducting the child abuse investigation.

Supporting Evidence:

Cope Decl., ¶ 4i.

j.    The record reveals the District Attorney found there was sufficient evidence that Jesus Flores had caused the injuries to M.F. and they filed criminal charges against him.

Supporting Evidence:

Cope Decl., ¶ 4j.

k.    Members of the Bakersfield Police Department meet or exceed the training standards established by POST and that Galland was well trained for his position as an investigator/ detective.

Supporting Evidence:

Cope Decl., ¶ 4k.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

l.     There is no evidence to support a finding that Galland was inadequately supervised during his investigation. In fact, the record clearly shows Galland consulted with supervision during his investigation of this matter.

Supporting Evidence:

Cope Decl., ¶ 4l.

m.   There is no evidence to support any contention that any member of the Bakersfield Police Department acted negligently during any of the investigation or criminal prosecution of the case against Plaintiff.

Supporting Evidence:

Cope Decl., ¶ 4m.

n.    There is no evidence to support any contention that reflects that the Bakersfield Police Department has any policy, practice, custom or procedure that condones violating any persons Civil Rights.

Supporting Evidence:

Cope Decl., ¶ 4n.

o.    There is no evidence to support any contention that reflects that the Bakersfield Police Department has any policy, practice, custom or procedure to overlook or ratify supposed wrong doing by members of the organization.

Supporting Evidence:

Cope Decl., ¶ 4o.

102.  Both Sara Guzman and Jesus Flores were notified of their *Miranda* rights and both indicated they understood and were still willing to participate in the interviews.

Supporting Evidence:

Galland Decl., ¶ 10f-g; SG Interview, Ex. 8 to MGM Decl.; JF Interview, Ex. 13 to MGM Decl.

103.  Social Services became involved in investigating M.F.'s welfare on or about May 22, 2015.

Supporting Evidence:

Declaration of Bonnie Holt ("Holt Decl."), ¶ 4.

104.  On June 26, 2015, the Kern County Department of Health Services filed a petition alleging: (1) M.F. was at risk of suffering serious physical harm inflicted nonaccidentally by a parent or as a result of a parent's failure to adequately protect him (§ 300, subd. (A)) and M.F., who was under the age of five, suffered severe physical abuse by a parent or another person known by the parent, and the parent know or reasonably should have known that person was physically abusing the child (§300 subd. (E)).

Supporting Evidence:

Court of Appeal Opinion at p. J0360, Ex. G to RJN.

105.  There were Court proceedings related to whether the child should be put up for adoption and Mr. Flores was given an opportunity to respond to the position taken by Child Protective Services regarding M.F.

Supporting Evidence:

Holt Decl., ¶ 11; Court of Appeal Opinion at p. J0361, Ex. G to RJN.

106. On May 12, 2016, the Disposition Hearing was held wherein the Department of Health Services recommended denial of reunification services for both parents.  While the Department was not convinced that Jesus Flores was the sole source of M.F.'s multiple injuries, the Department felt that both parents failed to protect M.F.

Supporting Evidence:

Holt Decl., ¶ 12; Court of Appeal Opinion at p. J0361, Ex. G to RJN.

Dated:  October 21, 2019                    MARDEROSIAN & COHEN


                                            /s/ Michael G. Marderosian
                                       By:_____
                                            Michael G. Marderosian,
                                            Attorney for Defendants above-named.