**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESUS FLORES, | ) Case No.: 1:17-cv-1393 - JLT |
| Plaintiff, | ) |
| | ) ORDER GRANTING DEFENDANTS' MOTION |
| v. | ) FOR SUMMARY JUDGMENT |
| | ) |
| CITY OF BAKERSFIELD, et al., | ) (Doc. 32) |
| | ) |
| Defendants. | ) |
| | ) |

Jesus Flores asserts that his constitutional rights were violated by the City of Bakersfield and Officer Joseph Galland through Plaintiff's arrest, incarceration, and prosecution for child abuse crimes. In addition, Plaintiff asserts the defendants are liable for interference with his familial relationship with his son, and violations of California tort law for false arrest/imprisonment, negligence, and infliction of emotional distress. (Doc. 17)

Defendants contend Plaintiff is unable to succeed on his claims and seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 32) Plaintiff filed his opposition to the motion on November 11, 2019 (Doc. 38), and a corrected memorandum on November 21, 2019. (Doc. 43) Defendants filed their brief in reply on November 27, 2019. (Doc. 44) For the following reasons, the motion for summary judgment is **GRANTED**.

///

///

# I.    Background and Undisputed Material Facts[1]

On May 21, 2015, at approximately 4:14 p.m., Bakersfield Police Officer Helmuth Achtmann was dispatched to 8709 Domingo Street, to assist with medical aid for a two-month-old boy, "M.F." (UMF 1)  hen Achtmann arrived at the residence, "M.F. was en route to Bakersfield Memorial Hospital via Hall Ambulance." (UMF 2)

## A.    Investigation and Police Report by Galland

Detective Joseph Galland was advised of a possible child abuse incident and informed the baby was at Memorial Hospital approximately an hour after the initial dispatch.  (UMF 3)  Galland investigated the incident and "prepared a report detailing his investigation." (UMF 4)  In the report, Galland indicated that upon arrival at Bakersfield Memorial Hospital, he learned M.F. had been placed on a ventilator and was "in a medically induced coma to stabilize him."  (DSF 1)  Galland reported he spoke first with Dr. Burny, a pediatric specialist, and then Dr. Wade Naven, an emergency room physician who was also the attending physician at the time.  (DSF 2)  Dr. Naven was a mandatory reporter, and indicated that when he "first saw the patient," there was "enough worry to call CPS to call the officers."  (Doc. 43-4 at 27, Depo. 67:18-23)  He was unable to recall whether he called CPS himself or whether he instructed someone to do so. (*Id.* at 28, Depo. 86:2-7)

Dr. Naven informed Galland that "he did not believe the bruising on M.F.'s cheeks was caused by CPR."  (UMF 5)  Galland noted in the report that Dr. Naven advised him "M.F. had injuries to his brain," and "Dr. Naven was very worried that M.F. was the victim of child abuse." (DSF 3)  Galland also indicated in his report that he "asked Dr. Naven how recent the acute brain injuries had been caused and Dr. Naven stated he believed the injuries were no more than two hours old."  (DSF 7)  The same day, Galland placed an investigative hold on M.F. "and placed him into protective custody" at

---

[1] This section is a summary of both the undisputed facts and the parties' positions in this action. Defendants filed a "Joint Statement of Undisputed Facts" in support of the motion. (Doc. 32-3) The Court will refer to the undisputed material facts in this statement as "UMF".  The parties also each prepared separate statements of facts to support their respective positions. (Doc. 32-2 [the defendants]; Doc. 43-3 [Plaintiff])  However, Plaintiff failed to cite to any of the identified facts in his opposition to the motion.  (*See generally* Doc. 43-1)  Thus, this document is of no assistance to the Court in its review of the merits of the motion or opposition.

To the extent any separate facts identified by the defendants are undisputed **and the Court found the evidence cited supports the facts identified**, these are identified as "DSF" for Defendants' Separate Facts.  Likewise, to the extent the evidence cited by Plaintiff in his opposition is not disputed by the defendants' evidence, the Court has directly cited the evidence in its analysis.

Memorial Hospital.  (Doc. 38-5 at 74-75, Galland Depo. 142:8-143:10)  This hold prevented Flores from having contact with the child.  (*See* Doc. 38-5 at 75, Galland Depo. 143:7-16)

Galland took photographs of M.F.'s face that "depict[ed] bruising on M.F.'s left and right cheeks."  (DSF 10)  After taking these photographs, Galland interviewed Sara Guzman, M.F.'s mother, at the hospital.  (UMF 6; *see also* Doc. 36-2 at 2, Galland Decl. ¶ 6)  Ms. Guzman informed Galland that "M.F. had no medical problems or allergies that she was aware of and had been seen about a month earlier for a checkup."  (DSF 11)  Galland inquired about M.F.'s schedule, and Ms. Guzman reported that "she and her mother, aunt, and cousins had left the house around 2 p.m. to get a haircut and look at a gym memberships, leaving M.F. alone with Plaintiff."  (*Id.*)  She reported they returned around 3:00 or 3:15 p.m., but "left to go to the Farmer's Market …, again leaving M.F. alone with Plaintiff Jesus Flores."  (*Id.*)  Ms. Guzman stated Flores "called her while she was at the Farmer's Market and said 'the baby's not breathing," and "[s]he directed him to call 911."  (UMF 11)  Galland "obtained a medical release for M.F.'s medical records from Bakersfield Memorial Hospital from Ms. Guzman."  (UMF 7)

Galland re-contacted Dr. Naven, who stated M.F. would be transferred to Valley Children's Hospital.  (DSF 12; Doc. 32-6 at 2, Galland Decl. ¶ 6)  Dr. Naven gave Galland the radiology report and showed him the CT scan, which depicted "multiple hematomas."  DSF 4; *see also* Doc. 32-6 at 2, ¶6) Dr. Naven felt even a 'non-medical person could see' that it was not normal."  (*Id.*) Dr. Naven diagnosed M.F. with: "(1) Subdural hematoma; (2) Evaluate non-accidental trauma; and (3) Respiratory alkalosis with metabolic acidosis."  (DSF 6; *see also* Doc. 32-13 at 31)  In addition, Dr. Naven noted there were "multiple subdural hematomas, the majority of which contain acute hemorrhage mixed with additional hemorrhage of varying ages." (*Id.*; *see also* Doc. 32-13 at 30-31)  In his report, Galland noted that Dr. Naven opined "M.F. had a reasonable chance of survival but indicated he thought there was a high probability the child would suffer significant permanent brain damage as a result of the injuries."  (DSF 12)  Galland also reported: "I asked Dr. Naven how recent the acute brain injuries had been caused and he stated he believed the injuries were no more than 2 hours old."  (Doc. 32-12 at 14)

Flores contends there is a dispute about whether Dr. Naven identified this two-hour time frame.[2]  (*See* Doc. 43-2 at 4-5)

Following the second conversation with Dr. Naven, Galland "reached out to Detective McAfee, who was at the subject residence and who was going to return to the Police Department to author a search warrant."  (DSF 13; *see also* Doc. 32-6 at 3, Galland Decl. ¶ 8)  Flores was transported to the Bakersfield Police Department, and Ms. Guzman agreed to meet at the department.  (Doc. 32-6 at 3, ¶¶ 7-8; *see also* DSF 13)

Detectives Galland and Davenport "proceeded to interview the family/witnesses including: (1) Mariana Ramirez, the aunt of Sara Guzman; (2) Araceli Reyes, the daughter of Mariana Ramirez; (3) Jose Mendez, M.F.'s grandfather; (4) Christopher Guzman, Sara Guzman's brother; (5) Geneveva Ramirez, Sara Guzman's mother; (6) Sara Guzman; and (7) Jesus Flores."  (DSF 14)  Prior to the interviews of Ms. Guzman and Flores, "*Miranda* rights were explained and waived."  (DSF 14)

Galland inquired about the bruises on M.F.'s face and noted some of the relatives reported observing bruises on both of M.F.'s cheeks "before they left the residence."  (DSF 19)  "Ms. Guzman indicated she recalled seeing them on Monday morning but had no explanation as to what caused them."  (*Id.*)  Plaintiff told the detectives he saw the bruises "on Sunday night and had also seen red marks in the white portions of M.F.'s eyes."  (*Id.*)  "To Detective Galland, this meant the bruises pre-existed the CPR that was performed earlier in the day."  (*Id.*)

During the interviews, "Galland learned that Jesus Flores was alone with M.F. from approximately 2 p.m. to 3 p.m. or 3:15 p.m., and again from approximately 3:40 p.m. or 3:45 p.m. until the time that the Fire Department arrived around 4:20 p.m."  (DSF 17)  Jose Mendez stated during his interview that "Jesus Flores did not take very good care of the baby because he was always busy playing video games and that he had observed Jesus Flores lose his temper when M.F. was fussy and that Jesus Flores and yelled at M.F. so loudly that the child became startled."  (DSF 18)

The interview of Plaintiff began at approximately 11:00 p.m. on May 21, 2015. (Doc. 32-6 at 1,

---

[2] As discussed below, Dr. Naven testified during the criminal trial that he could not recall specifically what he told the police officers.  (DSF 89(b))  However, in August 2019, it was still his opinion that "based on the acute subdural hematoma that the timeline could be as recent as two hours."  (*Id.*)  During the deposition on April 16, 2019, Dr. Naven testified he did not "have a direct recollection" of stating the injury happened within two hours.  (Doc. 32-13 at 3, Depo. 23: 20-24)  Dr. Naven said his "standard practice would be to say within a few hours."  (*Id.*; *see also* Depo. 52:23- 53:6)

Galland Decl. ¶10(g))  Prior to the interview, "*Miranda* rights were explained and waived." (DSF 14)
Flores reported M.F. had been "really fussy" that day, and "admitted that on the day of the incident he
got frustrated because he could not seem to make the baby stop crying." (DSF 23; *see also* Doc. 32-22
at 95, Transcr. 93:8-10)  Flores said this was frustrating "because he was supposed to be playing a live
stream video game at 1 p.m. but the baby was still fussy." (DSF 23)

Flores recounted that at approximately 1 p.m., he "took M.F. outside to rock him." (DSF 11;
*see also* Doc. 32-22 at 95, Transcr. 93:8-10)  Flores said he gave M.F. a shower, changed him, and
made a bottle; and M.F. then took a nap. (DSF 11)  He reported that after all the relatives returned and
left again, M.F. was in his bassinet sleeping when he started coughing and began choking. (*Id.*)  Flores
noticed M.F. stopped breathing, and said he picked up M.F., who started to breathe again and then
stopped. (*Id.*)  Flores said he went to the shower and splashed some water on M.F.'s face, at which
point M.F. seemed to wake up but lost consciousness. (*Id.*) Flores stated he called 911, and began
performing CPR. (*Id.*)  He stated he took medication for anxiety and his heart was "still racing" at the
time of the interview. (Doc. 32-22 at 105, Transcr. 103:3-8)

Flores contends the officers used "sophisticated techniques of psychological manipulation," and
engaged in a "psychologically coercive interrogation" that cause him "to become confused, come to
doubt himself, and speculate that he might have shaken the baby too hard." (Doc. 43-1 at 12, 14)
Flores asserts that "the officers implied [he] would receive 'forgiveness,' and thus more lenient
treatment, if he stopped denying," stating:

> For example, the officers told Mr. Flores, "What people don't understand is when
> somebody doesn't…stand up for and say what they did was wrong when they mess up,
> okay. People are very <u>forgiving</u> when people tell the truth and admit they made a
> mistake, okay" (Interrogation Transcr., 89:18-25, emphasis added). And again: "We
> understand accidents happen, okay. But if you don't own up to it, there is no—there is
> no getting past it. There is no <u>forgiveness</u>" (Interrogation Transcr., 98:10-13, emphasis
> added).

(Doc. 43-1 at 13)  In addition, Flores contends the officers made statements such as there are "only a
couple of ways that babies of that age end up with bleeding brains," but Galland later admitted, "[t]hat
doesn't necessarily mean it's true." (*Id.* at 14, quoting Galland Depo. 90:18-24, 95:5-8)

During the interview, "Flores was given a doll and asked to demonstrate how he shook M.F."
(DSF 24) "Galland observed Mr. Flores start as though he was rocking the baby in his lap and then he

accelerated and showed a more violent shaking motion." (DSF 25) "Based on Detective Galland's observations, as well as his education, training, and experience, he knew that the doll was not that heavy and so it took a significant amount of energy to make the doll's head move." (*Id.*) Flores demonstrated how he rocked M.F. while outside and said: "I was like this. I don't remember, like, if I was going hard or if I was going soft, or if you know, it happened at that time. Like, if I did it, I'm -- I'm the worst -- " (Doc. 32-22 at 145, Transcr. 143:4-8) The officers asked Flores to demonstrate the hardest shake Flores thought he could give M.F., which Flores did. (*Id.*, 143:9-14) Flores again repeated:

> I was outside, and then I was like this, but I don't know if it was, like, a hard shake. I don't remember if it was hard shake, if it was a little shake, a medium shake, if he was hitting his – his face against my chest.

(Doc. 32-22, Transcr. 145:8-12) As the questioning continued, the following statements were made:

> Flores: I didn't shake my kid violently. I didn't say, "Shut the hell up."
>
> Speaker No. 2: Okay.
>
> Flores: I mean, I might have gotten a little frustrated and been, like, "calm down" or something, you know, like --
>
> Speaker No. 2: Okay.
>
> Flores: -- and maybe then I shook him a little too hard and --
>
> Speaker No. 1: Too hard.
>
> Flores: Maybe he hit his brain or something --
>
> Speaker No. 2: Okay.
>
> Flores: But that wasn't my intention.

(Doc. 32-22, Transcr. 148:18-149:6) Towards the end of the questioning, Flores stated: "I'll admit – I'll admit that the only time I actually moved him hard was when I was outside on the patio." (*Id.*, Transcr. 150:18-20) He repeated that he "didn't know [he] was shaking him too hard." (*Id.*, Transcr. 150:18-20) Further, Flores stated:

> Did I mean to shake him -- like, even if I did shake him hard, which I don't remember, because I had so much things going on. I had this stream that I was supposed to start and I was late. I had to feed him. I changed his poopy big old diaper that like weighs five pounds.
> He was being fussy still so I tried feeding him. He didn't eat. I took him outside.

He calmed down for a little bit and then he just started being fussy again and I didn't know what was wrong with him. I did, you know, try to comfort him and stuff, but I didn't know if I was doing it too hard. And if I did, it wasn't on purpose. I wasn't. And I hate myself for what I did. I would never hurt my kid. That baby is my life.

(Doc. 32-22 at 154-55, Transcr. 153:2-15) Galland then suspended the interview to consult with Sergeant Burdick and an on-scene social worker. (DSF 27) "Galland made the decision not to arrest anyone based on a lack of updated information from Children's Hospital." (*Id.*) The interview with Flores lasted for 85 minutes. (UMF 12)

M.F. was transferred to Valley Children's Hospital. (*See* UMF 13) On May 22, 2015, Galland received medical reports from the hospital. (*Id.*) The reports Galland received indicated "a bone scan had been conducted which showed several fractures to M.F.'s left humerus and both of his femurs, as well as a possible fracture to his left ulna." (DSF 28) M.F.'s injuries were classified as "non accidental trauma." (*Id.*) In addition, "an MRI conducted by Valley Children's Hospital showed several brain injuries and was characterized as "non accidental trauma." (*Id.*) This information was later detailed in Galland's report. (*Id.*)

The same day, Galland spoke with Dr. Phillip Hyden, a board-certified child abuse pediatrician, who was also the Medical Director of The Guilds Child Abuse Prevention and Treatment Center at Valley Children's Hospital. (DSF 29) The Pediatric Intensive Care Unit had called Dr. Hyden to come and determine if M.F.'s injuries, and any further injuries found, were the result of non-accidental trauma. (*Id.*; *see also* Doc. 32-29 at 3, Hyden Depo. 18:8-12) Galland wrote in his report:

I spoke briefly with Dr. Hyden regarding the case. He indicated there were more tests to be conducted, and he had not had a chance to review all of the case files, but what he had seen to this point was clearly indicative as child abuse. Dr. Hyden and I made arrangements to speak the following week once more medical tests had been conducted and Dr. Hyden had a chance to review all of the documentation.

(Doc. 32-12 at 30) At his deposition in 2019, Dr. Hyden was unable to recall whether his first conversation with law enforcement in the case occurred on May 22, 2015. (Doc. 32-29 at 30, Depo. 96:5-8) However, Dr. Hyden acknowledged his notes indicated that he was informed: "Law enforcement had the father reenact the event with a doll, and the observation was that the father was very rough with the doll and the rocking was actually shaking with the head and neck being obviously affected by the violent movements." (*Id.* at 19-20, Depo. 66:23- 67:9) Dr. Hyden testified that whether

this information was true or not "would not change [his] opinion, because even though … histories are important, [he] can't assume they're true or false." (*Id.* at 21, Depo. 68:2-4)  In addition, Dr. Hyden testified that the discussion with Galland played no role in the physician's conclusion that M.F. was the victim of non-accidental, abusive head trauma.  (*Id.* at 41, Depo. 110:13-18)

Over the weekend, "Galland was advised that M.F.'s condition had worsened and that M.F. had numerous seizures and had been placed on seizure medication." (UMF 14)  In addition, Galland was informed that M.F. "remained on a ventilator." (*Id.*)  On May 25, 2015, Galland was notified by Valley Children's Hospital that an eye exam revealed M.F. had "numerous retinal hemorrhages and … had likely suffered severe irreversible brain damage." (UMF 15)  These updates were detailed in Galland's report.  (UMF 14, 15)

Genoveva Ramirez contacted Galland on May 26, 2015, indicating that "she found another photograph, which … showed a broken blood vessel in M.F.'s left eye." (UMF 16)  Ms. Ramirez estimated the photo was taken on May 14, 2015. (*Id.*)  Galland "asked for a copy of the photo and also asked to speak with Sara Guzman again." (UMF 17) Ms. Ramirez and Ms. Guzman went to the police department at about 3:00 p.m. that day, and Ms. Ramirez consented to Galland searching her phone, which was given to the computer forensics section to download photographs.  (UMF 18; *see also* Doc. 32-12 at 31)

Galland began a third discussion with Ms. Guzman at 3:19 p.m. on May 26, after again advising Ms. Guzman of her *Miranda* rights.  (DSF 30) "Galland inquired further with Ms. Guzman about whether or not Jesus Flores was ever alone with M.F." (DSF 31)  "Ms. Guzman confirmed that Mr. Flores was alone with M.F. two times a week." (*Id.*)  When Galland asked who else could have done this, Ms. Guzman responded that she did not know. (*Id.*)  She "ruled out her father as causing these problems and expressed concern she may have injured M.F. by picking him up by the arms." (DSF 32) "In addition, Ms. Guzman told Detective Galland that Jesus Flores told her that during the time he was taking care of M.F., and during the time [M.F.] was in respiratory distress, that Jesus Flores had anxiety attacks and blacked out." (DSF 33)  Reviewing the events of May 21, Ms. Guzman reported Flores was also alone with M.F. when she and her mother were making lunch. (DSF 34)  She told Galland that when M.F. was fussy, Plaintiff "usually hand[ed] him off," but she "did not know that [Plaintiff]

8

did when he was unable to hand [M.F.] off." (DSF 35)

Galland and Dr. Hyden spoke later in the afternoon on May 26, 2015. (Doc. 32-6 at 6, Galland Decl. ¶ 16) According to Galland, Dr. Hyden stated "he was still in the process of reviewing medical records and had not formed his formal opinion, but the injuries that he had seen and the documents strongly indicated that [M.F.] had been abused, and that he had been abused on previous occasions as well." (Doc. 32-12 at 31; *see also* Doc. 32-6 at 6, ¶ 16) Galland indicated in his report: "Dr. Hyden stated that based on the injuries he had seen he would state that it was highly likely that the brain injury which caused [M.F.] to stop breathing likely occurred no more than ten minutes before [M.F.] stopped breathing and possibly immediately after the injury occurred." (*Id.* at 32; DSF 37) The only person alone with M.F. during the window of time—as identified in Galland's report —was Plaintiff. (DSF 38)

Dr. Hyden later stated the information in Galland's report was incorrect, because Dr. Hyden did not "use exact numbers" and "would never say 10 minutes." (Doc. 38-7 at 20, Hyden Depo. 43:19-23) Dr. Hyden testified, "I would have said possibly immediately, but I wouldn't have said a time, 10 minutes." (*Id.* at 22, Hyden Depo. 45:11-16) When Plaintiff's counsel questioned "why [Dr. Hyden] did not tell Sgt. Galland 10 minutes," Dr. Hyden stated:

> I would never say 10 minutes, because that's 600 seconds and I don't know if it's 600 seconds. I just know that it's almost immediate. I don't have a stopwatch. I can't predict exactly the time. But I know it doesn't take a long period of time after a severe event like this to cause a child to become unresponsive. It would be almost immediate is what I more than likely told him. I just don't recall.

(Doc. 32-29 at 25-26, Hyden Depo. 78:21- 79:3)

On May 27 and 28, 2015, "Galland received updates from medical social workers and nurses at Valley Children's Hospital." (DSF 39; Doc. 43-2 at 28) Galland was informed that Ms. Guzman claimed "she believed her mother, Genoveva Ramirez, had caused M.F.'s injuries." (*Id.*) "[B]ased on the timeline provided by Dr. Hyden … Galland did not believe Ms. Ramirez was responsible as the only person with [M.F.] 15 minutes prior to his respiratory distress was Jesus Flores." (*Id.*) In addition, Galland noted that "the fact that Ms. Guzman and her mother picked M.F. up by the arms did not explain the fractures to M.F.'s femurs." (*Id.*)

Flores was taken into custody on May 29, 2015, at approximately 2:50 p.m., and transported to

the Bakersfield Police Department. (DSF 40; Doc. 43-2 at 29)  Flores was again advised of his *Miranda* rights.  (*Id.*)  During the interview, Galland advised Plaintiff that the injuries suffered to M.F.'s brain, which caused M.F.'s respiratory distress, "had likely happened 10 to 15 minutes prior to when M.F. stopped breathing." (DSF 41; Doc. 43-2 at 29)  "Flores denied shaking M.F. and just said he had rocked him hard, but never shook him."  (*Id.*) "Galland also showed [Plaintiff] the picture that Genoveva Ramirez had provided depicting the obvious hemorrhage in M.F.'s eye and advised [him] that Ms. Ramirez could not have caused it because she had not been at the residence for a week."  (*Id.*) "Flores said if he had done this, even by accident, then he should be taken to jail."  (*Id.*)  At the end of the interview, Plaintiff was arrested for: (1) child abuse causing significant brain injury or paralysis; (2) willful harm or injury to a child in violation of Penal Code 273a(a); and (3) assault resulting in great bodily harm, in violation of Penal Code 245(a)(4).  (Doc. 32-6 at 7, Galland Decl. ¶ 18; *see also* Doc. 32-12 at 33)

On May 29, 2015, at approximately 4:22 p.m., Galland submitted the Kern County Arietis form, including the following statement:

> On 4/21/15 [sic] the victim, a 2 month old infant, was brought to the hospital in respiratory distress and with bruises on his face. Medical testing revealed the child had an acute brain injury. Follow-up medical testing showed numerous prior brain injuries and fractures in various states of healing. Medical experts have determined the child has suffered severe, permanent brain injury, and is currently in a coma being kept alive with a ventilator. Medical experts determined the child had suffered the most recent brain injuries as little as 10 minutes prior to the onset of the respiratory distress that prompted the call to 911. The only person alone with the child during the time period the injury occurred was the father, JESUS FLORES. Under Miranda, JESUS FLORES admitted to shaking the baby due to his frustration.

(UMF 21; Doc. 32-24 at 2)  "The Probable Cause Declaration was 'Approved by Judge' on May 29, 2015 at 5:02 p.m.  (UMF 22; Doc 32-24 at 2)  On May 30, 2015 at 12:02 a.m., Judge Brian McNamara signed the statement, indicating his determination that there was probable cause to believe Plaintiff had committed a crime.  (*Id.*)

On June 1, 2015, Galland spoke with Dr. Hyden again.  (Doc. 32-6 at 7, Galland Decl. ¶ 20)  In the police report, Galland noted:

> Dr. Hyden told me that [M.F] was still in the PICU with a guarded prognosis, likely poor as the result of a severe traumatic brain injury.  Dr. Hyden said [M.F.] requires the assistance of a ventilator, and is being medicated to prevent additional seizures.  Dr.

Hyden advised he had examined the medical records associated with case and had formed an opinion about the cause of the injuries. Dr. Hyden said the injuries, revealed in the tests conducted by Valley Children's Hospital and Bakersfield Memorial Hospital, were the result of child abuse.

(Doc. 32-12 at 35)  In addition, Galland noted in the report that Dr. Hyden opined M.F.'s injuries—including "fractures to the left humerus, right humerus, right ulna, left femur, right femur, (all corner fractures or bucket handle fractures) a possible fracture to the left ulna, and a broken third rib"— could not have been caused during child birth.  (*Id.* at 35-36)  Further, Galland noted: "Dr. Hyden said he reviewed the blood work and other diagnostic tests and noted no reason for the fractures other than abuse."  (*Id.* at 36)

On June 2, 2015, Galland submitted his report to the Kern County District Attorney's office. (Doc. 32-6 at 8, Galland Decl. ¶ 21)  Galland "had no other communication regarding whether or not the District Attorney intended to pursue criminal charges against Mr. Flores."  (DSF 49; Doc. 43-2 at 35-36)

On June 10, 2015, Galland received a phone call from Crystal Espinoza, who identified herself as a "friend of Jesus Flores."  (DSF 45)  Galland reports: Ms. Espinoza indicated Flores "told her that he was alone with M.F., who was choking on throw up and so he shook him because he thought M.F. was going to pass out. I asked her if he said he shook the baby and she said he used the word 'shook.'" (Doc. 32-6 at 8, Galland Decl. ¶ 22)  During the conversation, which was recorded and transcribed, Ms. Espinoza stated:

> [H]e was like -- he was -- he was -- he was, like, choking -- choking on his throat, you know. And it looked like he was going to pass out. And then, I guess, that's when Jesus tried to -- tried to, like, shake him. Not shake him. Like, he didn't intentionally try to hurt him but he shook him because he, like -- he didn't know what to do. He didn't know how to react. And that's when he told me --
>
> Q.   So he told you he shook -- he shook the baby?
>
> A.   Yeah, he -- yes, he told -- he told me that.
>
> Q.   Okay.
>
> A.   He was trying to wake him up. He didn't say that he shook him. He tried to wake him up.
>
> Q.   Which is -- you just said that he told you that he shook him and then you're saying --

11

A.   He -- he said that he tried to wake him up, and I thought, okay, well, he probably shook him. That's what I'm saying. He tried to wake him up.

(Doc. 32-26 at 6-7; *see also* DSF 45)  In addition, Ms. Espinoza indicated that Flores wanted to talk with her social worker, Janette Shaw.  (*Id.* at 7)

Galland reports that he spoke with Ms. Shaw on July 16, 2016.  (Doc. 32-6 at 8, Galland Decl. ¶ 24)  According to Galland, "Ms. Shaw told [him] that Jesus Flores told her that he 'didn't hurt the baby' and 'didn't shake him that hard'."  (*Id.*)

**B.     Criminal Charges and Preliminary Proceedings**

The same day Galland submitted his report, the DA filed a criminal complaint in Kern County Superior Court, Case No. BF160324A charging Flores with crimes related to M.F.'s injuries.  (UMF 25; *see also* Doc. 32-40 at 4)

Eric Smith, a Deputy District Attorney involved with the prosecution of Jesus Flores, reports that his "office received not only the Police Report pertaining to Jesus Flores, but also the audio and video recordings of the interviews that were conducted, photographs, [and] medical records pertaining to M.F."  (Doc. 32-8 at 1-2, Smith Decl. ¶¶ 2-4)  He asserts the Kern County District Attorney's Office "reviewed all of the evidence independently of what was stated in the police report."  (*Id.* at 2, ¶5)  According to Mr. Smith, "[a]t no time did any City of Bakersfield representative or Bakersfield Police Department employee, including Detective Galland, exert any pressure or influence on the Kern County District Attorney's office or [Smith] to file charges and/or criminally prosecute Mr. Flores."  (*Id.*, ¶ 6)  Mr. Smith reports the decision to file charges "was made independently."  (*Id.*)

On June 2, 2015, Flores appeared before Judge Michael Bush, who set bail at $1,000,0000 and issued a "criminal protective order" "[a]s a term and condition of [his] bail," which prevented Flores from having any contact with M.F.  (UMF 25)  In addition, a pre-preliminary hearing was set for June 11, with a preliminary hearing to occur the following day on June 12, 2015.  (*Id.*)  Galland had no contact with Judge Bush and "did not testify at that hearing."  (DSF 62)

Flores appeared at hearings in June, July, and September 2015; during which he agreed to continuances of the preliminary hearing. (DSF 63; Doc. 32-41 at 4; Doc. 32-42 at 4; Doc. 32-43 at 4) The preliminary hearing was held finally in Case No. BF160324A on October 21, 2015. (UMF 26)

Plaintiff was represented by David Faulkner, while the People were represented by Kristina Wenzel. (*Id.*; *see also* Doc. 38-9 at 2) "The District Attorney called two witnesses at the Preliminary Hearing and Mr. Flores's counsel called no witnesses." (UMF 27)

Officer Achtmann was the first witness called, and he testified about "being dispatched to the subject residence on May 21, 2015 and his communications with Mr. Flores." (UMF 27) Achtmann testified that when he arrived, Flores was there by himself and M.F. was being transported to Memorial Hospital. (Doc. 38-9 at 9-10) Achtmann stated Flores said he had been home alone with M.F. (*Id.* at 10) Achtmann testified that Flores said M.F. woke up crying, so Flores attempted to sooth him. (*Id.*) In addition, Flores told the officer that M.F. started having trouble breathing and became unresponsive after vomiting, despite splashing water on the baby's face. (*Id.* at 10) Achtmann testified Flores stated he dialed 911 after about two minutes and performed CPR by placing M.F. face-up on the floor. (*Id.*)

Galland was the second witness called at the hearing. (DSF 64; Doc. 43-2) "Galland testified that Dr. Naven advised him that M.F. was in acute respiratory distress and that he noticed bruises on M.F.'s cheeks and that Dr. Naven ordered a CAT Scan from which he noticed subdural hematomas and bleeding in the brain." (*Id.*) Galland also testified that Dr. Naven informed him "[a]t least one of the hematomas was fresh and there were older healing subdural hematomas," and he did not believe the bruising on M.F.'s cheeks would be caused by CPR. (*Id.*)

Galland testified about the May 21 interview with Flores, and stated: "He admitted to at one point to shaking the child. He stated that he started off rocking the child. That didn't work. And he demonstrated using a stuffed animal and demonstrated him shaking the child." (Doc. 38-9 at 21; *see also* DSF 66, Doc. 43-2 at 66) Galland said he spoke to Flores about getting frustrated or angry with the baby, and Flores said "he sometimes gets frustrated because the child won't stop crying." (*Id.*) Galland stated that Flores indicated he was frustrated on May 21 because M.F. "wouldn't stop crying," and he could not figure out why after trying to feed him, sooth him, and changing his diaper. (*Id.* at 22) Flores also "was receiving messages from people who watch him play video games online asking him why he wasn't online yet." (*Id.*) Galland stated he could not "recall specifically if [Flores] said he shook the baby in response to that," but Flores indicated he shook the baby on that date, and demonstrated using a "stuffed animal … or stuffed baby." (*Id.* at 22-23) Galland testified also that

13

Flores "stated that he shook him harder than he meant to." (*Id.* at 23)

Further, Galland testified about his discussions with Dr. Hyden, including "Dr. Hyden's conclusion that M.F.'s injuries were the result of child abuse and that the hemorrhaging in both retinas was the result of shaking and child abuse." (DSF 67; *see also* Doc. 38-9 at 26-27) Galland said, "[Dr. Hyden] stated that based on the injuries that he saw in the CAT scans that the child would have stopped breathing almost immediately, if not -- and if not immediately within 10 minutes." (Doc. 38-9 at 27:5-8) Galland testified that on June 1, he talked with Dr. Hyden and was informed M.F. "was intubated, on a ventilator," and having seizures. (*Id.* at 28:7-12) Further, Galland testified he was told by Dr. Hyden that "the injuries he saw on [M.F.] were the result of child abuse," and he based this opinion on the injuries to the brain, broken bones, and retinal hemorrhaging. (*Id.*, 28:19-26) In addition, Galland stated that Dr. Hyden reported M.F. "had a torn ligament in his neck," which was indicative of "shaking and child abuse." (*Id.* at 29-30) According to Galland, Dr. Hyden classified the "corner and bucket-handle fractures" that M.F. suffered as "non-accidental trauma." (*See id.*, 29:13-24)

During cross-examination, Mr. Faulkner asked Galland to describe the shaking Flores demonstrated during the videotaped interview. (Doc. 38-9 at 30) Galland stated: "He was holding the child, as I recall, facing him. He said that he started rocking him, that wasn't working. He got frustrated and he started shaking. While he was doing that, the stuffed animal that he was holding, the head was snapping violently back and forth." (*Id.* at 30:24-28) Mr. Faulkner asked if the head was unsupported while the shaking was going on, and Galland responded: "Correct."[3] (*Id.* at 31:1-3)

Mr. Faulkner established through questioning that "M.F. had bruises on his face prior to the date in question." (UMF 34; *see also* Doc. 38-9 at 34, 36-37) Galland described the interviews with M.F.'s relatives, and testified that Ms. Guzman noticed the bruises on M.F.'s face on Monday that week. (Doc. 38-9 at 41:12-17) When asked to describe the bucket-handle fractures, Galland stated:

I'm not a medical doctor, so I'm paraphrasing, but my understanding is that where the

---

[3] The Court has reviewed the video. There is a point at which the doll's head is "unsupported"—meaning Mr. Flores is holding the doll with each hand on each of the doll's shoulders/arms/upper torso while Mr. Flores shakes it. This is depicted on the video soon after Mr. Flores demonstrates how he attempted to rouse the baby by "smacking" it on the face, after he was asked how hard he "smacked" the baby. Moreover, at trial, Galland testified that though Mr. Flores had his hand behind the doll's head, it was bouncing up and back against Flores' hand. Thus, exactly what was meant by "unsupported" in this line of questioning is unclear.

tendons attach at the edges of the bone they are caused when the joints, or say, for example, the arm is violently shaken, the muscle tone of a child, of a baby does not have the same capability to retard the motion as an adult and that the – they're essentially a repetitive- use injury. They're -- they cause microfractures until finally the bone rips away from the -- the bone connected to the tendon rips away from the main portion of the bone.

(*Id.* at 40:27-42:9)

Following the testimony of Achtmann and Galland, the court determined there was "probable cause to believe that the offenses as alleged, including any enhancements, have been committed and sufficient cause to believe … [Flores] committed those offenses." (Doc. 38-9 at 44)

## C.    Termination of Parental Rights

On May 22, 2015, Social Services became involved in investigating M.F.'s welfare. (DSF 103) Bonnie Holt, "a social service worker with the Kern County Department of Human Services," became involved in M.F.'s case on that date. (Doc. 32-7 at 1-2, Holt Decl. ¶¶ 1, 4) Ms. Holt reports, "Once the child was taken to the hospital… and there were concerns that the child's injuries were the result of abuse, [DHS] was responsible for conducting an investigation, separate and apart from any investigation conducted by the police, to determine what would be in the best interest of the child." (*Id.* at 2, ¶ 4)

Between May 22 and June 25, 2015, Ms. Holt "was in constant contact with several medical social workers from Valley Children's Hospital regarding M.F.'s status." (Doc. 32-7 at 2, Holt Decl. ¶ 6) She reports that she was "requesting and being provided with M.F.'s medical records so that [she] could evaluate M.F.'s condition and his doctors' impressions and diagnoses." (*Id.*) Ms. Holt asserts: "To the extent I was in contact with the Bakersfield Police Department, and specifically Detective Galland, it was mostly procedural or administrative in nature. I wanted particular photographs or to know if M.F.'s mother was a person of interest. I wanted to view videos of the interviews on M.F.'s mother and Jesus Flores." (*Id.*, ¶ 5) In addition, Ms. Holt reports that during the course of her investigation, she took the following actions:

I personally interviewed numerous individuals including M.F.'s mother, Jesus Flores, M.F.'s maternal grandmother, and M.F.'s maternal aunt. I also personally watched the videos of the interviews that had been conducted by the Bakersfield Police Department including videos of M.F.'s mother, Jesus Flores, M.F.'s maternal grandmother, M.F.'s material step grandfather[,] M.F.'s maternal aunt, and cousin. I submitted regular

15

reports to the Juvenile Justice Center which outlined the history of the case and the findings and impressions made by the social workers involved in M.F.'s case.

(*Id.*, ¶ 7)

On June 26, 2015, the Kern County Department of Health Services ("DHS") filed a petition based upon its investigation, alleging:

M.F. was at risk of suffering serious physical harm inflicted non- accidentally by a parent or as a result of a parent's failure to adequately protect him and M.F., who was under the age of five, suffered severe physical abuse by a parent or another person known by the parent, and the parent knew or reasonably should have known that person was physically abusing the child.

(Doc. 37-7 at 2, Holt Decl. ¶ 8; *see also* DSF 13)  The same date, the hospital discharged M.F., and he was placed in a foster home.[4]  (*Id.*)

Following the filing of the petition, Ms. Holt continued her investigation.  (Doc. 32-7 at 3, Holt Del. ¶ 9)  She also "received reports from other social workers, including Family Services Social Worker, Mary Little, on behalf of M.F.'s mother and on behalf of Jesus Flores." (*Id.*)  Ms. Holt reports:

While M.F.'s mother was initially committed to visits with M.F. and to fulfilling her obligations in terms of attending parenting classes, this commitment diminished over time.  M.F.'s mother was noted to have "poor" attendance at the Parent Education Program "Nurturing Parenting" and was dropped from the class in September 2015.  There were several times when M.F.'s mother did not attend several scheduled visits with M.F. …

From June 29, 2015 to August 29, 2015, M.F.'s mother had an opportunity to visit M.F. 94 times.  According to case documentation, the mother attended 23 visits.  The visits were missed due to the mother cancelling, not showing up, or going months without contacting the Department to schedule visitation.

(Doc. 32-7 at 3, ¶ 9)  Ms. Holt reports, "Based on the totality of the Kern County Department of Human Services Investigation, it was recommended that the parental rights of M.F.'s mother and Jesus Flores be terminated."  (*Id.*, ¶ 10)

On December 1, 2015, Flores and M.F.'s mother were present at a Continued Jurisdictional Hearing, and both parents were "represented by their own counsel."  (Doc. 32-7 at 3, Holt Decl. ¶ 11)  Ms. Holt reports, "All counts and specific allegations of the petition … were considered true."  (*Id.*)

---

[4] Bonnie Holt indicates at one point that the petition was filed on June 25, 2015, and M.F. was released from the hospital on that date.  (Doc. 32-7 at 2, Holt Decl. ¶ 8)  However, she also reports the petition was filed on June 26.  (*Id.* at 3, ¶11)  The opinion from the Fifth District Court of Appeal indicates these events occurred on June 26, 2015.  (Doc. 32-37 at 3)  Thus, it appears the June 25 date was a typographical error.

In January 2016, Ms. Holt "was informed that M.F.'s mother dropped out of all her case plan components approximately 'three weeks ago' and had 'basically given up'." (*Id.*, ¶ 9)

On May 12, 2016, DHS "recommended total denial of reunification services for both parents." (Doc. 37-7 at 3, Holt Decl. ¶ 12)  Ms. Holt reports that DHS "was not convinced that Jesus Flores was the sole source of M.F.'s multiple injuries, however, the child was in the sole care of the father at the time the child sustained the acute injuries." (*Id.*)  Further, DHS believed both parents "failed to protect M.F." (*Id.*)  Ms. Holt maintains the DHS investigation, "and findings derived therefrom," "was entirely independent of any investigation or conclusion drawn by the Bakersfield Police Department and/or Detective Galland." (*Id.*)  The petition was ultimately sustained, and M.F. was "ordered removed from the physical custody of the parents on the sustained petition." (*Id.*, Holt Decl. ¶ 12(b)[5])  M.F. was adjudged a dependent child of the court pursuant to California Welfare and Institutions Code § 300(a) and (e). (*Id.*)

On September 9, 2016, Flores' counsel "informed the juvenile court that she had received an email from Mr. Flores's criminal attorney in which the defense attorney stated that he []had top physicians in the field who had 'new evidence' that Mr. Flores had not injured M.F." (DSF 79; Doc. 43-2 at 75)  In a subsequent petition, counsel stated: "new evidence had come to light that was not previously available which showed that father was not responsible for M.F.'s condition..." (DSF 80)  This new evidence from counsel included the opinions of two experts, Dr. Charles Hyman and Janice Ophoven. (DSF 81)  In reviewing the evidence,

> [T]he appellate court pointed out the section 388 petition relied on the new expert's opinion that was based on old evidence available at the time of trial and that, with due diligence, could have been presented at trial. The fact the new expert interpreted the evidence differently than the medical doctors who testified at the jurisdiction hearing did not make his opinion "new evidence" within the meaning of section 388. [Citation.] Moreover, the new expert's opinion was not based on additional facts obtained after the jurisdiction hearing; instead, the expert reached his opinion "based on the *same evidence available to the experts who testified at trial* and simply came to a different conclusion than theirs." [Citation.]

(Doc. 32-27 at 7, 2017 Cal. App. Unpub. LEXIS 4016 *18-19) (emphasis in original). Ultimately, "the

---

[5] The declaration from Ms. Holt includes two paragraphs identified as paragraph "12." For clarity, the second paragraph "12" is identified herein as ("12(b)").

Family Court Judge[6] determined that Mr. Flores's and Ms. Guzman's parental rights should still be terminated." (DSF 83)

### D. Criminal Trial

The criminal trial against Flores commenced on May 15, 2017. (DSF 72) Flores sought to exclude the statements he made during his interviews with the officers and argued they were not voluntarily made. In rejecting the motion, the parties agree that the trial court concluded that:

> (1) Detective Galland was required to and did give the Miranda advisal in both the May 21 and May 29 engagements with Mr. Flores and that Mr. Flores waived such rights; (2) while there was no confession by Mr. Flores, there were quite a few admissions, particularly as to when Mr. Flores took M.F outside; and (3) Mr. Flores is quite intelligent and during the course of the questioning, he was able to see and understand when the Detectives were trying to corner him on things and he jousted back thereby demonstrating that he is "bright", "able to reason", "able to comprehend", and "able to resist". The Court concluded by finding that the statements made by Mr. Flores were voluntary.

(DSF 71)

On June 7, 2017, Dr. Naven and Dr. Hyden testified. (DSF 72, 73) Dr. Naven testified that he was the attending physician the evening M.F. was taken to the emergency room, and he "had special training specific to infants in emergency situations." (*Id.*; *see also* Doc. 32-38 at 3-4, Trial Transcr. 41:23- 42:14) Dr. Naven also testified about M.F.'s injuries including:

> M.F. had bruising on the right side of his cheek and a weak cry, which is usually a bad sign. M.F.'s O2 saturation was very low which could be caused by trauma or infection. Dr. Naven also noted questionable blood behind the right Tympanic Membrane, which is indicative of head trauma in most cases. In addition, the head CT showed multiple subdural hematomas that were contained both acute hemorrhage along with old hemorrhage. This was significant to Dr. Naven because it's a sign that it was not just a single, isolated incident.

(DSF 72(b)) When asked to explain what "acute" meant related to the diagnosis in M.F.'s case, Dr. Naven responded: "Usually when a radiologist remarks there is acute blood in the head, it's blood that's only been there for a couple hours, at most." (*Id.* at 9, Trial Transc. 48:7-11) Dr. Naven also testified that he could not recall specifically the information provided to Galland—or the identity of the officer to whom he spoke— regarding the timeline for the acute subdural hematoma. (Doc. 32-38 at 11, Trial Transcr. 53:13-20) Although Dr. Naven was unable to recall whether he stated, "the

---

[6] This appears to be an error. As demonstrated by the opinion of the Fifth District Court of Appeal, the child was under the jurisdiction of the Juvenile Court, not the Family Court.

timeline could be as recent as two hours," Dr. Naven confirmed "it definitely could have." (*Id.*)  In addition, Dr. Naven testified that he was concerned that M.F.'s injuries were the result of non-accidental trauma, which means abuse.  (DSF 72(c))

Dr. Hyden testified that he saw M.F. at the Pediatric Intensive Care Unit of Valley Children's Hospital.  (DSF 73)  He indicated he saw M.F., reviewed his chart, "and talked to medical personnel about their observations and findings."  (DSF 73(b); *see also* Doc. 32-38 at 13-14, Trial Transcr. 88:22-89-13)  Dr. Hyden testified that "M.F. had sustained mixed density, which means a combination of old and new bleeding in the brain in subdural spaces, in two separate locations."  (DSF 73(c)) He also stated M.F. had a healing proximal humerus fracture; corner fractures on the femurs, distal radius and ulna buckle fractures, or periosteal elevation, on the left radius and ulna; and a left rib fracture.  (DSF 73(d))  When asked the basis of his diagnosis of "abusive head trauma," Dr. Hyden stated:

> As a physician in pediatrics -- child abuse pediatrics, I have to look at the history that's given, the surrounding situation, and the physical findings, and the scientific findings based on radiographs, exams, all those things.  And based on that I determined that [M.F.] was subjected to severe nonaccidental trauma by repetitive shaking and possibly slamming onto a soft surface, possibly not.  It could have just been shaking.  And that it was severe enough that it caused these injuries and the subsequent apparent life-threatening event.

(Doc. 32-38 at 22, Trial Transcr. 104:1-17)

On June 16, 2017, the jury acquitted Flores of all charges.  (*See* Doc. 38-11 at 810, Trial Transcr. 415:1- 417:4)

## II.     Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim…") (internal quotation marks and citation omitted).  The standards that apply on a

motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.

*Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### III.    Evidence before the Court

In evaluating a motion for summary judgment, the Court examines the evidence provided by the parties, including pleadings, deposition testimony, answer to interrogatories, and admissions on file. *See* Fed. R. Civ. P. 56(c). On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Court has reviewed each of the evidentiary objections identified by the parties related to the motion and opposition for summary judgment. (*See* Doc. 43-2; Doc. 44-2) However, the Court declines to address each of the individual objections identified by the parties. *See Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (observing "it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised").

To the extent Defendants object to evidence on the grounds of relevance, such objections are inappropriate, because the Court must determine whether a fact is relevant and material as part of "the summary judgment standard itself." *Burch v. Regents of the Univ. of Cal.*, 433 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006). Toward that end, any evidence deemed irrelevant was omitted from the Court's summary of the facts and contentions above. Further, the Court, as a matter of course, has not factored into its analysis any statements identified by either party that are speculative or represent a legal conclusion. *See Burch*, 433 F. Supp.2d at 1119 ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment.") (citation omitted, emphasis in original). Thus, the Court has relied upon only evidence it has deemed admissible. In addition, the Court will consider only those facts that are supported by admissible evidence and to which there is no genuine dispute.

## IV.   Discussion and Analysis

Defendants seek summary adjudication of all remaining causes of action in the First Amended Complaint, including: (1) deprivation of civil rights against Defendant Galland; (2) interference with the familial relationship under the Fourteenth Amendment against Defendant Galland; (3) False Arrest/ Imprisonment against all defendants; (4) negligence against all defendants; and (5) intentional infliction of emotional distress against all defendants.  (*See generally* Doc. 32-1; *see also* Doc. 17)

Defendants propounded discovery to determine the facts that would support this cause of action. (DSF 85; Doc. 43-2 at 77)  According to Defendants,

> The gist of the response is that: (1) Defendant Galland made false and misleading statements which led to the filing of criminal charges; (2) M.F. was separated from his parents; (3) Defendant Galland had contact with Child Protective Services which []indicated to CPS that Plaintiff abused his son; (4) Defendant told Plaintiff's girlfriend and family that Mr. Flores abused his son; (5) Defendant Galland caused a restriction preventing Plaintiff from visiting his son at the hospital; (6) Defendant Galland caused an investigative hold to be put on M.F.; (7) Defendant Galland testified falsely as to what occurred during his interviews with Plaintiff; (8) an examination of the child while he was in foster care supposedly exonerated the Plaintiff but he was not released and the prosecution continued; and (9) as a result of Defendant Galland's conduct, Plaintiff spent two years in jail and bail was fixed at or above $1,000,000.

(Doc. 32-1 at 34, citing DSF 85; *see also* Doc. 32-25; Doc. 32-26)  Defendants assert that Flores is unable to succeed on his claims because he presents "nothing more than unsupported rhetoric."  (Doc. 32-1 at 34)

Flores opposes summary judgment, arguing "a jury could reasonably conclude that his arrest, detention, and prosecution were without probable cause" and his rights were violated.  (*See* Doc. 43-1 at 28)  According to Flores, when the facts viewed in the manner most favorable to him, "Galland essentially framed Plaintiff for a crime he did not commit, twisting and embellishing details in an effort to ensure that he was found guilty of a serious crime for which he faced up to life in prison." (*Id.* at 47)

### A.   First Claim for Relief:  Deprivation of Civil Rights under 42 U.S.C. § 1983

Flores seeks to hold Galland liable for violations of his civil rights arising under the Fourth, Fifth, and Fourteenth Amendments to the Constitution, pursuant to 42 U.S.C. § 1983 ("Section 1983"). (Doc. 17 at 13, ¶ 62)  Section 1983 "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage,

of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must demonstrate a specific injury was suffered and show causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Here, Flores contends Galland violated his rights "to be free from detention and arrest absent reasonable suspicion or probable cause" through the following actions: "by falsely labeling and defaming him as a child abuser; by falsifying or misrepresenting the evidence against him; by prolonging his prosecution and incarceration once clear proof of his innocence came to light; and/or by maliciously causing him to be prosecuted over a more than two year period." (Doc. 17 at 13, ¶ 63)

### 1. Defamation

Defendants observe that as part of the first claim for relief, Flores contends Galland violated his civil rights by "falsely label[ing] him a 'child abuser,' and as a result, [Flores] was not able to visit his son/and or lost custody of him." (Doc. 32-1 at 50) In addition, Flores contends "his relationships with his girlfriend and their family members [were] apparently ruined." (*Id.*) Defendants argue these allegations are "not enough to make a claim for defamation under 42[] U.S.C. § 1983." (*Id.*)

To establish a claim for defamation under Section 1983, a plaintiff must first establish defamation under state law. *See Crowe v. County of San Diego,* 242 F.Supp.2d 740, 746 (S.D. Cal. 2003) ("Admittedly, to find defendant liable for violation of § 1983 under a defamation-plus theory, the jury must necessarily find that defendant defamed plaintiffs and must necessarily look to state law in determining whether defamation occurred"). Under California law, defamation "involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to

injure or which causes special damage." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999); *see also Lee Myles Assocs. Corp. v. PaulRubke Enters., Inc.*, 557 F. Supp.2d 1134, 1139 (S.D. Cal. 2008).

However, defamation alone does not support a claim under Section 1983. *Paul v. Davis*, 424 U.S. 693, 701-710 (1976). As Defendants observe, the Ninth Circuit explained: "To state a claim for defamation under section 1983, a plaintiff must allege loss of a recognizable property or liberty interest in conjunction with the allegation of injury to reputation." *Cooper v. Dupnik*, 924 F.2d 1520, 1532 (9th Cir. 1991) *aff'd in relevant part*, 963 F.2d 1220, 1235 n.6 (9th Cir.) (en banc), *cert. denied*, 506 U.S. 953 (1992). The court explained the constitutional protections of due process apply to a defamation claim "if the accuracy of a charge impairing a citizen's reputation for honesty or morality is contested, there is public disclosure of the charge, and it is made in connection with the alteration of some right or status recognized by state law. *Cooper,* 924 F.2d at 1532 (citing *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773, 777-78 (9th Cir. 1982). Courts have identified this as the "stigma-plus" or "defamation plus" test. *See id. Crowe v. County of San Diego*, 608 F.3d 406, 444 (9th Cir. 2010). A plaintiff must satisfy the "stigma-plus" test by demonstrating: (1) "the injury to reputation was inflicted in connection with a federally protected right" or (2) "the injury to reputation caused the denial of a federally protected right." *Crowe*, 608 F.3d at 444.

Seeking summary adjudication of the first claim for relief to the extent it is based on defamation, Defendants contend Flores is unable to satisfy the "stigma-plus test" because he "has not and cannot demonstrate that Detective Galland's statements damaged his reputation or that he suffered some other stigma sufficient to satisfy this claim." (Doc. 31-2 at 52) Further, Defendants observe that courts have determined "prosecution itself (the indictment and arrest) cannot be used as the basis for constitutional injury supporting a 1983 defamation claim." (*Id.* at 51, citing, e.g., *Rehberg v. Paulk*, 611 F.3d 828 (11th Cir. 2010); *Spence-Jones v. Rundle*, 991 F. Supp. 2d 1221 (S.D. FL 2013); *Buckley v. Fitzsimmon*s, 20 F.3d 789, 797 (7th Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995)).

Flores does not address the challenge to this cause of action in his opposition for summary judgment. (*See generally* Doc. 43-1 at 1) Defendants argue the Court should grant summary adjudication for this reason. (Doc. 44 at 14) However, even if a motion for summary adjudication is unopposed, the Court cannot grant summary judgment solely because no opposition has been filed.

*Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994). The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact, and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). Thus, where summary adjudication of a specific claim is not addressed by the party opposing summary judgment, "the Court applies the standard for an unopposed motion for summary judgment with respect to [that] claim." *Pinder v. Empl. Dev. Dep't.*, 227 F.Supp.3d 1123, 1151 (E.D. Cal. 2017).

Significantly, there is no evidence identified by Flores—either in his opposition to the motion or the separate statement of facts—that supporting the allegation that Galland called Flores a "child abuser." (*See generally* Doc. 43-1 and Doc. 43-3) Absent such evidence, Plaintiff is unable to establish a necessary element of a claim for defamation, let alone satisfy the test for "defamation plus." Further, Flores fails to present any evidence that demonstrates damage to his reputation. Accordingly, Defendants' motion for summary adjudication of the first claim for relief, to the extent it is based upon defamation, is **GRANTED**.

### 2. Coercive investigation

In the First Amended Complaint, Flores appears to allege Galland violated his right to be free from a coercive interrogation under both the Fifth Amendment and Fourteenth Amendment. (Doc. 17, ¶¶ 38-45, 62-64) Notably, the Ninth Circuit determined a plaintiff may bring claims under both amendments for a coercive investigation. *See Crowe v. Cty. of San Diego,* 608 F.3d 406, 430, 433 (9th Cir. 2010) (permitting the plaintiffs to assert both Fifth Amendment and Fourteenth Amendment claims based on very similar allegations).

### a. Fifth Amendment standards

The Fifth Amendment provides that no person shall be "compelled in any criminal case to be a witness against himself." *U.S. Const. amend. V.* This self-incrimination clause encompasses a proscription against coercing confessions from a suspect during an interrogation. *See Crowe v. County of San Diego*, 593 F.3d 841, 862 (9th Cir. 2010). An interrogation is sufficiently coercive to violate the Fifth Amendment when "the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810

(9th Cir. 2003); *see also Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("Under the Fifth Amendment, a confession is coerced or involuntary if the defendant's will was overborne at the time he confessed.").

A plaintiff may establish a violation of the Fifth Amendment where a coerced confession is used against him in a criminal proceeding. *Jackson v. Barnes*, 749 F. 3d 755 (9th Cir. 2014); *see also Hall v. City of Los Angeles*, 697 F. 3d 1059, 1068 (9th Cir. 2012) (holding the Fifth Amendment is the explicit constitutional provision governing a plaintiff's Section 1983 claim that authorities used a coerced confession to secure his conviction); *Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009) (noting that allowing a coerced statement to be used against a defendant once charges are filed imposes "precisely the burden precluded by the Fifth Amendment: namely, they make the declarant a witness against himself in a criminal proceeding").

b. Fourteenth Amendment standards

The Supreme Court determined that "the Fourteenth Amendment demands that statements taken from a suspect by police by the 'voluntary product of a free and unconstrained will.'" *Cooper v. Dupnik*, 963 F.2d 1220, 1247 (9th Cir. 1992) (quoting *Haynes v. Washington*, 373 U.S. 503, 514 (1963)). "The standard for showing a Fourteenth Amendment substantive due process violation … is quite demanding." *Stoot*, 582 F.3d at 928. "Only the most egregious official conduct" is "arbitrary in the constitutional sense," and constitutes a violation of substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation and quotation marks omitted). Thus, a Fourteenth Amendment claim for use of investigatory tactics that violate the due process clause is cognizable only if the abuse of power "shocks the conscience" and "violates the decencies of civilized conduct." *See id.*

c. Analysis

Flores argues that the Bakersfield Police Officer's used "investigative techniques that were so coercive and abusive that defendant knew, or was deliberately indifferent, that those techniques would yield false information."[7] (Doc. 43-1 at 34) Flores directs the Court's attention to the Seventh Circuit

---

[7] The first amended complaint alleges that the Fifth Amendment claim stems from the failure to have reasonable suspicion for his detention and probable cause for the arrest. (Doc. 17 at 13, ¶¶ 62-63) At the hearing, Flores' counsel agreed that if the Court finds there is probable cause, the Fifth Amendment claim fails. Nevertheless, assuming a free-standing Fifth

case of *Aleman v. Village of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011), asserting the court considered "facts that are strikingly similar to this case." (*Id.* at 24)

In *Aleman*, the plaintiff was interrogated by the police regarding the death of an infant, Joshua. *Id.*, 662 F.3d at 901. An officer "repeatedly told Aleman that he'd talked to three doctors and all had told him that Joshua had been shaken in such a way that he would have become unresponsive (unconscious) immediately, meaning that Aleman's shaking must have caused Joshua's injury." *Id.* The court observed: "This account of what the doctors had said was a lie, but it elicited from Aleman the statement that 'I know in my heart that if the only way to cause [the injuries] is to shake that baby, then, when I shook that baby, I hurt that baby . . . . I admit it. I did shake the baby too hard.'" *Id.* at 902. The Seventh Circuit reversed the dismissal of a claim for involuntary confession, finding the officer "forced on Aleman a premise that led inexorably to the conclusion that he must have been responsible for Joshua's death; the lie if believed foreclosed any other conclusion." *Id.* at 906.

Flores argues the matter before the court is analogous, because he "was placed in the same inescapable vise," and "told that the only possible cause of his son's injuries was that he had been shaken before the collapse." (Doc. 43-1 at 27) According to Plaintiff, "Not being an expert in shaken-baby syndrome, Jesus Flores could not doubt the irresistible conclusion he had handled the child must have caused the injury, because all other possibilities had been excluded as a matter of medical certainty." (*Id.*) Flores asserts "[h]e had no memory of shaking the child, but since he was the only person to have been in contact with his son immediately before and during his son's collapse, it was a logical necessity that he had been responsible for his son's condition." (*Id.*) Thus, Flores contends that under *Aleman*, his statement that he shook the baby is "worthless" and should be "adjudged to weigh zero on the scales." (*Id.*)

On the other hand, Defendants assert *Aleman* "is not binding precedent and has not been accepted by this Circuit or any other." (Doc. 44 at 16) Defendants observe: "The *Aleman* case has not been cited or relied upon by a single court within the Ninth Circuit. In fact, with the limited exception of the 11th circuit, no circuit has accepted or adopted the *Aleman* holding." (*Id.*) In addition,

---

Amendment claim based upon coercive and improper questioning, the Court conducts analysis of the Fifth Amendment claim aside from the probable cause determination.

Defendants contend the case is factually distinct because: "the suspect was initially put in an interrogation room for almost six hours. He went back and forth on wanting to talk to his lawyer. He was then questioned for more than four hours." (*Id.* at 16, n.3) (citing *Aleman*, 662 F.3d at 901-02.

Further, Defendants argue that "[c]ourts within the Ninth Circuit have routinely held that the approach to the interview of the Plaintiff by Detective Galland was entirely lawful and reasonable." (Doc. 44 at 16) (citations omitted)  Defendants also note:

> Contrary to the holding in Aleman, Courts within the Ninth Circuit have found that police deception alone will not render a confession involuntary. *See United States v. Crawford*, 372 F.3d 1048, 1060-61 (9th Cir. 2004) ("Trickery, deceit, even impersonation do not render a confession inadmissible...). Thus, police generally can lie to a suspect about, for example, the extent of the evidence against the suspect or feign friendship with the suspect without fear of rendering the resulting confession involuntary. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 737-739 (1969) (confession voluntary even though officer falsely told suspect that suspect's co conspirator had confessed); *Ortega v. Sherman*, 2016 U.S. Dist. LEXIS 120919, at *39-40 (C.D. CA Mar. 9, 2016); *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997) (suspect falsely told he had been identified by an eyewitness).

(Doc. 44 at 17)  In addition, as Defendants observe, this Court observed that "misrepresentations and trickery by the police are permissible under clearly established Supreme Court precedent and are only one factor of the totality of circumstances to be considered." (*Id.*, quoting *Mays v. Clark*, 2012 U.S. Dist. LEXIS 42300 at *62-63, *70-71; 2012 WL 1037942 (E.D. Cal. Mar. 26, 2012).

Importantly, the court must consider the "totality of the circumstances" to determine whether a statement was voluntary or the interrogation tactics were coercive in violation of the plaintiff's constitutional rights.  *See Miller v. Fenton,* 474 U.S. 104, 112 (1985). This includes consideration of both the characteristics of the plaintiff and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). (The court must examine "the factual circumstances surrounding the confession, assess [] the psychological impact on the accused, and evaluate [] the legal significance of how the accused reacted").  Factors to be considered by the court include: "the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011); *see also United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (noting courts often consider the age of the accused, "his intelligence, the lack of any advice to the accused of his

constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep").

Flores does little to assist the Court with its analysis of the factors identified by the Ninth Circuit courts. Instead, his argument regarding the coercive nature of the interrogation stands on the Seventh Circuit's analysis in *Aleman*. (*See* Doc. 43-1 at 24-28) Flores notes that the officers told him: "There's only a couple of ways that babies of that age end up with bleeding brains,"—and Galland acknowledged during his deposition that Flores was told this, but "That doesn't necessarily mean it's true." (*Id.* at 25, citing Galland Depo. 95:5-8) Plaintiff contends that after being told this, and being promised with "forgiveness," he was lead to "admit that the only time I actually moved him hard was when I was outside in the patio." (*Id.*)

However, contrary to Flores' argument now that he "could not doubt" the officers' statement "there are only a few ways that [injury] happens" and implication that Flores caused the injury to M.F. (Doc. 43-1 at 27), Flores did, in fact, express doubt during the interrogation. When the officers made the statement, Flores immediately responded: "The doctor told us there's a million ways it could happen." (Doc. 32-22 at 115, Transcr. 113:2-5) Thus, it appears Flores had the mental ability to question the officers' representations. Further, Plaintiff demonstrated how he grabbed M.F. to try to wake him and how Flores held M.F. while outside *before* the officers made any statement about "forgiveness"—which Flores asserts lead to his admission— during the interrogation on May 21. (*See id.* at 129-130, 145)

Moreover, it is undisputed that the interview during which Flores acknowledged shaking M.F.—though he could not recall "if it was hard shake, if it was a little shake, a medium shake"—lasted 85 minutes. (*See* UMF 12; Doc. 32-22, Transcr. 145:8-12) This duration is significantly different from *Aleman*, where Aleman sat in an interrogation room for nearly six hours before the questioning started, and once the interrogation started, "the officers… questioned him for four hours." *Aleman*, 662 F.3d at 901, 902. In addition, there are no facts that Flores lacked the intelligence to understand the questioning, and the officers did not repeatedly ask the same question or use physical punishments. Although Flores takes medication for anxiety, he does not assert that his mental health impacted his ability to voluntarily respond to the questions posed by the officers. Finally, Flores was

not a minor, and there is no showing his age warranted any special care by the officers during the investigation.[8] *See, e.g. United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir. 1986) (factors to consider under "totality of the circumstances" test where the individual is a minor include parental notification, or lack thereof; age; background, experience; and conduct).

Flores fails to identify any actions by Galland during the interrogation on May 21 that "shocks the conscience" or "violates the decencies of civilized conduct." There is no dispute of material fact related to the actions taken by Galland during the interrogation, and the totality of the circumstances shows Flores was not coerced into making his statements regarding how he handled M.F. The Court agrees with the criminal court that Flores appeared to be "quite intelligent" during the interviews, "Mr. Flores is quite intelligent and during the course of the questioning, he was able to see and understand when the Detectives were trying to corner him on things and he jousted back thereby demonstrating that he is 'bright', 'able to reason' 'able to comprehend', and 'able to resist.'" (Doc. 43-2 at 69 DSF 71). As the criminal court did, the Court here concludes that the statements made by Mr. Flores were voluntary. Therefore, Flores fails to establish essential elements of his claim against Galland for violations under the Fifth and Fourteenth Amendments and summary adjudication is appropriate for these claims. *See Celotex*, 477 U.S. at 323. Defendants' motion for summary adjudication of the First Claim for Relief under Section 1983, to the extent it is based upon coercive interrogation under the Fifth and Fourteenth Amendments, is **GRANTED**.

### 3. Fabrication of evidence

"[T]here is a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (citing *Devereaux v. Perez*, 218 F.3d 1070, 1074-75 (9th Cir. 2000)). To bring a claim for fabrication of evidence under Section 1983, a "plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Id*. To establish a claim for fabrication of evidence,

---

[8] The Court notes also that though Mr. Flores seemed distressed toward the end of the interview, after the officers left the room, he composed himself relatively quickly and, within minutes, was playing with the jewelry on his wrist and picking his teeth using a twig or string.

"a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Caldwell*, 889 F.3d at 1115 (citation omitted).

The Ninth Circuit explained "the plaintiff must first point to evidence he contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). Then, the plaintiff may employ one of two "circumstantial methods'" to demonstrate that the fabrication was "deliberate:"

> The first method is to demonstrate that the defendant continued his investigation of the plaintiff even though he knew or should have known that the plaintiff was innocent. The second method is to demonstrate that the defendant used "investigative techniques that were so coercive and abusive that [he] knew or should have known that those techniques would yield false information."

*Id.* (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (internal citations omitted).

Further, an officer's actions based on fabricated evidence violate the Fourth Amendment only if there is no probable cause without the fabrication. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978). Thus, where a plaintiff makes a substantial showing that an officer included fabricated evidence in an affidavit, the court should grant summary judgment for a Fourth Amendment claim if the facts nevertheless state probable cause with the fabrication omitted. *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995).

Flores contends his claim for fabrication of evidence survives summary judgment because there are "numerous inaccuracies in Galland's reports and testimony." (Doc. 43-1 at 33) Specifically, Flores asserts:

> The Ninth Circuit has found evidence of intentional fabrication sufficient to survive summary judgment where "witnesses pointed out that the [investigation] report contained evidence or statements they never made." *Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1114 (9th Cir. 2018). Here, Dr. Hyden indicated that what Sergeant Galland wrote in the police report about what Dr. Hyden told him is not accurate. Hyden Dep., 45:11-13 ("Q. Is that accurate, what is in the police report there? A. No."). Here, Galland reported Naven's equivocal statements as unequivocal, recorded a two hour time frame that may have actually been six, told Plaintiff that there was only one way the injury could have happened, lied about Plaintiff's conduct during the interview, fed false information to Dr. Hyden, invented the 10-minute time frame and used it to exclude all other suspects, recommended a charge carrying life in prison without any facts indicating that Plaintiff intentionally hurt his son, and then lied at the preliminary hearing about the head being unsupported while it was violently snapping back and forth.

(*Id.* at 43-1 at 33-34)  The Court addresses each piece of evidence identified by Plaintiff in turn.

### a.  The 10-minute window for respiratory distress

Flores argues that "a figure of ten minutes [was] invented out of whole cloth" by Galland, "and used to exclude all other suspects." (Doc. 43-1 at 41)  In the probable cause statement submitted by Galland on the Arietis form, Galland indicated: "Medical experts determined the child had suffered the most recent brain injuries as little as 10 minutes prior to the onset of the respiratory distress that prompted the call to 911." (UMF 21; Doc. 32-24 at 2)

Flores contends this evidence was fabricated, pointing to the deposition testimony of Dr. Hyden that the statement was not accurate.  (Doc. 43-1 at 33, quoting  Hyden Dep., 45:11-13) Significantly, however, Flores ignores the remainder of the testimony from Dr. Hyden, who explained the statement was incorrect because he "did not use exact numbers." (Doc. 38-7 at 20, Hyden Depo. 43:19-23)  Dr. Hyden testified, "I would have said *possibly immediately*, but I wouldn't have said a time, 10 minutes." (Id. at 22, Hyden Depo. 45:11-16) (emphasis added)  When Plaintiff's counsel questioned "why [Dr. Hyden] did not tell Sgt. Galland 10 minutes," Dr. Hyden stated:

> I would never say 10 minutes, because that's 600 seconds and I don't know if it's 600 seconds.  I just know that it's almost immediate.  I don't have a stopwatch.  I can't predict exactly the time.  But I know it doesn't take a long period of time after a severe event like this to cause a child to become unresponsive. *It would be almost immediate is what I more than likely told him*. I just don't recall.

(Doc. 32-29 at 25-26, Hyden Depo. 78:21- 79:3) (emphasis added).  When asked with the forces that caused the injury were applied to the child, Hyden continued, "Almost immediately prior to the child's sudden decompensation. I say that because I can't give you an exact time; very proximal to the time. In other words, kids don't have an injury, hang out for a little bit, and then keel over and decompensate. It's usually very, very close to the time it happened." (Doc. 32-29 at 21-22) The Court is unable to find the 10-minute timeframe identified by Galland is inconsistent with Dr. Hyden's testimony that respiratory distress "would be almost immediate," let alone a *fabrication* of evidence by Galland.

Importantly, this is the only piece of evidence challenged by Flores that was presented in the probable cause declaration dated May 29, 2015.  Thus, Flores' claim fails to the extent it is based upon fabrication of evidence in the statement of probable cause.

///

<u>b.      The two-hour time frame from Dr. Naven</u>

In the police report, Galland stated: "I asked Dr. Naven how recent the acute brain injuries had been caused and he stated he believed the injuries were no more than 2 hours old."  (Doc. 32-12 at 14)  Flores maintains that "[t]he deposition testimony of Dr. Naven, who was deposed twice in this action, casts doubt on whether he said any such thing to Galland."  (Doc. 43-1 at 9)  Flores asserts:

> While Dr. Naven stated that he could not recall specifically what he told Galland, the time frame that Dr. Naven generally assigned to acute blood in the head is within six hours. *See* Naven Dep., 9:1-11:15. Dr. Naven testified: "I think of usually within about six hours when I get that sort of read." Naven Dep., 11:16-12:3.

(*Id.* at 9; *see also* Doc. 43-4 at 6-9, Naven Depo. 9:1-12:3)  Thus, Flores maintains Galland fabricated evidence in the report when he "recorded a two hour time frame that may have actually been six." (Doc. 43-1 at 34)

Notably, Dr. Naven also testified during the trial that he could not recall specifically the information provided to Galland—or even the identity of the officer to whom he spoke— regarding the timeline for the acute subdural hematoma.  (Doc. 32-38 at 11, Trial Transcr. 53:13-20)  However, when asked to explain what "acute" meant related to a diagnosis in M.F.'s case, Dr. Naven responded: "Usually when a radiologist remarks there is acute blood in the head, it's blood that's only been there *for a couple hours*, at most."  (*Id.* at 9, Trial Transc. 48:7-11, emphasis added)  Although Dr. Naven was unable to recall whether he told Galland "the timeline could be as recent as two hours," Dr. Naven said "it definitely could have."  (*Id.* at 11, Trial Transcr. 53:13-20)  Consequently, Galland's report was consistent with the timeframe identified by Dr. Naven, and Plaintiff fails to identify conclusive evidence that Galland fabricated the two-hour time frame.

Regardless, the police report was not submitted as an exhibit during the preliminary hearing. (*See* Doc. 39-8 at 6)  In addition, Galland did not mention this two-hour window for an acute brain injury during his testimony at the preliminary hearing.  (*See generally* Doc. 38-9 at 14-43) Thus, the statement was not factored in the probable cause determinations.  Because neither Judges McNamara nor Bush considered the identified statement, Plaintiff is unable to demonstrate it "caused … [him a] deprivation of liberty." *See Caldwell*, 889 F.3d at 1115 (citation omitted).

///

c.    Plaintiff's conduct during the interview

Flores asserts, "Galland testifie[d] incorrectly at the preliminary hearing" related to how Flores

handled the doll during the May 21 interview.  (Doc. 43-1 at 19, emphasis omitted)  Plaintiff observes:

> At the preliminary hearing, Galland testified: "He admitted to at one point to shaking the child. He stated that he started off rocking the child. That didn't work. And he demonstrated using a stuffed animal and demonstrated him shaking the child." Preliminary Hearing Transcr., at 20:6-10.
> Galland further testified: "He was holding the child, as I recall, facing him. He said that he started rocking him, that wasn't working. He got frustrated and he started shaking. While he was doing that, the stuffed animal that he was holding, the head was snapping violently back and forth." Preliminary Hearing Transcr., at 29:22-28. At the preliminary hearing, Galland testified that the head was unsupported while the shaking was going on. Preliminary Hearing Transcr., at 30:1- 3.

(Doc. 43-1 at 19)  Flores contends Galland has changed his testimony regarding Plaintiff's conduct

"multiple times," because during the trial, "Galland admitted that his prior testimony about the head

being unsupported during the alleged shaking was incorrect." (*Id.*)  Specifically, Flores notes Galland

testified as follows:

> Q.  And when you testified the other day at trial here you testified that that was not true, correct? The part about his head being unsupported.
> A.  The part about his head being unsupported, I stated that I did not remember that correctly because I hadn't watched the video prior.
>
> Q.  So the testimony you gave at the preliminary hearing was untrue?
> A.  It was incorrect.

(Doc. 43-1 at 19) Plaintiff notes Galland further testified at his deposition that "the head was in fact

unsupported while the shaking was going on," and asserted that during the criminal trial, he stated his

testimony that the head was unsupported related to a specific portion of the video shown at that time.

(*Id.* at 20)

At this juncture, the question before the Court is whether Galland fabricated the evidence

related to Plaintiff's treatment of the doll, and whether it lead to the findings of probable cause and a

deprivation of Flores' liberty.  Because Galland did not mention Flores' handling of the doll in the

Arietis statement dated May 29, 2015, it did not impact this finding of probable cause.  However, his

testimony related to the handling of the doll was given at the preliminary hearing and was considered

by the court in the probable cause determination.

Defendants argue, "There is no evidence that Detective Galland deliberately reported

something he knew to be untrue, or deliberately mischaracterized a witness statement." (Doc. 44 at 19) According to Defendants, "even if this Court were to view the video and disagree with whether or not Mr. Flores had supported the doll's head or the subjective level of shaking, this does not amount to deliberate fabrication on the part of Detective Galland." (*Id.*, citing e.*g., Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) [mere carelessness is insufficient]; *Merritt v. Arizona*, 2019 U.S. Dist. LEXIS 198924, at *48 (D. Az. Nov. 15, 2019) [negligence or carelessness is not sufficient to show fabrication]; *Devereaux v. Abbey*, 263 F.3d 1070, 1077 (9th Cir. 2001) [evidence of negligent inaccuracy on the part of investigators alone is insufficient to prove a fabrication of evidence claim]) .

The Court agrees Flores fails to identify evidence supporting a conclusion that Galland's testimony regarding whether or not the doll's head was unsupported is tantamount to fabricated evidence. As the Third Circuit explained:

> [T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong. Therefore, for example, a witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith.

*Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014). Flores fails to identify evidence that a reasonable jury could conclude Galland's statements regarding the treatment of the doll were deliberately fabricated. For example, Flores fails to carry the burden to show the fabrication was "deliberate" by showing Galland "continued his investigation … even though he knew or should have known that the plaintiff was innocent" by the time of the preliminary hearing, or engaged in "coercive and abusive" investigative methods that "would yield false information." *See Bradford*, 803 F.3d at 386 explaining how a plaintiff may demonstrate that the fabrication was "deliberate"); *see also Devereaux*, 263 F.3d at 1076. Accordingly, Galland's statements regarding Flores' treatment of the doll during the interview do not support a claim for fabrication of evidence.

### d. Statements to Dr. Hyden

According to Flores, "Galland [fed] Dr. Hyden incorrect information," thereby tainting the medical evidence in the action. (Doc. 43-1 at 15, emphasis omitted) Flores asserts: "On May 22, the day after the interrogation of Mr. Flores, Galland told Dr. Hyden that the father re-enacted the event with a doll, and the observation was that the father was very rough with the doll and the rocking was

actually shaking, with the head and neck obviously affected by the violent movements." (*Id.*)

Plaintiff again maintains, "This information is contradicted by the video." (*Id.*)

In response, Defendants contend "Galland did not falsify anything about what occurred during the interrogation." (Doc. 44 at 11, emphasis omitted)  In addition, Defendants observe that Dr. Hyden testified that "[a]ny history provided to him, whether it be from law enforcement, the parent, social worker, etc., would not change his opinion that the child sustained severe accelerative/decelerative rotational accelerational forces upon the head and neck to cause the subdural hematomas, the retinal hemorrhages the global encelphalopathy, the possible cortical atrophy and other injuries from a prior experience." (*Id.*, emphasis omitted)  Indeed, Dr. Hyden testified that whether the information received — including that Flores acted "very rough with the doll and the rocking was actually shaking with the head and neck being obviously affected by the violent movements"— "would not change [his] opinion, because even though … histories are important, [he] can't assume they're true or false." (Doc. 32-12 at 21, Depo. 68:2-4) Further, Dr. Hyden testified that the discussion with Galland played no role in his medical conclusion that M.F. was the victim of non-accidental, abusive head trauma. (Id. at 41, Depo. 110:13-18)

Notably, Flores was already in custody when Dr. Hyden informed Galland of his conclusion on June 1, 2015 that M.F.'s "injuries, revealed in the tests conducted by Valley Children's Hospital and Bakersfield Memorial Hospital, were the result of child abuse." (*See* Doc. 32-12 at 35)  Thus, only testing results and diagnoses were included in the probable cause declaration, not the medical opinion of Dr. Hyden that M.F. suffered from a non-accidental injury or child abuse.  (*See* UMF 21)  On the other hand, Galland testified as to the findings of Dr. Hyden at the preliminary hearing, and the findings were considered by the state court in determination of probable cause on October 21, 2015 (*See* DSF 67; *see also* Doc. 38-9 at 26-27)

However, this Court cannot speculate, as Plaintiff would have it, that contrary to Dr. Hyden's testimony, the information provided by Galland played a role in his diagnoses of M.F. or opinions related thereto.  According to Dr. Hyden, *whether* the history provided by Galland was true, the statements did not affect his opinions or diagnoses, which Galland summarized at the preliminary hearing.  Consequently, Plaintiff fails to carry his burden to show Galland tainted the medical evidence

and caused a deprivation of liberty based on statements made to Dr. Hyden.

### e. Conclusion

Flores fails to meet his burden of identifying evidence that was fabricated by Galland in his statement of probable cause submitted on May 29 or his preliminary hearing testimony on October 21, 2015. Further, to the extent Galland made an incorrect statement during his testimony, Flores fails to show this was a *deliberate* fabrication, which caused his deprivation of liberty. Consequently, Flores fails to establish essential elements of his claim that Galland caused a violation of his civil rights with the fabrication of evidence, and Defendants' motion for summary adjudication of the First Claim for Relief, to the extent it is based on these grounds, is **GRANTED**.

### 4. Malicious Prosecution

A malicious prosecution claim brought under Section 1983 incorporates state law. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561-62 (9th Cir. 1987). Under California malicious prosecution law, a plaintiff must prove that the underlying prosecution: "(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice." *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) (citing *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 871, 254 Cal. Rptr. 336, 765 P.2d 498 (1989)); *see also Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (2015) ("The absence of probable cause is a necessary element of § 1983 false arrest and malicious prosecution claims.") (citations omitted).

Notably, claims for malicious prosecution under Section 1983 cannot be based on a violation of "substantive due process." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004). Instead, to establish a malicious prosecution claim, Flores must prove that the defendants acted for the purpose of depriving him of a "specific constitutional right." *Id.* That right can be found, for example, in the Fourth Amendment. Malicious prosecution claims arising under the Fourth Amendment may be asserted against "government investigators" when the investigators "submit false and material information in a warrant affidavit." *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002). Thus, a "plaintiff must show that the investigator 'made deliberately false statements or recklessly disregarded the truth in the affidavit' *and* that the falsifications were 'material' to the

finding of probable cause." *Id.* (quoting *Hervey*, 65 F.3d at 670) (emphasis added).

As set forth above, Flores fails to demonstrate Galland made deliberately false statements or recklessly disregarded the truth in the probable cause statement and his preliminary hearing testimony. Moreover, Flores fails to show that the purported false statements were material to the findings of probable cause. As noted above, pieces of evidence—such as the two-hour time frame, Plaintiff's conduct during the interview and Galland's statements to the physicians—were not encompassed in the probable cause declaration submitted on May 25. Further, the Court is unable to find the remaining purported inconsistencies were material to the state court's finding of probable cause, particularly where the court was informed that Flores was the only individual alone with M.F. on the date of the incident and the doctors believed the injuries were non-accidental.

Given Plaintiff's failure to establish any falsified evidence that was material to the findings of probable cause—and thus satisfy elements identified by the Ninth Circuit to support a claim for malicious prosecution under Section 1983—summary adjudication of the First Claim for the Relief, on these grounds, is **GRANTED**.

### 5. The Fourth Amendment and Probable Cause

The Fourth Amendment prohibits arrests without probable cause or other justification, by providing: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." *U.S. Constitution, amend. IV*. Flores contends his "Fourth Amendment rights were violated by his arrest and detention without probable cause." (Doc. 43-1 at 21, emphasis omitted)

Probable cause "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)); *see also Conner v. Heiman*, 672 F.3d 1126, 1132 (9th Cir. 2012) (probable cause to arrest exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime"). A plaintiff may succeed on a claim

38

for a seizure in violation of the Fourth Amendment where the arrest is made without probable cause. *Id.*

a. Prior probable cause determinations and collateral estoppel

Defendants argue Flores is unable to proceed on a claim under the Fourth Amendment for arrest and detention without probable cause because "[t]he issue of probable cause to arrest has already been decided – twice." (Doc. 32-1 at 35, emphasis omitted)  Defendants observe: "First, Judge McNamara determined that there was probable cause to arrest Mr. Flores on May 30, 2015 at 12:02 a.m. based on the information set forth in the Kern County – Arietis form submitted by Detective Galland."  (*Id.*, citing DSF 21)  In addition, Defendants observe "the existence of probable cause to prosecute was also confirmed at the Preliminary Hearing."  (*Id.*)

Defendants observe, "Judicial determinations of probable cause to arrest that are made within 48 hours of arrest are presumptively reasonable, i.e., they do not violate the Fourth Amendment." (Doc. 32-1 at 36, citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991)) Because Judge McNamara determined there was probable cause based on the Kern County Arietis form submitted by Galland within 48 hours of Flores' arrest, Defendants contend "the post arrest confirmation by Magistrate McNamara who approved the Probable Cause declaration is outcome determinative and should serve as collateral estoppel to the Plaintiff's claims in this lawsuit."  (*Id.* at 37)

In addition, Defendants contend that "probable cause was determined as a matter of law at the preliminary hearing."  (Doc. 32-1 at 37, emphasis omitted)  According to Defendants, "Because the issue of whether there was probable cause for Plaintiff's arrest has already been decided, the Plaintiff is precluded from re-litigating the issue vis-a-vis the instant federal civil rights action."  (*Id.*) Defendants maintain that the doctrine of collateral estoppel bars Flores' claim because "[a] probable cause determination is a 'final, conclusive determination of the issue' of probable cause."  (*Id.* at 38, citing *Haupt v. Dillard*, 17 F.3d 285, 288-289 (9th Cir. 1994))

Flores argues collateral estoppel does not apply to his claim because "there are substantial indications that the evidence that was presented at the time of the preliminary hearing was inaccurate." (Doc. 43-1 at 22-23)  Flores again argues that Galland fabricated evidence, his statements during the interrogation do not support the state's determination of probable cause, and the medical evidence was "tainted by Defendant Galland's manipulation of the flow of information."  (*See id.* at 23-30)

<u>b.      Collateral estoppel and Section 1983</u>

The doctrine of collateral estoppel protects a party from re-litigating identical issues. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). Collateral estoppel applies to claims under Section 1983, because there is "no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court." *Allen v. McCurry*, 449 U.S. 90, 104 (1980).

The preclusive effect of a state court judgment is determined by that state's rules of preclusion. *In Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  Because the parties address the judgment of a state court in California, the Court must apply California's rules related to collateral estoppel.  *See id.*

Notably, the Ninth Circuit and the California Court of Appeals have both affirmed trial courts' decisions to preclude Section 1983 claimants from re-litigating probable cause determinations made in the preliminary hearing of a related criminal matter. For example, in *Haupt v. Dillard*—which was cited by Defendants—the Ninth Circuit affirmed the granting of summary judgment to the defendants in a Section 1983 action based on its conclusion "that probable cause to arrest [the plaintiff] had been conclusively determined during his state criminal prosecution." *Haupt,* 17 F.3d 285, 288 (9th Cir. 1994). The plaintiff objected that probable cause for his arrest was a distinct determination from the court's probable cause determination at a preliminary hearing, which the Ninth Circuit acknowledged potentially had merit.  However, the court explained: "[T]he issues are different only in the sense that probable cause for his arrest involves reference to the evidence that was or should have been presented to the magistrate, while probable cause to bind [him] over involves reference to the evidence available to the court at the preliminary hearing." *Id.* at 289.  However, the Court found the plaintiff identified "no evidence adduced at his preliminary hearing that was not available to the defendant officers when they obtained his arrest warrant." *Id.*

California's Fourth District Appellate Court followed *Haupt* in *McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138 (1999), in determining whether the plaintiff's civil suit was collaterally estopped by a finding of probable cause in his criminal prosecution.  Because the court found *Haupt* was "well reasoned and supported by California law," the court decided to "follow the Ninth Circuit" and hold

that "a prior judicial determination at a preliminary hearing that there was sufficient evidence to hold the plaintiff over for trial may, in some situations, preclude the plaintiff from relitigating the issue of probable cause to arrest in a subsequent civil suit." *McCutchen*, 73 Cal App. 4th at 1145, 1147. Like the Ninth Circuit in *Haupt*, the McCutchen court recognized the possibility that "a ruling on sufficiency of the evidence at a preliminary hearing" may not "meet the identity of the issues requirement." *Id*. at 1146. The Fourth District followed the Ninth Circuit in requiring "a showing that evidence not available to the arresting officer was presented at the preliminary hearing" in order to defeat collateral estoppel. *Id.* Because the plaintiff demonstrated "the evidence presented at the preliminary hearing was not the same as the evidence available" at the time of his arrest, the court found collateral estoppel did not bar re-litigation of the issues of probable cause. *Id.* at 1147-48.

In contrast, here, Flores does not identify any new evidence available *at the time of the preliminary hearing* that undermines the finding of probable cause. Moreover, the Court has evaluated Plaintiff's claims that Galland used unlawful interview techniques and fabricated evidence presented in his statement of probable cause and the preliminary hearing, and found Flores failed to support these claims.

### c. Collateral estoppel applies to Plaintiff's claims

Under California law, the party asserting that collateral estoppel must establish the following five elements:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Lucido v. Superior Court*, 51 Cal.3d 335, 341 (1990). Notably, the Ninth Circuit observed: "As a general rule, each of these requirements will be met when courts are asked to give preclusive effect to preliminary hearing probable cause findings in subsequent civil actions for false arrest and malicious prosecution." *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013) (citing *McCutchen*, 73 Cal App. 4th 1138).

///

###### i. *Identity of issues*

"The application of the doctrine of collateral estoppel depends on whether the issue in both actions is the same, not whether the issue arises in the same *context*." *First N.B.S. Corp. v. Gabrielsen*, 179 Cal.App.3d 1189, 1195-1196 (1986) (italics in original).  With a claim addressing probable cause, the Ninth Circuit indicated "the identity-of-issues requirement will be satisfied because in most cases the issue resolved at the preliminary hearing is identical to the issue that must be resolved in a false arrest or malicious prosecution action—namely, whether the evidence supports a finding of probable cause." *Wige*, 713 at 1186.  Indeed, the issue of whether there was probable cause for prosecute Flores in the criminal action is identical to the issue raised by Flores' assertion that the state lacked probable cause for his arrest and prosecution.[9]  Thus, this requirement is satisfied.

###### ii. *Actually litigated and necessarily decided*

As Defendants argue, the purpose of the preliminary hearing was to determine whether there was probable cause, "Mr. Flores' counsel had every opportunity to cross examine Detective Galland, regarding any perceived inaccuracies." (Doc. 32-1 at 48)  Following the presentation of evidence, the court "determined that there was probable cause to believe that Mr. Flores committed the offenses alleged in the felony complaint and Mr. Flores was held to answer for that complaint."  (*Id.*; *see also* Doc. 38-9 at 44)

The Ninth Circuit determined a probable cause determination is necessary to judgment, even where the plaintiff was acquitted in the criminal trial, because "the sole purpose of the preliminary hearing was to determine whether [plaintiff] should have been bound over for trial. But for the probable cause determination, there would have been no trial and no judgment of acquittal." *Haupt*, 17 F.3d 285. In it is undisputed that the probable cause issue was actually and necessarily litigated at the preliminary hearing in Flores' criminal proceeding.  Thus, these requirements are satisfied.

///

---

[9] The Court observes also that the juvenile court made findings determining that Flores posed a danger to the child and caused the child significant injuries.  Mr. Flores was entitled to appeal these findings and, in fact, did appeal the termination of her parental rights.  However, because the defense does not argue that this determination bears on the conclusiveness of the probable cause claim raised in this litigation, the Court does not analyze the preclusive effect caused by the juvenile court judgment.

*iv.    Final decision on the merits*

To be a final determination for collateral estoppel purposes, a decision need not be a final judgment, but it must be "sufficiently firm to be accorded conclusive effect." *Luben Industries, Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983).  In *McCutchen,* the California Court of Appeal explained: "A finding of probable cause to hold the defendant over for trial is a final judgment on the merits for the purposes of collateral estoppel under the California law because the accused can (1) immediately appeal the determination by filing a motion to set aside the preliminary hearing (Pen. Code, § 995) and (2) obtain review of the decision on the motion to set aside the preliminary hearing by filing a writ of prohibition (Pen. Code, § 999a)." *McCutchen,* 73 Cal.App.4th at 1145-1146.  In addition, the court observed that "the issue of probable cause cannot be litigated further because it cannot be used as a defense at trial."  *Id.*  Because it is undisputed that the state court made a determination that there was probable cause to support the charges against Flores, it made a final judgment on the merits.  Consequently, this factor is satisfied.

*v.    Same party*

Finally, it is undisputed that the individual against whom collateral estoppel is asserted— Jesus Flores— was the defendant in the criminal action.  Thus, this factor is also satisfied.

*vi.    Conclusion*

As Defendants assert, each of the factors identified under California law are satisfied, and Flores is collaterally estopped from bringing claims premised on a lack of probable cause in this matter.  Accordingly, summary adjudication of Plaintiff's First Claim for Relief is **GRANTED**.

**B:    Second Claim for Relief:  Interference with the Familial Relationship**

"[T]he freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights."  *Board of Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544 (1987).  The Ninth Circuit has determined "a parent has a constitutionally protected liberty interest in the companionship and society of his or her child." *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1992); *see also Venerable v. City of Sacramento,* 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002).  The constitutional interest in a familial relationship "extends to protect children from unwanted state inference with their relationship with their parents."

43

*Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir.2001). Further, "parents have a constitutionally protected liberty interest in making decisions about the care, custody, and control of their children." *Miller v. California*, 355 F.3d 1172, 1175 (9th Cir. 2004) (emphasis omitted).

Notably, the constitutional rights of the parents to make decisions regarding their children "are not absolute." *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012). "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child... and on occasion, this accommodation may occur without a pre-deprivation hearing." *Id.*; *see also Woodrum v. Woodward County*, 866 F.2d 1121, 1125 (9th Cir. 1989) ("The interest of the parents must be balanced against the interests of the state and, when conflicting, against the interests of the children").   For example, the "constitutional rights of parents step aside... 'when the children are subject to immediate or apparent danger or harm.'" *Mueller*, 700 F.3d at 1187 (quoting *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir. 1991); *see also Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001) (the Fourteenth Amendment "guarantees that parents will not be separated from their children without due process of law except in emergencies").

### 1.    Standard of culpability

For a parent to state a claim for violation of the familial relationship, a parent must demonstrate the state's action was so egregious that it shocks the conscious. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  To determine whether Galland's conduct "shocks the conscience," the Court must first decide which "standard of culpability" applies: (1) deliberate indifference to the harm caused or (2) a "purpose to harm" the individual "for reasons unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008).  Defendants assert the "purpose to harm" standard applies (Doc. 32-1 at 55). Flores contends the "deliberate indifference" standard governs.  (Doc. 43-1 at 38)

This Court previously explained, "The appropriate standard of culpability... depends upon the type of situation that defendant finds himself in at the time of the challenged action." *Duenez v. City of Manteca*, 2013 WL 6816375 (E.D. Cal. Dec. 23, 2013).  If the officer was in a situation "[w]here actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the

44

conscience. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). On the other hand, the "purpose to harm" standard applies "when an officer encounters fast paced circumstances presenting competing public safety obligations." *Porter*, 546 F.3d at 1139. Likewise, Ninth Circuit determined the "purpose to harm" standard applies when an officer must make "a snap judgment because of an escalating situation." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013).

The Court's review of the first amended complaint reveals that Flores fails to clearly identify the action or actions of Galland, which form the basis for this claim. Instead, Flores merely alleges that "[t]he acts of Defendant Galland … deprived Plaintiff of his particular rights under the United States Constitution" and "[t]he conduct of Defendant Galland[]… as described above, shocks the conscience." (Doc. 17 at 14, ¶¶ 69, 70) Nevertheless, opposing summary judgment, Plaintiff asserts that the investigative holds placed by Galland on May 21, 2015 and June 25, 2015—which prevented M.F. from being seen by his parents—constituted "a total eclipse of [Plaintiff's] constitutionally-protected interest in seeing his son." (Doc. 38 at 39-40) In addition, Flores contends "Galland executed a transfer of custody document" at an unidentified time. (*Id.*) Flores also argues that "Galland lacked probable cause to believe that Plaintiff had harmed his son," and "there was no good reason at all to believe that Plaintiff was going to harm his child if he was allowed into the room while the child was being treated at the hospital." (*Id.*) Thus, it appears Flores bases his claim for interference with the familial relationship on the hospital holds Galland placed upon M.F. Because "actual deliberation [was] practical" for the decision to place the hospital holds, and Galland was not required to make "a snap judgment." Accordingly, the "deliberate indifference" standard applies to the claim.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997); *Kennedy v. City of Ridgefield*, 411 F.3d 1134, 1143 (9th Cir. 2005). Thus, under the deliberate indifference standard, an individual "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### 2. Placement of the hold

Importantly, a state actor may intrude on a parent's custody of a child "without prior judicial

45

authorization" when "the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). The Court uses an objective standard to determine evaluate whether an official with reasonable cause to believe such circumstances exist. See *Wallis*, 202 F.3d at 1139 n.9.

When Galland arrived at Memorial Hospital, he learned that M.F. had been placed on a ventilator and was "in a medically induced coma to stabilize him." (DSF 1) Galland spoke with Dr. Naven, who later testified that when he "first saw the patient," there was "enough worry to call CPS to call the officers." (Doc. 43-4 at 27, Naven Depo. 67:18-23) Dr. Naven informed Galland that "he did not believe the bruising on M.F.'s cheeks was caused by CPR." (UMF 5) Galland noted in the report that Dr. Naven advised him "M.F. had injuries to his brain," and "Dr. Naven was very worried that M.F. was the victim of child abuse." (DSF 3) Galland also indicated that he "asked Dr. Naven how recent the acute brain injuries had been caused and Dr. Naven stated he believed the injuries were no more than two hours old." (DSF 7) Galland interviewed M.F.'s mother at the hospital and learned M.F. had been left alone with Flores. (DSF 11) The same date, Galland placed the hospital hold that prevented Flores from having contact with the child.

With the information Galland received at the hospital, it is indisputable that Galland had reasonable cause to believe M.F. was in imminent danger and the victim of child abuse. The Court is unable to find the placement of a hospital hold on M.F. "shocks the conscience" and exhibited deliberate indifference to the rights of Flores. Rather, the hold was necessary to prevent any of the possible perpetrators from further injuring the child or removing him from the hospital.

### 3. Termination of parental rights

To the extent the basis of this claim against Galland is the termination of Flores' parental rights, the undisputed evidence before the Court fails to support a conclusion that Galland may be held liable for this action. Flores suggests "the information provided by Galland played a role in the initiation of proceedings to deprive Plaintiff of his parental rights." (Doc. 43-1 at 40) Flores presents no evidence to support this conclusion.

Social Services began investigating M.F.'s welfare on May 22, 2015, and Galland was not

involved with the investigation petition for termination of rights. (DSF 103; Doc. 32-7 at 2, Holt Decl. ¶ 4) Bonnie Holt, a social worker with the Department of Human Services, reports, "Once the child was taken to the hospital… and there were concerns that the child's injuries were the result of abuse, [DHS] was responsible for conducting an investigation, separate and apart from any investigation conducted by the police, to determine what would be in the best interest of the child." (*Id.* at 2, ¶ 4) According to Ms. Holt, between May 22 and June 25, 2015, she "was in constant contact with several medical social workers from Valley Children's Hospital regarding M.F.'s status." (Doc. 32-7 at 2, Holt Decl. ¶ 6) She reports that she was "requesting and being provided with M.F.'s medical records so that [she] could evaluate M.F.'s condition and his doctors' impressions and diagnoses." (*Id.*) In addition, Ms. Holt reports that during the course of her investigation, she took the following actions:

> I personally interviewed numerous individuals including M.F.'s mother, Jesus Flores, M.F.'s maternal grandmother, and M.F.'s maternal aunt. I also personally watched the videos of the interviews that had been conducted by the Bakersfield Police Department including videos of M.F.'s mother, Jesus Flores, M.F.'s maternal grandmother, M.F.'s material step grandfather[,] M.F.'s maternal aunt, and cousin. I submitted regular reports to the Juvenile Justice Center which outlined the history of the case and the findings and impressions made by the social workers involved in M.F.'s case.

(*Id.*, ¶ 7) Ms. Holt maintains that contact with Galland "was mostly procedural," to obtain the videos and photographs, and to learn if M.F.'s mother was a person of interest. (*Id.*, ¶ 6)

The Kern County Department of Health Services filed a petition based upon its investigation, alleging in part: "M.F. was at risk of suffering serious physical harm inflicted non- accidentally by a parent or as a result of a parent's failure to adequately protect him and M.F." (Doc. 37-7 at 2, Holt Decl. ¶ 8; *see also* DSF 13) Ultimately, "[b]ased on the totality of the Kern County Department of Human Services Investigation, it was recommended that the parental rights of M.F.'s mother and Jesus Flores be terminated." (*Id.*, ¶ 10) On May 12, 2016, DHS "recommended total denial of reunification services for both parents." (Doc. 37-7 at 3, Holt Decl. ¶ 12) The juvenile court sustained the petition "ordered [M.F.] removed from the physical custody of the parents on the sustained petition." (*Id.*, Holt Decl. ¶ 12(b)). Flores fails to present any evidence that Galland was involved with these decisions or that these decisions were based upon anything other than the investigation described by Ms. Holt.

### 4. Conclusion

Because Flores fails to identify evidence supporting a conclusion that Galland was involved

with the filing of the petition for termination of rights, he fails to establish an essential element of his claim on these grounds. In addition, Flores fails to demonstrate Galland acted in a manner that shocks the conscience in violation of Flores's constitutional rights because Galland had reasonable cause to believe that M.F. was in danger when the hospital hold was placed. Accordingly, Defendants' motion for summary adjudication of the Second Claim for Relief related to interference with the familial relationship against Galland is **GRANTED**.

### C. Fourth Claim for Relief: False Arrest/Imprisonment

False imprisonment is defined under California law as "the unlawful violation of the personal liberty of another."Cal. Pen. Code. § 236. The tort is defined similarly and consists of the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Molko v. Holy Spirit Assoc.,* 46 Cal.3d 1092, 1123 (1988). Under California law,

> A peace officer may arrest a person in obedience to a warrant, or, pursuant to the authority granted to him or her by Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, without a warrant, may arrest a person whenever any of the following circumstances occur:
> (1) The officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence.
> (2) The person arrested has committed a felony, although not in the officer's presence.
> (3) The officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed.

Cal. Pen. Code § 836. In addition, a law enforcement officer is protected from liability for false arrest where the officer, acting within the scope of his or her authority, either (1) effects a lawful arrest or (2) has reasonable cause to believe the arrest is lawful. *Galvin v. Hay*, 374 F.3d 739 (9th Cir. 2004). Where an officer had probable cause for an arrest, a plaintiff's "false arrest claim fails as a matter of law." (*Bulfer v. Dobbins*, 2011 U.S. Dist. LEXIS 11358 citing Cal. Pen. Code §§ 836.5(b), 847(b)); *see also People v. Kraft*, 23 Cal.4th 978, 1038 (Cal. 2000) ("An arrest is valid if supported by probable cause"); *Moore v. City & County of S.F.*, 5 Cal.Ap.3d. 728, 735 (Cal. Ct. App. 1970) ("Imprisonment based upon a lawful arrest is not false, and is not actionable in tort.")

As set forth above, the state determined there was probable cause at the preliminary hearing,

48

Flores is collaterally estopped from re-litigation the issue of probable cause related to his arrest. Accordingly, Defendant's motion for summary adjudication of the Fourth Claim for Relief of false arrest/imprisonment under state law is **GRANTED**.

### D. Fifth Claim for Relief: Negligence

To prevail on a California common law claim of negligence against a police officer, Plaintiff must show that (1) the officer owed plaintiff a duty of care; (2) the officer breached the duty by failing "to use such skill, prudence, and diligence as other members of profession commonly possess and exercise," (3) there was a "proximate causal connection between the [officer's] negligent conduct and the resulting injury" to the plaintiff; and (4) the officer's negligence resulted in "actual loss or damage" to the plaintiff. *Harris v. Smith*, 157 Cal.App.3d 100, 104 (1984). Put another way, "to prevail on the negligence claim, Plaintiff[] must show that the Defendant officer[] acted unreasonably and that the unreasonable behavior harmed Plaintiff[]." *Robinson v. City of San Diego*, 954 F. Supp. 2d 1010 (S.D. Cal. 2013) (internal quotation marks and citation omitted).

In the first amended complaint, Plaintiff alleges officers "had a duty, at a minimum, to conform their conduct to that of reasonably careful and prudent police officers." (Doc. 17 at 17, ¶ 94) Plaintiff fails to identify any specific actions that he believed breached this duty. In opposing summary adjudication of the claim, Plaintiff asserts the "conduct that has been described above in relation to the federal civil rights claims would constitute negligence under California law." (Doc. 43-1 at 45)

Importantly, as discussed above, Plaintiff fails to present evidence or identify a material dispute of fact related to the actions of Galland during his investigation. Consequently, this claim also fails. *See Ramos v. Orange County Sheriff's Dep't,* 2014 WL 12575767 at *7 (C.D. Cal. July 25, 2014) (granting summary adjudication on a negligence claim where the plaintiff alleged, in part, the officer breached a duty to follow proper investigative procedures, but the court had previously determined there was probable cause for the arrest). Defendants' motion for summary adjudication of the Fifth Claim for Relief is **GRANTED**.

### E. Seventh claim for Relief: Infliction of Emotional Distress

Flores contends Galland and the City are liable under California law for the intentional infliction of emotional distress. (Doc. 17 at 19) Under California law, the elements of intentional

inflication of emotional distress are outrageous conduct by the defendant (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Cote v. Henderson*, 218 Cal. App. 3d 796, 805-806 (Cal. App. 2d Dist. 1990).

Previously, this court observed the requirement of "extreme and outrageous" conduct closely follows the "outrageous" standard for due process liability under the Fourteenth Amendment. *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 993 (E.D. Cal. 2010), a*ff'd*, 685 F.3d 867 (9th Cir. 2012) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 8471043).   Indeed, Flores asserts he is able to proceed on this claim based upon the same actions addressed by the Court related to the First Claim for Relief, arguing:

> On Plaintiff's facts, Galland essentially framed Plaintiff for a crime he did not commit, twisting and embellishing details in an effort to ensure that he was found guilty of a serious crime for which he faced up to life in prison. Plaintiff was innocent, and the consequences of this conduct for Plaintiff was devastating.

(Doc. 43-1 at 46)  However, as set forth above, Plaintiff fails to present evidence to support his claims that Galland deliberately fabricated the evidence against Flores or used coercive investigatory techniques that shock the conscience.  The fact that he was subjected to an investigation for criminal behavior, and ultimately acquitted, is not sufficient to support his claim.

Because Flores fails to present evidence that Galland engaged in outrageous conduct during the course of his investigation, his claim for intentional infliction of emotional distress likewise fails. Accordingly, Defendants' motion for summary adjudication of the Seventh Claim for Relief is **GRANTED**.

## V.        Conclusion and Order

As set forth above, Plaintiff fails to identify evidence that establishes essential elements of his claims.  In addition, the doctrine of collateral estoppel precludes Plaintiff from re-litigating the issue of probable cause related to his claims arising under federal and state law.  Because there are no genuine issues of material fact related to Plaintiff's claims, summary judgment is appropriate.   *Celotex*, 477 U.S. at 322.

50

Based upon the foregoing, the Court **ORDERS**: Defendants' motion for summary judgment (Doc. 32) is **GRANTED**.

IT IS SO ORDERED.

Dated:   **December 20, 2019**             **/s/ Jennifer L. Thurston**
                                      UNITED STATES MAGISTRATE JUDGE